1 William A. Markham, State Bar No. 132970
  Dorn Graham Bishop, State Bar No. 147994
2 LAW OFFICES OF WILLIAM MARKHAM
  550 West C Street, Suite 2040
3 San Diego, CA 92101

4 Tel:        (619) 221-4400
  Fax:        (619) 224-3974
5 E-mail:     wm@maldonadomarkham.com

6 Attorneys for Orchard Supply Hardware LLC.

7                    **UNITED STATES DISTRICT COURT**

8                   **NORTHERN DISTRICT OF CALIFORNIA**

9                       **SAN FRANCISCO DIVISION**

| | | |
|---|---|---|
| 10 ORCHARD SUPPLY HARDWARE LLC, | ) ) | Case No. |
| 11          Plaintiff, | ) ) | COMPLAINT FOR: |
| 12          Vs. | ) ) | 1.   UNLAWFUL GROUP BOYCOTT IN VIOLATION OF 15 U.S.C. § 1 (PER SE RULE); |
| 13 HOME DEPOT USA, INC.; MILWAUKEE ELECTRIC TOOL | ) ) ) | |
| 14 CORPORATION; and MAKITA USA, INC., | ) ) | 2.   UNLAWFUL GROUP BOYCOTT IN VIOLATION OF 15 U.S.C. § 1 (RULE OF REASON); |
| 15          Defendants. | ) ) | |
| 16 ―――――――――――――― | ) | 3.   UNLAWFUL GROUP BOYCOTT IN VIOLATION OF CALIFORNIA |
| 17 | | BUSINESS & PROFESSIONS CODE §§ 16720 AND 16726 (PER SE RULE) |
| 18 | | |
| 19 | | 4.   UNLAWFUL GROUP BOYCOTT IN VIOLATION OF CALIFORNIA |
| 20 | | BUSINESS & PROFESSIONS CODE §§ 16720 AND 16726 (RULE OF REASON) |
| 21 | | 5.   UNFAIR BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA |
| 22 | | BUSINESS & PROFESSIONS CODE §§ 17200 *et seq.* |
| 23 | | |
| 24 | | 6.   TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS |
| 25 | | 7.   TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC |
| 26 | | RELATIONS |
| 27 | | PRAYER FOR RELIEF |
| 28 | | DEMAND OF JURY TRIAL |

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.

# I. CONCISE STATEMENT OF THE CASE

1.      Plaintiff, Orchard Supply Hardware LLC ("Orchard"), is a wholly-owned subsidiary of Orchard Supply Hardware Stores Corporation, which is a publicly traded company.  Orchard owns and operates a chain of all-purpose general hardware stores throughout California.

2.      To remain a viable competitor in the below described lines of commerce, Orchard must carry professional power tools made by two of the Defendants in this case, Milwaukee Electric Tool Corporation ("Milwaukee") and Makita USA, Inc. ("Makita"), which are the predominant suppliers of professional power tools in North America.

3.      Orchard, however, can no longer purchase any power tools from either of these two necessary, predominant suppliers because its direct competitor, Defendant Home Depot USA, Inc. ("Home Depot"), has prevailed upon both of them to cease making any sales to it. Moreover, Milwaukee and Makita have instructed their respective distributors not to sell their products to Orchard, so that Orchard has no direct or other access to any products made by Milwaukee or Makita.  Until Home Depot used its purchasing power to induce or coerce Milwaukee and Makita to refuse to make any further sales to Orchard, both of them made substantial, ongoing sales to Orchard, and Orchard for its part was a historic, significant, and excellent customer of both suppliers.  Orchard depended upon the supply of their products in order to engage in the below-described lines of commerce, from which it will be progressively disqualified because of Defendants' concerted withholding of these products from it.

4.      Milwaukee and Makita both unexpectedly cut off all further supplies to Orchard at around the same time in June 2012, doing so very shortly after Home Depot had publicly announced in early June 2012 that it planned to lock up the supply of key hardware products in order to counter the competitive threat posed by Amazon and other online retailers.

5.      Defendants' concerted withholding of these supplies has undermined Orchard's ability to remain a viable provider of power tools in the below-pled lines of

commerce. Orchard further understands that Home Depot has prevailed on Milwaukee and Makita to withhold their necessary supplies from other major sellers of hardware products, including the approximately four-thousand member stores of the Ace Hardware wholesale cooperative as well as other sellers of hardware products.

6.      Makita and Milwaukee each produce every kind of power tool commonly sold in the United States. The principal kinds of power tools that each makes are as follows: 12v impact drivers, 18v impact drivers, 12v cordless tools and combo kits, 18v cordless tools and combo kits, impact drivers, grinders, hammer drills, direct and circular drive saws, jig saws, sanders, and reciprocating saws.

7.      Of the principal kinds of power tools sold in the United States each year, Makita and Milwaukee collectively make the following percentages of them:

| Kind of power tool | Milwaukee and Makita's combined market share of overall sales in the United States |
|---|---|
| 12v impact drivers | 50% |
| Reciprocating saws | 46% |
| 12v cordless tools and combo kits | 44% |
| 18v cordless tools and combo kits | 36% |
| direct and circular drive saws | 34% |
| 18v impact drivers | 34% |
| grinders | 31% |
| sanders | 22% (finished sanders); 17% (orbital sanders) |
| hammer drills | 15% |
| jig saws | 9% |

8.      Owing to Defendants' group boycott (their withholding of power tools made by Milwaukee and Makita), Orchard cannot remain a viable seller of any of the following kinds of power tools, each of which belongs in a separate product market for antitrust purposes (as is pled more fully below):

//

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.                                    -3-

(1)     12v impact drivers

(2)     18v impact drivers

(3)     reciprocating saws;

(4)     12v cordless tools and combo kits;

(5)     18v cordless tools and combo kits;

(6)     direct and circular drive saws;

(7)     grinders; or

(8)     sanders.

9.     For each of these kinds of power tools, Milwaukee and Makita jointly make a substantial percentage of all of the products sold each year in the United States, accounting for 50% of 12v impact drivers, 46% of reciprocating saws, 44% of all 12v cordless tools and combo kits, 36% of all 18v cordless tools and combo kits, 34% of direct and circular drive saws, 34% of 18v impact drivers, 31% of all grinders, 22% of all finished sanders and 17% of all orbital sanders.

10.     Many customers seek either to purchase their wares or at least compare their wares to those made by other suppliers before making a purchase.  If a seller of power tools lacks the above kinds of power tools from either Milwaukee or Makita, it cannot remain a viable competitor in the product markets for the sale of the above kinds of power tools (with limited exceptions that are not available to Orchard).

11.     Moreover, power tools as a category of related products constitute a "cluster" of products for purposes of antitrust market analysis:  Many purchasers choose to purchase their power tools and related accessories from the same seller and will decline to consider a seller does not carry any power tools made by Milwaukee and Makita.  See *Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1204-05 (9th Cir., 1997) ("[A] cluster approach [to market definition in antitrust cases] is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately.")

//

12. Above all, Defendants' concerted withholding of these supplies threatens to undermine Orchard's ability to remain a viable provider of power tools and the above-listed specific kinds of power tools to "professional customers" (tradesmen and other professional customers). These sales qualify for distinct treatment as an antitrust sub-market in accordance with the principles set forth in *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523-24 (1962). Milwaukee and Makita specifically make their power tools in order to sell them to "professional tradesmen," and most professional tradesmen purchase only power tools made by Milwaukee and Makita. Indeed, Milwaukee and Makita themselves refer to their products as "professional power tools" or "power tools for the professional." Their tools are priced differently, promoted differently, and regarded differently by professional customers and by the sellers of these products. There exists an independent demand curve among professional customers for power tools made by Milwaukee and Makita.

13. By their concerted withholding of these supplies, Defendants intend to ensure that Orchard cannot remain a viable provider in the above lines of commerce, and in consequence Orchard will lose profits that it otherwise would have earned by competing in these lines of commerce.

14. Many professional purchasers of power tools make recurring purchases of power tools and related accessories, and they typically make most or all of their purchases at the same hardware store or at least at a recognized chain of hardware stores at which they know in advance they can make their required or preferred purchases of power tools. Professional customers usually make "basket purchases" of power tools, related accessories and other hardware products from the same store or chain of stores. Because of Defendants' conduct, professional customers in particular will cease to make "basket purchases" from Orchard's hardware stores. Orchard will lose the profits that it otherwise would have made from these sales.

15. Because of Defendants' conduct, Orchard has already lost sales, profits, and goodwill in each of the above-lines of commerce.

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.                                    -5-

16.     Defendants' timing is not a matter of happenstance.  Orchard, which historically has been a successful operator of a chain of hardware stores in California, recently developed a new, successful format for its stores, and its newly formatted stores have been highly profitable.  Orchard plans to use its new format at all of the stores that it will operate, and it reasonably expects to generate substantial and increasing profits by operating its stores in accordance with its new system.  Home Depot, a direct competitor of Orchard, is openly concerned about the competitive threat posed by Orchard's new format, which has drawn customers and sales from its own stores.  In the meantime, it is also preoccupied with the competitive threat to its dominant position in its different product markets posed by Amazon's online model.

17.     To counter these threats to its market positions, Home Depot publicly announced in early June, 2012 that it planned to lock down the sales of core hardware products, particularly the power tools made by core suppliers of them.  Less than one week later, Makita gave notice that it would no longer sell any of its products to Orchard despite Orchard's excellent and long history as a substantial customer of Makita.  Around two weeks later, and still in June, 2012, Milwaukee for its part gave notice that it too would refuse to make sales of any of its products to Orchard, even though Orchard had enjoyed a long, uninterrupted, and prosperous relationship with Milwaukee.  All of this happened within the space of a few weeks in June, 2012.

18.     Orchard estimates that Defendants' group boycott has already caused it to lose sales on which it would otherwise have generated profits at the rate of $2 million per year from July, 2012 onward.  Orchard reasonably apprehends that its losses will increase significantly as the housing and construction markets in California continue to recover.

19.     By using this tactic, Home Depot has succeeded at undermining Orchard's ability to compete in the above lines of commerce merely to try to harm a direct competitor and in order to "fortify" its position in different product markets, but not for any reasonable or pro-competitive purpose, much less a compelling business necessity that can justify its acting in concert with the two predominant suppliers of professional power tools in order to

1    ensure that its direct competitor can no longer carry them.

2         20.    By so acting, Defendants have acted to deprive customers of a meaningful

3    consumer choice and the benefits of competition among hardware sellers for their business

4    on the basis of price, quality, service, and product offerings.  By these tactics, Defendants

5    have caused harm to competition in general in various product markets, with ensuing harm to

6    consumers in these markets.  Moreover, the anti-competitive character of Defendants'

7    harmful conduct has caused significant harm to Orchard.

8         21.    In this manner Home Depot and the two suppliers, Milwaukee and Makita,

9    have organized and enforced a group boycott that constitutes an unlawful restraint of trade

10   under Section 1 of the Sherman Act (15 U.S.C. § 1).  See *Northwest Wholesale Stationers,*

11   *Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 293-94, 105 S.C t. 2613, 2619

12   (U.S., 1985) (a group boycott constitutes a per se violation of Section 1 of the Sherman Act

13   when it entails "joint efforts by a firm or firms to disadvantage competitors by either directly

14   denying or persuading or coercing suppliers or customers to deny relationships the

15   competitors need in the competitive struggle.")

16        22.    In an abundance of caution, Orchard has pled the matter in the alternative,

17   alleging that Defendants' group boycott is illegal per se (the first cause of action) and/or

18   illegal under the "rule of reason" (the second cause of action).

19        23.    Orchard has further pled that the same conduct also constitutes violations of

20   California's Cartwright Act (California Business & Professions Code §§ 16720 and 16726),

21   as well as unfair business practices in violation of California's Unfair Competition Law

22   (California Business & Professions Code §§ 17200).

23        24.    Orchard lastly has alleged that the same conduct gives rise to common law

24   claims for tortious interference with its existing contracts, as well as tortious interference

25   with prospective economic relations:  Home Depot has tortiously interfered with Orchard's

26   contract with each supplier, and all three Defendants have foreseeably and tortiously

27   interfered with its existing and prospective contracts with present and prospective customers.

28   //

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.                                          -7-

25.     Orchard requests a jury trial at which it will seek treble damages for its ongoing and predicted losses.  It also requests injunctive relief, attorney's fees, pre-judgment interest, and punitive damages for the common-law torts.

## II.  THE PARTIES

26.     Orchard Supply Hardware LLC ("Orchard") is a limited liability company and wholly owned subsidiary of Orchard Supply Hardware Stores Corporation, which is organized under the laws of Delaware.  Orchard maintains its business headquarters in San Jose, California.

27.     Home Depot USA, Inc. ("Home Depot") is a corporation that is organized under the laws of Delaware.  Home Depot maintains its business headquarters in Atlanta, Georgia and operates stores throughout North America, including California.

28.     Milwaukee Electric Tool Corporation ("Milwaukee") is a corporation that is wholly owned by Techtronic Industries Co. Ltd.  Milwaukee maintains its business headquarters in Brookfield, Wisconsin.

29.     Makita USA, Inc. ("Makita") is a corporation that is wholly owned by Makita Corporation of Japan.  Makita maintains its business headquarters in La Mirada, California.

## III.  JURISDICTION AND VENUE

30.     **Subject-Matter Jurisdiction**.  Orchard's principal, primary causes of action are its first two causes of action, which it asserts against all three Defendants under Section 1 of the Sherman Act (15 U.S.C. § 1).  This Court has original and exclusive subject-matter jurisdiction over these causes of action under Section 4 of the Clayton Act (15 U.S.C. § 15) (authorizing civil, private relief for violations federal antitrust law, and vesting the federal district courts with original, exclusive subject-matter jurisdiction of private claims for violations of federal antitrust law).

31.     This Court therefore has subject-matter jurisdiction over Orchard's first two causes of action under 28 U.S.C. § 1331.

32.     Orchard's remaining five causes of action arise under the common and statutory laws of California.  This Court has supplemental subject-matter jurisdiction over

these claims under 28 U.S.C. § 1367 (a):  These remaining five causes of action arise from the same transactions, occurrences, and "nucleus of operative fact" that have given rise to Orchard's primary claims, over which this Court has original and exclusive jurisdiction under 15 U.S.C. § 15 and 28 U.S.C. § 1331, as pled above.  This Court therefore has supplemental subject-matter jurisdiction over Orchard's remaining claims, nor should the supplemental jurisdiction be denied under 28 U.S.C. § 1367 (c).

33.    Lastly, this Court can properly exercise its pendant subject-matter jurisdiction over each of Orchard's state law claims because these claims arise from the same transactions, occurrences, and "common nucleus of operative fact" that have given rise to its primary causes of action, over which this Court has original and exclusive jurisdiction under 15 U.S.C. § 15 and 28 U.S.C. § 1331, as pled above.  See *United Mine Workers of America v. Gibbs* (1966) 383 U.S. 715, 725, 86 S.Ct. 1130, 1138 ("Pendent jurisdiction, in the sense of judicial power, exists whenever there is a [federal claim] ..., and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case. The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.")

34.    **Personal Jurisdiction**.  This Court has personal jurisdiction over each Defendant.  Each Defendant conducts business and engages in commerce in this judicial district, and therefore the Court can properly exercise personal jurisdiction over all of them under California's long-arm statute and in accordance with the constitutional doctrine of a defendant's "minimum contacts" with the forum state.

35.    Moreover, this Court is specifically authorized under 15 U.S.C. § 22 to adjudicate Orchard's first two causes of action against all three Defendants, since each of them conducts business and engages in commerce in this judicial district.

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.                                    -9-

36.   **Venue**. This Court is the proper venue for the present action because (1) Orchard maintains several of its stores in this judicial district; (2) each Defendant conducts substantial commerce in this judicial district; and (3) Defendants have engaged in the challenged conduct and employed the challenged business practices in this judicial district.

37.   Moreover, the San Francisco Division of this Court is a proper intra-district venue for this case because (1) Orchard maintains several of its stores in the following counties: San Mateo, San Francisco, Marin, Napa, and other counties that are within the San Francisco Division's designated territory; (2) each Defendant conducts substantial commerce in these counties; and (3) Defendants have engaged in the challenged conduct and employed the challenged business practices in these counties.

## IV.  COMMON ALLEGATIONS

38.   **Household Hardware Products and Hardware Stores**.  "Household hardware products" or, more commonly, "hardware products" are terms generally recognized by the public at large and in particular by the producers, distributors, retailers, and end-purchasers (consumers) of these products.

39.   As used by the general public and industry participants, the term "hardware products" broadly refers to *various kinds of tools, implements, materials, and related products used by professional and non-professional customers in order to fix and improve structures, machines, and yards – or, more specifically, in order make repairs, modifications, and improvements to structures, machines and yards.*

40.   This category of products is very broad, but is commonly recognized and treated as a distinct category of products by the general public as well as by the producers, distributors, retailers and consumers of these products.

41.   Core household hardware products include the following kinds of goods: Power tools, hand tools, fasteners, builders' materials, painting supplies, plumbing supplies, electrical supplies, cleaning supplies, outdoor power equipment, and lawn and garden products.

//

42.     As used by the general public and industry participants, the term "hardware stores" refers to retail stores that specialize in displaying, promoting, and selling hardware products and related products – i.e., hardware products that their customers use to make repairs, modifications, and improvements to structures, machines, and yards, as well as ancillary products that their customers use to furnish, refurbish, decorate, and protect structures and yards.

43.     Many products sold by hardware stores are also available at other kinds of stores, but only hardware stores specialize in displaying, explaining, and selling only hardware products and related products, but no other kind of product, and, until the advent of online retailers (see below), it was only at general hardware stores that a customer could expect to find a reasonably complete range of necessary hardware products, even if other kinds of stores also carried some of these products along with many other kinds of products that are not hardware products nor ancillary or in any way related to hardware products (e.g., many stores carry kitchen cleaning agents, as do hardware stores, but a customer who seeks to purchase tools and materials to make repairs and who also requires cleaning agents in order to clean up after making repairs will look only to hardware stores in order to purchase the necessary products for this purpose; this is an example of the "commercial reality" of hardware products and hardware stores.)

44.     Hardware stores sometimes distinguish themselves from other hardware stores by offering a specialty line of hardware products or by offering services or conveniences not offered by their competitors, *but all hardware stores sell goods commonly understood to be "hardware products," and their customers understand that hardware stores stock and offer these kinds of goods for sale and shop at them in order to purchase these kinds of goods.*

45.     The basic concept of a hardware store has always been the same. *Hardware stores provide the tools and implements as well as many of the construction materials and ancillary products that professional and non-professional customers require to make repairs and improvements to structures, machines, and yards.*

//

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.                                      -11-

46.     **Professional and Non-Professional Customers.**  Hardware stores broadly recognize two distinct classes of customers:   (1) Non-professional customers, who typically seek to purchase a general inventory of appropriate hardware products for future use, or who seek to purchase specific items in order to perform a "do-it-yourself" project or repair at a property or to a machine that they use or own; and (2) professional customers, who typically make recurring purchases of specialized tools and construction materials that they require in order to perform professional construction and mechanical work, such as general contracting, mechanical work of all kinds, carpentry, framing, masonry, flooring, roofing, painting, insulating, plumbing, dry-walling, electrical work, interior decoration, landscaping, and a full range of other, related lines of work in the construction and mechanical trades.

47.     **Historic Competition for the Sale of Hardware Products**.  Historically, hardware stores competed only against one another to make sales of household hardware products.  The competition among these sellers was intense and unrelenting, and even the largest stores made only a small percentage of overall sales of hardware products in the United States.  There was no single brand or chain of hardware stores that dominated sales across the country, even if particular stores might command a high percentage of sales in certain isolated locales.

48.     As a general rule, there was intense competition among the many and diverse sellers of hardware products, and the stores themselves were owned by an enormous number of small and mid-sized owners and were widely dispersed across various regions and localities in every region of the United States.

49.     Some hardware stores sought to establish niches for themselves by catering to certain kinds of professional tradesmen or by offering services and conveniences calculated to appeal to non-professional customers.

50.     *The common denominator was that all hardware stores at all times devoted themselves to the display and sale of tools, implements, materials and related items used to modify, improve, or repair structures, machines and yards. No other kind of seller competed for these sales, even if certain products generally sold at hardware stores were also carried*

*by other kinds of sellers.*

51.    **Orchard's Hardware Stores**.  One substantial hardware seller was Orchard, which operated a chain of mid-size general hardware stores located throughout California, particularly in the San Francisco Bay Area and the greater Los Angeles Metropolitan Area. Orchard established its first stores more than eighty years ago.  Historically, Orchard's stores were profitable, but always operated in intensely competitive local markets.  Even so, Orchard has been widely regarded in the hardware industry as the operator of a well-known, significant chain of general hardware stores in California.

52.    Orchard currently operates 89 hardware stores that are located throughout California.  Among other locations it operates stores in the following counties:  San Mateo, San Francisco, Marin, and Napa Counties.  Orchard's stores serve as general, all-purpose hardware stores that sell a full range of hardware products to both professional and non-professional customers.  Its stores also offer particularly large nurseries and a broad range of landscaping and garden supplies, so as to attract customers who perform landscaping and gardening work, but Orchard's hardware stores are general hardware stores, which have always competed against other hardware stores that specialize in the display, promotion, and sale of general hardware products.

53.    **The Advent of Home-Improvement Centers:**  Competition for the sale of hardware products has changed dramatically since the late 1970s, which is when Defendant Home Depot pioneered the use of "home-improvement centers" or "big-box" hardware outlets.  Home Depot's innovation was to build hardware stores that were vastly larger than conventional hardware stores (by square footage, Home Depot's outlets typically were to ten to twenty times larger than conventional hardware stores).  Home Depot's big-box stores offered a wider range of hardware products in greater supply and at lower prices than did the conventional hardware stores.

54.    In addition, Home Depot's stores offered certain basic construction materials that professional customers had previously purchased at lumber yards and professional builders' outlets.  These materials included basic lumber products, flooring, roofing,

insulation, masonry, drywall, and other such products.

55.     Home Depot's new approach to selling hardware products instantly proved highly successful.  Home Depot's big-box approach to hardware sales was successfully emulated by another firm, Lowe's Companies, Inc. ("Lowe's"), which has become the second largest operator of home-improvement centers in the United States.  A third firm, Menards, established a series of big-box outlets in the north Midwest region of the United States, leading to a further concentration of sales of hardware products in this country.

56.     From the early 1980s onward, the big-box outlets increasingly dominated all retail sales of hardware products, especially the ones operated by Home Depot.  By 2005, Home Depot and Lowe's collectively accounted for a stunning 70% of all sales of hardware products in the United States.

57.     The big-box firms, and Home Depot in particular, purchased hardware supplies in enormous bulk volume directly from the manufacturers, and each offered an overwhelming array of every possible kind of hardware product as well as basic building materials and many ancillary offerings.  Their huge big-box outlets typically remained open seven days a week, 24 hours per day, and these stores were situated on sprawling, busy lots that frequently received incoming and huge shipments of products, which they would sell in enormous volumes to an endless procession of professional and non-professional customers who came at all hours of every day of the year, bar Thanksgiving and Christmas.

58.     Owing to their enormous and growing size, and owing especially to the extraordinary volume of their continual purchases, the big-box sellers were able to negotiate purchases of hardware products at steep discounts that smaller stores did not receive, so that the big boxes not only offered more hardware products in greater supply, but did so at substantially lower prices.  Home Depot even established regional purchasing offices that coordinated *all purchases for its stores in each designated region of the United States*.

59.     Customers who required hardware products increasingly frequented the big-box sellers to the exclusion of other stores, doing so on the assumption that at the big-boxes they would find what they required at the most competitive prices on offer.

60.     Using their superior revenues, the big-boxes were able to obtain exclusive discounts on core products, fund all sorts of advertising and promotional campaigns, and offer a broader range of hardware products and sell them at lower prices than could the traditional hardware stores.

61.     All of these trends reinforced one another, and the big boxes enjoyed success after success and went from strength to strength when offering products, promotions, sales, discounts, and related offerings.

62.     In 2011, Home Depot's stores in the United States sold an estimated $70 billion of hardware products, building materials, and ancillary products, while Lowe's made more than $47 billion in sales.  A third operator of big-box outlets, Menards, made an estimated $7 billion in sales. These sales easily dwarfed those made by all of the other hardware sellers combined.

63.     **How The Smaller Sellers Fared.**  After the big-box sellers came to dominate hardware sales, many smaller hardware stores went out of business entirely.  They could not match the competition of the big-box vendors.  Other stores adopted an alternative strategy, aiming to fill certain niches by specialty or location.

64.     The most common strategy for the smaller hardware outlets was to become a local neighborhood provider: The big-box outlets by definition are situated on enormous, sprawling complexes.  If a customer does not live near one, or if he wishes to purchase only a few items and does not care to make his way through an enormous, busy complex, or if he lives very close to a smaller store, he can purchase many if not all of his required hardware items at the smaller, nearby store and visit a big-box only when appropriate to acquire items for a more substantial project.

65.     The smaller, local sellers remained privately owned, but by 2005 most belonged to one of three wholesale cooperatives that are named "Do-It-Best," "True Value Hardware," and "Ace Hardware."  These cooperatives had been long established, but membership in them became all the important after the emergence of Home Depot, Lowe's and other big-box sellers.  Retailers who belong to the wholesale cooperatives usually cannot

1    obtain the same price discounts that the big-boxes enjoy, but they can make bulk purchases

2    at steep discounts that non-participating local sellers cannot obtain.  They also organize the

3    pooling of members' funds in order to promote their respective brands.  Thus private, local

4    members of these three wholesale cooperatives came to dominate the only significant

5    remaining niche in hardware sales after the big-boxes had eviscerated their smaller rivals by

6    offering larger stocks of more supplies at lower prices.

7         66.    During this period, moreover, certain very large general retailers, such as

8    Walmart and Target, opened hardware sections in their sprawling retail outlets, and these

9    sellers, which were able to negotiate handsome discounts for themselves, were able to

10   establish a foothold in various hardware product markets.

11        67.    Thus hardware products were increasingly sold by the big-box sellers,

12   especially Home Depot, as well local retailers that belonged to one of the three large

13   retailers' cooperatives.  In addition, some large general retailers, especially Walmart and

14   Target, established expansive hardware sections in their stores.  Many traditional hardware

15   stores could not withstand these competitive pressures and simply went out of business.  But

16   some mid-size hardware chains, such as the one successfully operated by Orchard, were able

17   to remain profitable and successful because of their long-term goodwill, loyal base of

18   returning customers, appealing customer service, and specialization in certain niche product

19   markets.

20        68.    **The State of Hardware Sales After the Advent of Home-Improvement**

21   **Centers.**  The emergence of the home-improvement big-boxes transformed the nature of

22   hardware sales.  Now most sales are made at the big-box outlets, and the surviving smaller

23   stores specialize only in certain kinds of sales. In addition, certain large retailers such as

24   Walmart have begun to sell substantial volumes of hardware products in special sections of

25   their immense retail outlets.

26        69.    The big-boxes and major general retailers can use their massive purchasing

27   power to negotiate favorable prices from the suppliers of hardware products.  Most of the

28   successful smaller stores obtain good prices from one of the three wholesale cooperatives,

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.                                          -16-

1    and they have established themselves as small, convenient hardware stores located in urban

2    or neighborhood centers, where they make sales to passers-by as well as customers who lack

3    the time or inclination to visit and cope with a sprawling big-box outlet.  These stores tend to

4    make modest sales of certain kinds of hardware products.  Other smaller stores have

5    developed specialty lines of hardware products that cater to their local communities.

6         70.     Most of the conventional hardware stores, however, simply went out of

7    business because they could not successfully compete against the big-box sellers, particularly

8    Home Depot.  Their disappearance has been nothing more than the inevitable result of lawful

9    and salutary competition on the merits.

10        71.     As for Orchard, its stores were able to remain modestly successful even after

11   the advent of big-box sellers, largely owing to Orchard's excellent goodwill, its excellent

12   offerings of nursery, gardening and landscaping products, and its loyal base of returning

13   customers.  Orchard was also sufficiently large in order to negotiate reasonable, competitive

14   prices for most of the hardware products that it purchased.

15        72.     Even so, the big-box era posed competitive problems for Orchard.  In response,

16   Orchard recently developed a new format for its operations in order to take full advantage of

17   the most recent trends in the hardware industry, and it is now poised to become an

18   exceptionally profitable operation that establishes a new, successful format for "brick-and-

19   mortar" hardware stores in the forthcoming era of internet sales of all retail products,

20   including hardware products.

21        73.     **The Most Recent Trends: The Advent of Online Sellers and Family-**

22   **Friendly General Stores.**  The big-box sellers, particularly Home Depot, now find that their

23   predominant position in the various regional and local markets for hardware sales has

24   suddenly come under threat from two distinct directions – online sellers (particularly

25   Amazon), and smaller, mid-sized operations that carry a reasonably full line of general

26   hardware products, yet also offer a more pleasing shopping experience and far superior

27   customer support.

28   //

74.   It is the first threat that is the most spectacular and even explains the relevance of the second threat.  Amazon, the online retailer, uses its superior server network and information systems to make available for immediate online purchase the same range of products offered by the big-box sellers, but at even lower prices.

75.   During the last few years, moreover, Amazon has opened enormous warehouses on the outskirts of major metropolitan regions.  Using state-of-the-art logistics, it has put into place a next-day and two-day delivery system, by which its customers can order products online and effortlessly receive them in their homes, at construction sites, or at their place of business on the following day or two days later.

76.   Amazon offers its next-day and two-day service for the full range of hardware products and building materials that Home Depot and Lowe's have offered to their customers.

77.   The big-box sellers particularly apprehend that many prospective customers will visit their big-box outlets, examine the hardware products on display there, and then use their cell-phones on the spot to order these products from Amazon.

78.   Other large retailers, such as Walmart's and Costco, have also developed online retail operations in order to compete for these sales, and the big-box operators, Home Depot, Lowe's and Menards, have belatedly tried to organize their own on-line sales operations, but Amazon seems to have decisive advantages in technology, warehousing, logistics, scale, organization, and branding for online sales of household hardware products.

79.   Thus online sales of hardware products have begun to transform the manner in which these products are sold: The big-box centers that have dominated sales until now reasonably apprehend that they will lose their best customers, the professional customers, who routinely make substantial purchases.

80.   Professional customers tend to know in advance exactly what they require for their work, and now they can make their purchases online and have Amazon deliver the goods directly to their worksites.

//

81.     With little fanfare, and in a matter of a few years, Amazon's sales model might definitively undermine the big-box model that Home Depot and Lowe's have employed with such resounding success.

82.     In addition, many customers will find that they prefer to make online purchases after browsing through the full range of hardware offerings and reviews on Amazon's site, and that they prefer the convenience of selecting products in this affable manner and then receiving the products effortlessly at work or home one or two days later.

83.     Even so, online shopping for hardware products remains only a looming competitive threat on the horizon, but it has not yet overtaken the big-box model.  In the meantime, Home Depot and Lowe's continue to make substantial sales, and if anything their sales for the time being have improved because of the recent, gradual recovery in most regional housing and construction markets.

84.     Home Depot thus remains a commanding seller of hardware products, and naturally it wishes to preserve its predominance.  Its officers and executives have publicly expressed their apprehension that Amazon's approach to sales might lead to its own displacement as the largest, dominant seller of hardware products in the United States.

85.     There is a second threat to the big-box sellers that comes from another direction – that of smaller all-purpose stores that offer superior customer support and a more pleasing, convenient shopping experience.  This matter requires further explanation.

86.     Historically, the big-boxes have trimmed costs by understaffing their stores with employees who, however well meaning, lack sufficient training or incentive to provide knowledgeable guidance and information to their customers.

87.     More generally, the big-boxes have always offered a decidedly unpleasant shopping experience that can even be hazardous:  Customers must make their way through a huge, bustling complex, where they must contend with incoming shipments, outgoing orders, many other customers, and vast piles of goods arrayed every which way and stacked literally to the rafters.

//

88.     At these stores there have been a surprising number of reported industrial incidents, injuries, and even deaths, and family shoppers in particular might conclude that it is an unsafe place for their children to play or explore, yet a tempting place for them to do so.

89.     Amid the chaotic scene at a typical big-box, customers find that they receive only inattentive, indifferent service from assistants who lack the training or incentive to provide useful guidance. Unless the customer is experienced at shopping at such a store, the entire experience can be intimidating and frustrating because it is difficult to find and purchase a particular kind of product or to make intelligent selections from the abundant variety of products on offer.

90.     Professional customers and highly knowledgeable customers are less deterred by these drawbacks, since they usually know what they wish to purchase before arriving at the store, but now these customers can spare themselves the hassle by simply making online purchases, after which they can receive their goods at home or the workplace one or two days later.  Less experienced customers may not be able to take full advantage of online offerings, but these customers will find that they prefer the approach now employed by forward-looking smaller general stores such as those that Orchard has begun to build and establish throughout California.

91.     **Orchard's New Opportunity in the Era of Online Sales.**  Orchard has recently adopted a new strategy that has *demonstrably* succeeded wherever it has been attempted.  Namely, Orchard has established a new store format and opened nine new stores that use this format (either by building brand-new stores or completely remodeling existing stores):  Its new stores display and stock products along a user-friendly "racetrack" rather than in traditional aisles, and above all these stores employ well-paid, highly knowledgeable staff, whose principal role is to educate customers about different hardware products and to explain to customers how they can best perform their contemplated projects.

92.     Each of Orchard's new stores also offers a "workbench," at which customers have can have keys copied, locks re-keyed, building materials professionally cut to size, and

related services performed.

93.    Moreover, Orchard's new stores are appointed in a manner calculated to appeal to neighborhood and upscale shoppers, and their staff are encouraged to befriend and help customers with their hardware needs and home-improvement projects.

94.    Orchard's new approach thus far has been a *proven success.* In each location where Orchard has installed a new store, the store has generated profits and has enjoyed increasing sales and profits.  Significantly, each of these new stores has attracted a substantial number of returning customers who formerly used to make their regular or periodic purchases from the closest Home Depot outlet.

95.    Having confirmed that its new approach is sound, Orchard plans to use it at *all of its stores*:  It already has nine stores that employ the new format, and it has publicly confirmed its specific plan to open approximately eleven additional stores in California and Oregon that will also use the new format (these stores will be either brand new or completely remodeled).  Orchard further plans to close its remaining stores, so that it will use its successful new format in all of its stores.

96.    The rationale for Orchard's new strategy is clear.  Orchard can offer a superior shopping experience to customers who require a fully stocked hardware store and require assistance and guidance from informed staff, and who are intimidated or put off by the prospect of trying to navigate their way through a sprawling big-box environment where the staff are sparse, indifferent, and not likely to provide useful information in a helpful manner.  Orchard's new stores are calculated to appeal to these customers on the further understanding that many of them will make certain kinds of purchases online and visit Orchard or its future emulators for the remainder of their hardware requirements.

97.    Thus by design Orchard's new stores are inviting, conveniently located, staffed by knowledgeable and helpful personnel, and at the same time sufficiently large to display and sell a reasonably full range of core hardware products.

98.    Wherever Orchard has installed these stores, they have flourished and drawn customers who otherwise would have continued to make purchases from the closet Home

1   Depot outlet.  These customers include professional customers who prefer to avoid the

2   disagreeable, time-consuming ordeal of shopping at a big-box, as well as non-professional

3   customers who share this preference and also seek more help and a less intimidating, safer,

4   more family-centric shopping experience, during which it is easy to see and find each kind of

5   product on offer because of Orchard's clever "racetrack" method of organization.  Many of

6   these customers have also begun to make substantial purchases of hardware goods from

7   online vendors, particularly Amazon, but they prefer to shop at Orchard's new stores for

8   their remaining hardware requirements.

9       99.    These trends auger poorly for the big-box sellers.  Customers who previously

10   made purchases from a big-box will avoid the big boxes in favor of online sellers for their

11   bulk purchases, and they will increasingly favor the more comfortable and helpful shopping

12   experience offered at general hardware stores such Orchard's new stores.

13      100.   Home Depot already apprehends that it has lost sales and its competitive edge

14   both to online sellers and to Orchard.

15      101.   **Home Depot and Orchard Are Direct Competitors for Hardware Sales.**

16           Appended as Exhibit 1 to this complaint is a true and correct copy of a photograph

17   recently taken at one of Home Depot's big-box outlets in California.  In this photograph,

18   Home Depot offers a financial incentive to any customer who cuts in half his membership

19   card to Orchard's stores.

20      102.   Appended as Exhibit 2 to this complaint is a true and correct copy of a

21   photograph recently taken of a Home Depot promotion, in which Home Depot boasts of

22   "crushing the competition" posed by Orchard's stores.

23      103.   Appended as Exhibit 3 to this complaint are true and correct copies of

24   photographs recently taken of a Home Depot promotion, at which Home Depot compared its

25   prices for specific products to those that it said Orchard charged for the same products, but

26   Home Depot attributed misleading, inflated prices to Orchard when in fact Orchard charged

27   lower prices for the same products.

28   //

104.   The photos appended as exhibits might merely be colorful methods of engaging in spirited competition on the merits, but they demonstrate that Home Depot itself regards Orchard as a significant, direct competitor worthy of its attention and efforts (they might also reveal Home Depot's culture of trying to "crush" and "destroy" perceived rivals).

105.   It is broadly understood within industry circles that Home Depot has become preoccupied with the competitive threat posed by Orchard's new format, which in tandem with the threat from the online sellers may undermine its decisive advantage as the premier and predominant seller of hardware products in the United States.

106.   For Home Depot this twin threat is as follows.  The online sellers will win steady, significant orders from professionals and non-professionals who know what they must purchase and prefer the lower prices and direct, speedy delivery now offered by Amazon or other competent online sellers.  At the same time, Orchard's new stores (and others that emulate this approach) will win the custom of family shoppers (non-professionals) and professional customers who, when they wish to visit a store, will often prefer the pleasing environment and helpful staff that they can find at Orchard's new stores and other, similar stores that follow Orchard's example.

107.   **Home Depot's Anti-Competitive Response:  An Illegal Group Boycott**.

Home Depot could have chosen to respond to these threats to its dominant position by developing a new, superior approach to selling hardware products – perhaps by offering innovative products, services, and pricing arrangements that cannot be matched by online sellers or its nimbler but smaller competitors, such as Orchard's new stores.

108.   Rather than do so, however, Home Depot has apparently decided that it will use its present strength as a major purchaser of core hardware products in order to prevail upon key suppliers of these products to withhold them from certain of its brick-and-mortar competitors, including Orchard, so that the targeted competitors cannot remain viable sellers in specified lines of commerce.

109.   On its own admission, Home Depot plans to organize, coordinate, and use these group boycotts in order to fortify its market positions and rid itself of competitive

1   threats from other brick-and-mortar outlets while it tries to develop a successful strategy for

2   countering the challenge posed by Amazon's online model.  Home Depot may also attempt

3   to deprive Amazon and other online sellers of access to these same core products.

4       110.  To this end, Home Depot has already succeeded at inducing the two principal

5   suppliers of professional power tools – Defendants Milwaukee and Makita – to refuse to

6   make further sales to Orchard, even though Orchard has been a historic, paying, and

7   excellent customer of both suppliers.

8       111.  The particulars of this group boycott have been as follows.  On June 7, 2012, a

9   key executive of Home Depot, Mr. Craig Menear, publicly announced at a convention in

10  Atlanta that Home Depot would take appropriate measures to answer the competitive threats

11  that now confront Home Depot.  Mr. Menear confirmed that Home Depot intended to

12  counter these threats by entering into exclusive-supplier contracts with key suppliers, so that

13  it would become the principal or only supplier of the single most important kind of core

14  hardware product – professional power tools and related accessories.  Appended as Exhibit 4

15  to this complaint is a true and correct copy of a newspaper article that disclosed these facts.

16      112.  Less than a week later, on June 12, 2012, Defendant Makita informed Orchard

17  that it (Makita) would cease to make further sales of any of its products to Orchard, ending a

18  long-term relationship which had been in place for at least fifteen years, and under which

19  Orchard had made substantial, ongoing purchases and always timely paid its bills to Makita.

20  Appended to this complaint as Exhibit 5 is a true and correct copy of the correspondence by

21  which Makita gave this notice to Orchard.  Since then Makita has pressured or instructed its

22  distributors to refuse to deliver any of its products or any of its accessories to any of

23  Orchard's stores.

24      113.  A short time afterwards, on June 29, 2012, Defendant Milwaukee informed

25  Orchard that it (Milwaukee) would cease to make further sales of any of its products to

26  Orchard, thereby ending its own long-term relationship which had been in place for at least

27  fifteen years, and under which Orchard had made substantial, ongoing purchases and always

28  timely paid its bills to Milwaukee.  Appended to this complaint as Exhibit 6 is a true and

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.

1 | correct copy of the correspondence by which Milwaukee gave this notice to Orchard.

2 | 114.    Shortly thereafter, a third supplier of power tools, Black & Decker Dewalt,

3 | disclosed to Orchard that Home Depot had requested that it (Black & Decker Dewalt) refuse

4 | to sell its power tools and related accessories to Orchard and others, but that Black & Decker

5 | Dewalt had declined to do so, and that in retaliation Home Depot had lessened its purchases

6 | of Black & Decker Dewalt's products and had begun to place them in disadvantageous

7 | locations in its retail outlets across the United States.

8 | 115.    Thus Home Depot, which competes directly against Orchard, has successfully

9 | prevailed upon two key suppliers of core hardware products to withhold their necessary

10 | products from Orchard.

11 | 116.    Orchard further understands that Home Depot has prevailed on Milwaukee and

12 | Makita to withhold their necessary supplies from other major sellers of hardware products,

13 | including the approximately four-thousand member stores of the Ace Hardware wholesale

14 | cooperative as well as other sellers of hardware products.

15 | 117.    **The Importance of Power Tools to Hardware Sales**.  Power tools are perhaps

16 | the single most important category of products offered by a hardware store (along with

17 | hammers, nails, nail-removers, screwdrivers, screws, nuts, bolts, washers, wrenches, plyers,

18 | and tape).

19 | 118.    A hardware store that lacks a reasonably complete line of power tools likely

20 | cannot remain a viable seller of power tools and in particular cannot remain a viable seller of

21 | power tools to the most important category of purchasers of these products, who are

22 | professional customers.

23 | 119.    **Milwaukee and Makita Are the Predominant Sellers of Power Tools in the**

24 | **United States.**  Milwaukee and Makita collectively make a substantial percentage of the

25 | principal kinds of power tools sold and used in the United States, as is alleged more fully

26 | above.  In particular, they jointly account for 50% of all 12v impact drivers sold in the

27 | United States, 46% of all reciprocating saws, 44% of all 12v cordless tools and combo kits,

28 | 36% of all 18v cordless tools and combo kits, 34% of direct drive and circular drive saws,

34% of all 18v impact drivers, 31% of all grinders, 22% of all finished sanders, 17% of all orbital sanders, and 15% of all hammer drills.

120.   Thus Milwaukee and Makita jointly make a very substantial percentage of each of the above-listed categories of products.  For each of these categories, there exists no other product or service that customers treat as a reasonably interchangeable substitute.

121.   If a customer wishes to purchase, say, a reciprocating saw, his options are limited to purchasing the different brands of reciprocating saws, and there is no other product or service that he can purchase as a reasonably interchangeable substitute for a reciprocating saw.  Since Milwaukee and Makita together make approximately 46% of all reciprocating saws sold in the United States, most customers and nearly all professional customers will regard a hardware store that lacks reciprocating saws made by either Milwaukee or Makita to be a deficient provider of reciprocating saws.  The same is true for the following kinds of power tools:  12v impact drivers, 18v impact drivers, 12v cordless tools and combo kits, 18v cordless tools and combo kits, direct drive and circular drive saws, grinders, finished sanders, orbital sanders, and hammer drills.

122.   Many customers and most professional customers will altogether cease to shop for any kind of power tool at a store that does not carry any power tools made by the two leading manufacturers, Milwaukee and Makita, given that these two sellers jointly account for such a large portion of the above kinds of power tools, which include the most commonly purchased kinds of power tools.

123.   Morever, professional customers largely prefer to use power tools made by either Milwaukee or Makita, which therefore are the two leading, predominant producers of professional power tools.  Many or even most professional customers will not even *consider* making substantial, ongoing purchases of any power tools or even any hardware products from a general hardware store that lacks power tools made by either Milwaukee or Makita.  A professional customer typically will not choose to make regular purchases or even any purchases of any kind from a hardware store that does not carry power tools made by Milwaukee or Makita, since most professional customers routinely purchase power tools or

1   related accessories and generally prefer to frequent a single store that can supply all of their

2   recurring hardware requirements.

3        124.    Most professional customers regard power tools made by Milwaukee and

4   Makita to be the *only* power tools fit for professional application.  Even if some of these

5   customers might sometimes purchase power tools made by a different firm, most of them

6   usually prefer to examine power tools made by Milwaukee and Makita before deciding to

7   purchase the same kind of tool made by a different supplier.

8        125.    Moreover, the purchasers of power tools generally regard them to be a

9   common category of product, which they purchase only from sellers that carry a reasonably

10  full line of the principal kinds of power tools.

11       126.    **Affected Relevant Markets and Lines of Commerce.**  For antitrust purposes,

12  the relevant geographic markets in this case are the different regions of California and

13  Oregon where there is or could be effective competition among existing and potential sellers

14  of the hardware products at issue in this case.  Defendants' challenged conduct has affected

15  or threatens to affect all of these regions in the same manner and with the same effect.

16       127.    For antitrust purposes, each kind of power tool listed above in paragraph 113

17  belongs to a separate relevant product market.  Each kind of power tool so listed lacks any

18  reasonably interchangeable substitute, and the purchasers of each kind of power tool do not

19  turn to other products or services in response to significant price increases for each kind of

20  power tool, nor turn away from alternatives in response to price decreases for each kind of

21  power tool.

22       128.    Rather, there is little or no cross-elasticity of demand between (1) each kind of

23  power tool listed in paragraph 113; and (2) any other kind of product or service.

24       129.    If, for example, a purchaser requires a reciprocating saw, there is no other

25  product or service that can serve as a reasonably interchangeable substitute, and the

26  purchaser will view his options as limited to the different kinds of reciprocating saws on

27  offer.  The same is true for each kind of power tool listed in paragraph 113.

28  //

1    130.   Therefore, there exists a relevant product market for each kind of power tool

2    listed in paragraph 113.

3    131.   For antitrust purposes, moreover, power tools and their necessary accessories

4    may be deemed a relevant "cluster" of products that constitute a distinct product market.

5    Professional and non-professional customers treat "power tools" as a specific, recognized

6    category of products that they purchase only from sellers that carry a reasonably full line of

7    power tools and related accessories. A seller of power tools that lacks a reasonable supply

8    and full range of them cannot remain a viable seller of them.  Power tools and their necessary

9    accessories may therefore be treated as a relevant "cluster" of products for antitrust purposes.

10   See *Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1204-05 (9th Cir.,

11   1997) ("[A] cluster approach [to market definition in antitrust cases] is appropriate where the

12   product package is significantly different from, and appeals to buyers on a different basis

13   from, the individual products considered separately.")

14   132.   Even if power tools cannot be treated as a distinct "cluster" of relevant

15   products for antitrust purposes, sellers that offer them are engaged in a distinct line of

16   commerce for purposes of analyzing an alleged group boycott.  The purpose and foreseeable

17   effect of Defendants' concerted refusal to sell professional power tools to Orchard has been

18   to diminish and undermine its ability to remain a viable seller of power tools.  The entire

19   point of Defendants' conduct has been to deprive one of Home Depot's direct competitors,

20   Orchard, of supplies that this competitor requires in order to remain a viable seller of (1)

21   power tools, (2) each kind of power tool listed in paragraph 113, and (3) power tools and

22   basket sales to professional customers.

23   133.   For antitrust purposes, moreover, the sale of power tools to professional

24   customers may be deemed a distinct sub-market in accordance with the principles set forth in

25   *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523-24 (1962) ("The outer

26   boundaries of a product market are determined by the reasonable interchangeability of use or

27   the cross-elasticity of demand between the product itself and substitutes for it.  However,

28   within this broad market, well-defined submarkets may exist which, in themselves, constitute

1    product markets for antitrust purposes.  The boundaries of such a submarket may be

2    determined by examining such practical indicia as industry or public recognition of the

3    submarket as a separate economic entity, the product's peculiar characteristics and uses,

4    unique production facilities, distinct customers, distinct prices, sensitivity to price changes,

5    and specialized vendors.")

6        134.    Every factor listed in *Brown Shoe* favors a finding that there exist distinct

7    submarkets for the sale of power tools to professional customers: There is widespread

8    recognition among the professionals customers themselves that they require only the most

9    durable, proficient kinds of power tools on offer in order to perform their work.

10       135.    Moreover, Milwaukee and Makita promote and set prices for their power tools

11   with a view to making most sales of them to professional customers, and there accordingly

12   exist independent demand curves among professional purchasers for the more expensive

13   professional power tools that they require for their work.  With modest exception, the only

14   two makers of professional power tools are Makita and Milwaukee, as is commonly

15   understood by professional customers and the sellers of power tools.

16       136.    For example, on Milwaukee's public website, the very first text that appears

17   states the following: *"Milwaukee Electric Tool Corp. is an industry-leading manufacturer*

18   *and marketer of heavy-duty, portable electric power tools and accessories for professional*

19   *users worldwide.  Since its founding in 1924, Milwaukee has focused on a single vision: To*

20   *produce the best heavy-duty electric power tools and accessories available to the*

21   *professional user. Today, the Milwaukee name stands for the highest quality, most durable*

22   *and most reliable professional tools money can buy."*  Source:

23   http://www.milwaukeetool.com/About/MilwaukeeStory/Default.aspx (December 11, 2012).

24       137.    Similarly, Makita's public website offers the following description of Makita's

25   business:  *"Makita applies the latest innovation to engineer and manufacture the best power*

26   *tools in the world. Makita Power Tools have more power and less weight, and are more*

27   *compact and more efficient than any other. At jobsites around the world, professional users*

28   *are dumping the old, getting the new and gearing-up with Makita. Makita offers more*

1      *solutions for the professional trade."* Source:

2      http://www.makitausa.com/en-us/Modules/Company/FeelInnovation.aspx (December 11,

3      2012.)

4          138.    In addition, Makita and Milwaukee set the prices of their power tools with

5      reference to one another's prices, and among professional customers there is substantial

6      cross-elasticity of demand between Makita's power tools and Milwaukee's power tools, but

7      not between the power tools of either supplier and those of any other supplier. Thus there

8      exist independent demand curves among professional customers for power tools made by

9      Makita and Milwaukee.

10         139.    Professional customers and the sellers of hardware products generally

11     understand that professional customers largely purchase only power tools made by

12     Milwaukee and Makita and as a general rule will not make regular or substantial purchases

13     of any hardware products at any hardware store that does not carry power tools made by

14     either Milwaukee or Makita.

15         140.    The antitrust laws are not supposed to be construed in a formulaic, rigid

16     manner, but rather are supposed to be applied so as to prevent major competitors from acting

17     in concert in order to sabotage and undermine competition on the merits in actual lines of

18     commerce in order to defend their own market positions in a manner that is calculated to

19     increase prices, stifle innovation, lessen the quality of service or deprive consumers of

20     meaningful choice and the benefits of competition on the merits for their favor.

21         141.    **Orchard's Antitrust Injuries**. By their above-pled group boycott, Defendants

22     have harmed competition on the merits in each of the above-pled relevant markets,

23     submarkets, and distinct lines of commerce. In so doing, they have caused specific,

24     demonstrable, and ongoing losses to Orchard, and these losses are directly linked to the anti-

25     competitive character of Defendants' challenged conduct: Home Depot and the two

26     predominant suppliers of a necessary line of products have purposefully withheld these

27     necessary supplies from one of Home Depot's direct competitors, Orchard, which in

28     consequence has suffered losses because it cannot remain a viable competitor in various

1    distinct product markets, product submarkets, and lines of commerce.

2          142.   As a proximate consequence of Defendants' challenged conduct, Orchard

3    estimates that it has and will continue to lose substantial sales of specific kinds of power

4    tools and power tools generally (including necessary accessories to power tools).  In

5    addition, Orchard will lose substantial sales of these products to professional customers, who

6    will increasingly abandon its stores altogether and also cease to make "basket purchases" of

7    power tools, accessories, and other hardware products from Orchard.

8          143.   Orchard also reports that an increasing number of professional customers have

9    largely or entirely stopped making purchases at its stores, and many of them have inquired

10   why it no longer carries power tools made by Makita and Milwaukee.  Orchard has noted a

11   similar, but less pronounced trend among non-professional customers.

12         144.   Using conservative estimates, Orchard calculates that Defendants' group

13   boycott will cause it to lose net profits of approximately $2 million per year from July, 2012

14   onward, and that its losses will significantly increase over time.

15         145.   Moreover, Orchard's losses will likely increase significantly when it cannot

16   compete for the above-pled sales during the emerging recovery of the housing and

17   construction markets now underway throughout California and Oregon.

18         146.   Orchard has not yet performed an expert analysis of its losses, but has

19   confirmed that its losses are already substantial, can be quantified at present at the rate of at

20   least $2 million per year from July, 2012 onward, and can be attributed only to Defendants'

21   concerted refusal to provide necessary supplies that it requires in order to remain a viable

22   competitor in the above lines of commerce.

23                      **V.  FIRST CAUSE OF ACTION**
                 **(UNLAWFUL GROUP BOYCOTT; PER SE VIOLATION)**
24                              **(15 U.S.C. § 1)**

25         147.   Orchard re-pleads and incorporates by reference each of the preceding

26   allegations.

27         148.   Home Depot and Orchard are direct competitors with one another.  They

28   directly compete for sales in the following relevant product markets: (1) The sale of each

1   kind of power tool listed in paragraph 113; (2) the sale of power tools and related

2   accessories; and (3) the sale of power tools and related accessories to professional customers.

3        149.   Milwaukee and Makita collectively make a substantial percentage of the

4   following kinds of power tools: 12v impact drivers, 18v impact drivers, 12v cordless tools

5   and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular

6   drive saws, grinders, finished sanders, orbital sanders, and hammer drills.

7        150.   For each of these categories of power tools, there exists no reasonably

8   interchangeable substitute.

9        151.   Owing to Defendants' withholding of these kinds of power tools, Orchard has

10   ceased to be or soon will cease to be a viable competitor in various regional markets for the

11   following categories of products: 12v impact drivers, 18v impact drivers, 12v cordless tools

12   and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular

13   drive saws, grinders, finished sanders, orbital sanders, and hammer drills.

14        152.   Moreover, Defendants' concerted withholding of these power tools from

15   Orchard has undermined its ability to remain a viable seller of power tools, which constitute

16   a relevant "cluster" of products for antitrust purposes, since most purchasers of power tools

17   consider purchasing them only from sellers that carry a reasonably full line of power tools

18   and related accessories (Orchard has pled this matter more fully above).

19        153.   Moreover, Defendants' concerted withholding of these power tools from

20   Orchard has undermined its ability to remain a viable seller of power tools to professional

21   customers, and these sales constitute a relevant submarket for antitrust purposes (Orchard has

22   pled this matter more fully above).

23        154.   Moreover, Defendants' concerted withholding of these power tools from

24   Orchard has undermined its ability to make "basket sales" to professional customers who

25   otherwise would purchase power tools, related accessories, and other hardware products

26   from Orchard.

27        155.   The purpose of Defendants' conduct has been clear – to deprive one of Home

28   Depot's direct competitors, Orchard, of supplies that it requires in order to remain a viable

1 competitor in the above product markets in each region of California and Oregon where it
2 operates a hardware store or has specific plans to do so.

3     156.   Defendants lack a compelling business reason for their concerted withholding
4 of these necessary supplies from Orchard.

5     157.   In proximate consequence of Defendants' concerted withholding of these
6 necessary supplies, Orchard has suffered losses and apprehends that it will suffer further
7 losses, as it has pled more fully above.

8     158.   By engaging in the above-pled group boycott of Orchard, and in light of the
9 above-pled matters, Defendants have committed a per se violation of Section 1 of the
10 Sherman Act (15 U.S.C. § 1).

11     WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for
12 Relief, which appears below.

13 **VI.  SECOND CAUSE OF ACTION**
**(UNLAWFUL GROUP BOYCOTT; RULE-OF-REASON VIOLATION)**
14 **(15 U.S.C. § 1)**

15     159.   Orchard re-pleads and incorporates by reference each of the preceding
16 allegations.

17     160.   Home Depot and Orchard are direct competitors with one another.  They
18 directly compete for sales in the following relevant product markets: (1) The sale of each
19 kind of power tool listed in paragraph 113; (2) the sale of power tools and related
20 accessories; and (3) the sale of power tools and related accessories to professional customers.

21     161.   Milwaukee and Makita collectively make a substantial percentage of the
22 following kinds of power tools:  12v impact drivers, 18v impact drivers, 12v cordless tools
23 and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular
24 drive saws, grinders, finished sanders, orbital sanders, and hammer drills.

25     162.   For each of these categories of power tools, there exists no reasonably
26 interchangeable substitute.

27     163.   Owing to Defendants' withholding of these kinds of power tools, Orchard has
28 ceased to be or soon will cease to be a viable competitor in various regional markets for the

following categories of products: 12v impact drivers, 18v impact drivers, 12v cordless tools and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular drive saws, grinders, finished sanders, orbital sanders, and hammer drills.

164. Moreover, Defendants' concerted withholding of these power tools from Orchard has undermined its ability to remain a viable seller of power tools, which constitute a relevant "cluster" of products for antitrust purposes, since most purchasers of power tools consider purchasing them only from sellers that carry a reasonably full line of power tools and related accessories (Orchard has pled this matter more fully above).

165. Moreover, Defendants' concerted withholding of these power tools from Orchard has undermined its ability to remain a viable seller of power tools to professional customers, and these sales constitute a relevant submarket for antitrust purposes (Orchard has pled this matter more fully above).

166. Defendants' conduct, as alleged above, has harmed competition in each of the above-pled regional product markets in the following manner: By depriving customers in these product markets of choice of supplier; by depriving customers in these product markets of the superior service offered by Orchard's new format; by restricting the number and variety of distribution outlets for each kind of product; by eventually imposing higher prices for these necessary supplies than otherwise would prevail, owing to lessened competition for customers' demand for each kind of product; and by reducing vigorous competition for customers' favor on the basis of price, service, convenience, and related factors.

167. Moreover, Defendants' concerted withholding of these power tools from Orchard has undermined its ability to make "basket sales" to professional customers who otherwise would purchase power tools, related accessories, and other hardware products from Orchard.

168. The purpose of Defendants' conduct has been clear – to deprive one of Home Depot's direct competitors, Orchard, of supplies that it requires in order to remain a viable competitor in the above product markets in each region of California and Oregon where it operates a hardware store or has specific plans to do so.

169.    Defendants lack a compelling business reason for their concerted withholding of these necessary supplies from Orchard, and even if they had a legitimate business purpose for the concerted withholding, they could readily accomplish it by less restrictive measures.

170.    In proximate consequence of Defendants' concerted withholding of these necessary supplies, Orchard has suffered losses and apprehends that it will suffer further losses, as it has pled more fully above.

171.    By engaging in the above-pled group boycott of Orchard, and in light of the above-pled matters, Defendants have imposed an unreasonable, unlawful restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

### VII.  THIRD CAUSE OF ACTION
#### (UNLAWFUL GROUP BOYCOTT; PER SE VIOLATION)
#### (CAL. BUS. & PROF. CODE §§ 16720 AND 16726)

172.    Orchard re-pleads and incorporates by reference each of the preceding allegations.

173.    Orchard re-pleads and incorporates by reference each of the preceding allegations.

174.    Home Depot and Orchard are direct competitors with one another.  They directly compete for sales in the following relevant product markets: (1) The sale of each kind of power tool listed in paragraph 113; (2) the sale of power tools and related accessories; and (3) the sale of power tools and related accessories to professional customers.

175.    Milwaukee and Makita collectively make a substantial percentage of the following kinds of power tools:  12v impact drivers, 18v impact drivers, 12v cordless tools and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular drive saws, grinders, finished sanders, orbital sanders, and hammer drills.

176.    For each of these categories of power tools, there exists no reasonably interchangeable substitute.

//

177.   Owing to Defendants' withholding of these kinds of power tools, Orchard has ceased to be or soon will cease to be a viable competitor in various regional markets for the following categories of products: 12v impact drivers, 18v impact drivers, 12v cordless tools and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular drive saws, grinders, finished sanders, orbital sanders, and hammer drills.

178.   Moreover, Defendants' concerted withholding of these power tools from Orchard has undermined its ability to remain a viable seller of power tools, which constitute a relevant "cluster" of products for antitrust purposes, since most purchasers of power tools consider purchasing them only from sellers that carry a reasonably full line of power tools and related accessories (Orchard has pled this matter more fully above).

179.   Moreover, Defendants' concerted withholding of these power tools from Orchard has undermined its ability to remain a viable seller of power tools to professional customers, and these sales constitute a relevant submarket for antitrust purposes (Orchard has pled this matter more fully above).

180.   Moreover, Defendants' concerted withholding of these power tools from Orchard has undermined its ability to make "basket sales" to professional customers who otherwise would purchase power tools, related accessories, and other hardware products from Orchard.

181.   The purpose of Defendants' conduct has been clear – to deprive one of Home Depot's direct competitors, Orchard, of supplies that it requires in order to remain a viable competitor in the above product markets in each region of California and Oregon where it operates a hardware store or has specific plans to do so.

182.   Defendants lack a compelling business reason for their concerted withholding of these necessary supplies from Orchard.

183.   In proximate consequence of Defendants' concerted withholding of these necessary supplies, Orchard has suffered losses and apprehends that it will suffer further losses, as it has pled more fully above.

//

1    184.    By engaging in the above-pled group boycott of Orchard, and in light of the

2  above-pled matters, Defendants have committed a per se violation of California Business &

3  Professions Code Sections 16720 and 16726.

4           WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for

5  Relief, which appears below.

6                            **VIII.  FOURTH CAUSE OF ACTION**
   **(UNLAWFUL GROUP BOYCOTT; RULE-OF-REASON VIOLATION)**
7                 **(CAL. BUS. & PROF. CODE §§ 16720 AND 16726)**

8           185.    Orchard re-pleads and incorporates by reference each of the preceding

9  allegations.

10          186.    Home Depot and Orchard are direct competitors with one another.  They

11  directly compete for sales in the following relevant product markets: (1) The sale of each

12  kind of power tool listed in paragraph 113; (2) the sale of power tools and related

13  accessories; and (3) the sale of power tools and related accessories to professional customers.

14          187.    Milwaukee and Makita collectively make a substantial percentage of the

15  following kinds of power tools:  12v impact drivers, 18v impact drivers, 12v cordless tools

16  and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular

17  drive saws, grinders, finished sanders, orbital sanders, and hammer drills.

18          188.    For each of these categories of power tools, there exists no reasonably

19  interchangeable substitute.

20          189.    Owing to Defendants' withholding of these kinds of power tools, Orchard has

21  ceased to be or soon will cease to be a viable competitor in various regional markets for the

22  following categories of products:  12v impact drivers, 18v impact drivers, 12v cordless tools

23  and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular

24  drive saws, grinders, finished sanders, orbital sanders, and hammer drills.

25          190.    Moreover, Defendants' concerted withholding of these power tools from

26  Orchard has undermined its ability to remain a viable seller of power tools, which constitute

27  a relevant "cluster" of products for antitrust purposes, since most purchasers of power tools

28  consider purchasing them only from sellers that carry a reasonably full line of power tools

1   and related accessories (Orchard has pled this matter more fully above).

2       191.    Moreover, Defendants' concerted withholding of these power tools from

3   Orchard has undermined its ability to remain a viable seller of power tools to professional

4   customers, and these sales constitute a relevant submarket for antitrust purposes (Orchard has

5   pled this matter more fully above).

6       192.    Defendants' conduct, as alleged above, has harmed competition in each of the

7   above-pled regional product markets in the following manner:  By depriving customers in

8   these product markets of choice of supplier; by depriving customers in these product markets

9   of the superior service offered by Orchard's new format; by restricting the number and

10  variety of distribution outlets for each kind of product; by eventually imposing higher prices

11  for these necessary supplies than otherwise would prevail, owing to lessened competition for

12  customers' demand for each kind of product; and by reducing vigorous competition for

13  customers' favor on the basis of price, service, convenience, and related factors.

14      193.    Moreover, Defendants' concerted withholding of these power tools from

15  Orchard has undermined its ability to make "basket sales" to professional customers who

16  otherwise would purchase power tools, related accessories, and other hardware products

17  from Orchard.

18      194.    The purpose of Defendants' conduct has been clear – to deprive one of Home

19  Depot's direct competitors, Orchard, of supplies that it requires in order to remain a viable

20  competitor in the above product markets in each region of California and Oregon where it

21  operates a hardware store or has specific plans to do so.

22      195.    Defendants lack a compelling business reason for their concerted withholding

23  of these necessary supplies from Orchard, and even if they had a legitimate business purpose

24  for the concerted withholding, they could readily accomplish it by less restrictive measures.

25      196.    By engaging in the above-pled group boycott of Orchard, and in light of the

26  above-pled matters, Defendants have committed a rule-of-reason violation of California

27  Business & Professions Code Sections 16720 and 16726.

28  //

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.                                    -38-

1    WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for

2    Relief, which appears below.

3                                   **IX.  FIFTH CAUSE OF ACTION**
                                  **(UNFAIR BUSINESS PRACTICES)**
4                     **(CAL. BUS. & PROF. CODE §§ 172000 ET SEQ.)**

5    197.    Orchard re-pleads and incorporates by reference each of the preceding

6    allegations.

7    198.    By the above-pled conduct, and in particular by their coordinated withholding

8    of supplies that Orchard requires in order to remain a viable competitor in the above-stated

9    lines of commerce, Defendants have committed unfair business practices in violation of

10   Sections 17200 *et seq.* of the California Business & Professions Code (the "UCL").   Their

11   above-pled conduct has caused proximate injury to Orchard's business and continues to do

12   so.

13   199.    This Court has authority under Section 17203 of the UCL to "make such orders

14   as may be necessary to restore to any person in interest any money or property, real or

15   personal, which may have been acquired by means of such unfair competition."

16   200.    Moreover, this Court possesses the inherent power to provide such injunctive

17   relief as may be necessary to protect the interests of the parties pending trial of this matter on

18   the merits.

19   WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for

20   Relief, which appears below.

21
                                     **X.  SIXTH CAUSE OF ACTION**
22                  **(TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS)**

23   201.    Orchard re-pleads and incorporates by reference each of the preceding

24   allegations.

25   202.    By the above-pled conduct, which is wrongful under the antitrust laws of the

26   United States and California, each defendant has foreseeably interfered with, impaired,

27   and/or incited the termination of existing contractual relations between Orchard and those of

28   its former regular customers who, as a consequence of Defendants' above-pled conduct, have

1    stopped making any purchases or regular purchases at its stores.

2         203.   Orchard can provide the names of businesses and individuals, particularly

3    professional customers, who have ceased to make regular purchases at its stores because they

4    no longer carry professional power tools made by Makita or Milwaukee, and Orchard can

5    provide a reasonable estimate of the profits that it has lost from all of the sales that it

6    otherwise would have made to these customers.  But for Defendants' above-pled wrongful

7    conduct, Orchard would continue to have regular trading relationships with these customers

8    and continue to improve its good-will by having them make purchases at its new stores.

9         204.   At all relevant times, Defendants understood that Orchard had in place specific

10   contractual dealings with its established customers, and that many of these contracts would

11   foreseeably be disrupted, impaired, interfered with, and breached because of their above-pled

12   conduct.

13        205.   In addition, Home Depot has impaired, interfered with, and wrongly induced

14   the termination of the master sales contract/ancillary contracts between Orchard and Makita

15   and the master sales contract/ancillary contracts Orchard and Milwaukee.  Home Depot has

16   done so for an improper purpose and by improper means, and by so acting it has caused

17   substantial harm to Orchard.

18        206.   Orchard has suffered proximate losses in consequence of the foregoing.

19        207.   In this matter, Defendants have acted with fraud, malice and/or oppression of

20   the kind that subjects each of them to liability for punitive damages under Section 3294 of

21   the California Civil Code.

22        WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for

23   Relief, which appears below.

24                      **XI.  SEVENTH CAUSE OF ACTION**
     **(TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)**
25                      **XII.  PRAYER FOR RELIEF**

26        208.   Orchard re-pleads and incorporates by reference each of the preceding

27   allegations.

28   //

1    209.    By the above-pled conduct, which is wrongful under the antitrust laws of the

2    United States and California, each defendant has foreseeably interfered with, impaired,

3    and/or incited the termination of prospective economic and contractual relations between

4    Orchard and prospective customers who would otherwise make substantial and recurring

5    purchases of professional power tools and other hardware products from its stores.

6    210.    At all relevant times, Defendants understood that their conduct likely would

7    have the above-pled detrimental and potentially ruinous effect on Orchard's business.  This

8    is precisely why they have engaged in the conduct.

9    211.    Orchard has suffered proximate losses in consequence of the foregoing.

10   212.    In this matter, Defendants have acted with fraud, malice and/or oppression of

11   the kind that subjects each of them to liability for punitive damages under Section 3294 of

12   the California Civil Code.

13   WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for

14   Relief, which appears below.

15   **XII.  PRAYER FOR RELIEF**

16   Orchard now prays to this Court for the following relief in order to redress each of the

17   legal wrongs that it has alleged above against all three Defendants.

18   **First Cause of Action**:

19   1.    Compensatory damages, trebled under 15 U.S.C. § 15.

20   2.    Pre-judgment interest.

21   3.    Costs of suit.

22   4.    Reasonable attorney's fees, as authorized by 15 U.S.C. § 15.

23   5.    Injunctive relief under 15 U.S.C. § 26.

24   6.    Such other relief as the Court deems appropriate and just.

25   **Second Cause of Action**:

26   1.    Compensatory damages, trebled under 15 U.S.C. § 15.

27   2.    Pre-judgment interest.

28   3.    Costs of suit.

1  4.      Reasonable attorney's fees, as authorized by 15 U.S.C. § 15.

2  5.      Injunctive relief under 15 U.S.C. § 26.

3  6.      Such other relief as the Court deems appropriate and just.

4          **Third Cause of Action**:

5  1.      Compensatory damages, trebled under California Business & Professions Code §

6          16750.

7  2.      Pre-judgment interest.

8  3.      Costs of suit.

9  4.      Reasonable attorney's fees, as authorized by California Business & Professions Code

10         § 16750.

11  5.     Injunctive relief under California Business & Professions Code § 16750.

12  6.     Such other relief as the Court deems appropriate and just.

13         **Fourth Cause of Action**:

14  1.     Compensatory damages, trebled under California Business & Professions Code §

15         16750.

16  2.     Pre-judgment interest.

17  3.     Costs of suit.

18  4.     Reasonable attorney's fees, as authorized by California Business & Professions Code

19         § 16750.

20  5.     Injunctive relief under California Business & Professions Code § 16750.

21  6.     Such other relief as the Court deems appropriate and just.

22         **Fifth Cause of Action**:

23  1.     Restitution, as authorized under California Business & Professions Code Restitution

24         §§ 17200 et seq.

25  2.     Appropriate injunctive relief, as authorized under California Business & Professions

26         Code Restitution §§ 17200 et seq.

27  3.     Such other relief as the Court deems appropriate and just.

28  //

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.                                    -42-

1    **Sixth Cause of Action:**

2    1.    Proximate damages.

3    2.    Pre-judgment interest.

4    3.    Costs of suit.

5    4.    Punitive damages, as authorized under California Civil Code § 3294.

6    5.    Such other relief as the Court deems appropriate and just.

7    **Seventh Cause of Action:**

8    1.    Proximate damages.

9    2.    Pre-judgment interest.

10   3.    Costs of suit.

11   4.    Punitive damages, as authorized under California Civil Code § 3294.

12   5.    Such other relief as the Court deems appropriate and just.

13

14            **XIII.  DEMAND OF JURY TRIAL**

15        So far as the law allows, Orchard demands that a jury of its peers try its claims against

16   Defendants.

17

18

19   DATED:  December 14, 2012        Respectfully submitted,

20                                    LAW OFFICES OF WILLIAM MARKHAM

21                          By:       _____

22                                    William A. Markham,
                                      Attorneys for Plaintiff,
23                                    ORCHARD SUPPLY HARDWARE LLC.

24

25

26

27

28

COMPLAINT FOR UNLAWFUL GROUP BOYCOTT, ETC.                                        -43-

# EXHIBIT 1



EXHIBIT 2



EXHIBIT 3



# EXHIBIT 4

Facebook       RSS

LinkedIn   Log In / Create an Account

Hardware Store Connect   Media Kit   Events   Multimedia   Subscribe   About

E-MAIL   PRINT   SHARE ON FACEBOOK   SHARE ON LINKEDIN   SHARE ON TWITTER   MORE SHARING SERVICES   SHARE

# Home Depot will defend its lead in power tools

JUNE 7, 2012 | BY KEN CLARK

Speaking at The Home Depot's 2012 Investor and Analyst Conference in Atlanta, Home Depot executive VP merchandising Craig Menear revved up the power tool rhetoric.

Menear said the company intends to defend its position as power tool market share leader.

He also described power tools as a category with a relatively high vulnerability to online competitors. One of the best defenses is a large fleet.

"Our 2,200 stores are convenient for our pro customers when they have a tool go down on the job," Menear said. "We are now executing a strategy to compete across all channels of the business."

The company is also playing offense in the category, developing and maintaining strategic relationships with suppliers that bring new products to Home Depot as exclusives, he said. Also, the company is building its capabilities in the area of product repair.

And online, Home Depot is fighting fire with fire, he said. "Rapid expansion of online assortments and brands has produced excellent results in this channel as well," he said. "We have grown market share the last two quarters faster than the online market leader."

The online-market share leader would be Amazon, which many believe is benefiting from smartphone-fueled consumer behavior that lets shoppers browse in a store, search online for cheaper prices and buy somewhere else.

Login or register to post comments       Print   E-mail

Post a Comment

### RELATED CONTENT

Home Depot names new Canadian chief

Home Depot will hire 60,000 for spring push

Romancing the pros

Home Depot reports $68 billion in 2010 sales

Home Depot's Menear honored by City of Hope

Home Depot shows sales and earnings growth

Home Depot in China: Fewer cities, tighter focus

AdChoices

Related Terms:   Headlines   Home Depot News   Home Centers   Atlanta   Home Depot   Company Technology   The Home Depot   Craig Menear   Dow Jones Industrial Average   executive   Home Depot   The Home Depot   VP

Events   Media

Subscribe   About Us   Privacy Policy

**News**
Headlines
Opinion
Products
Photo features
Industry events

**Hardware Stores**
Hardware Stores Headlines
Co-op news
Independent profiles

**Home Centers**
Home Centers Headlines
Home Depot News
Lowe's News
Warehouse home center profiles
HCN TOP 300 INDUSTRY SCOREBOARD

**Pro Dealers & LBM**
Pro Dealer news
ProDealer Industry Summit
THE 2012 TOP 200 PRO DEALER SCOREBOARD

**Green Central**

**Research**
Industry Scoreboards
RISI Research
Industry Dashboard
Special reports



**Lebhar-Friedman** websites

**Retail Group**
Chain Store Age
Connecting NW Arkansas
Drug Store News
Home Channel News
Retailing Today
RetailCareersNow
Specialty Pharmacy
DSN Collaborative Care

**Events - Retail**
Retail Clinician Congress
ProDealer Industry Summit
SPECS
Main & Wall
Green for Retail
Executive SPECS
Golden Hammer Awards

**Industry Guides, Research & Reports**
RetailNet

**International**
Diamond-Friedman Co. Ltd.
Diamond Chain Store Age
Diamond Home Center
Diamond Retail Technology
Diario IP Mark Distribucion Actualidad
Diamond Drug Store News Japan

View mobile site

© 2012 Home Channel News. All Rights Reserved.

# EXHIBIT 5

**From:**   Rich Chapman
**To:**   Jeff Garcia
**Cc:**   Hiroshi Tsujimura ;  Daniel Rhodes ;  Brandon Stover
**Subject:**   Orchard Supply
**Date:**   Thursday, August 02, 2012 4:26:54 PM

Jeff,

Brandon has asked that I confirm in writing our conversation of a few weeks ago.

As we discussed on the phone, Makita USA has determined that Orchard Supply is not a good fit for our distribution strategy going forward.
As such, we will not be accepting any further purchase orders effective immediately.

We appreciate your interest in our products,


Rich Chapman
Sr., V.P., Sales
Makita USA

# EXHIBIT 6



**MILWAUKEE ELECTRIC TOOL CORPORATION**

13135 West Lisbon Road • Brookfield, Wisconsin 53005 • 262.781.3600 • Fax 262.781.3117
darrell.hendrix@milwaukeetool.com • www.milwaukeetool.com

*SENT VIA CERTIFIED MAIL –*
*RETURN RECEIPT REQUESTED*

June 29, 2012

Orchard Supply Hardware, LLC
Attn: Steve Mahurin
6450 Via Del Oro
San Jose, CA 95119

      Re:    Termination of Vendor Agreement and all related agreements between
               Milwaukee Electric Tool Corporation and Orchard Supply Hardware

Dear Steve:

This letter provides Orchard Supply Hardware ("OSH") with 30 days' notice that Milwaukee Electric Tool Corporation is terminating its business relationship and any agreements between it and Orchard Supply Hardware including without limitation the Volume Rebate Program agreements dated October 1, 2010 and the Marketing Alliance Program agreement dated September 19, 2008.

During the period prior to termination, OSH may continue to order Milwaukee products in quantities and on terms acceptable to us in light of the impending termination. The quantities should not exceed OSH's immediate needs and should not seek to stockpile inventory to continue acting as a Milwaukee distributor after the termination date. Due to the termination, we reserve the right to require payment C.O.D., a letter of credit or similar security to assure timely payment. All orders are subject to our approval.

If questions arise about new orders during the next 30 days, please direct them to me.

Regards,

Milwaukee Electric Tool Corporation

Darrell Hendrix
Senior Vice President of Sales