William A. Markham, State Bar No. 132970
Dorn Graham Bishop, State Bar No. 147994
LAW OFFICES OF WILLIAM MARKHAM
550 West C Street, Suite 2040
San Diego, CA 92101

Tel:        (619) 221-4400
Fax:        (619) 224-3974
E-mail:     wm@maldonadomarkham.com

Attorneys for Orchard Supply Hardware LLC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| ORCHARD SUPPLY HARDWARE LLC,<br><br>　　　　　Plaintiff,<br><br>　　Vs.<br><br>HOME DEPOT USA, INC.;<br>MILWAUKEE ELECTRIC TOOL<br>CORPORATION; and MAKITA<br>USA, INC.,<br><br>　　　　　Defendants. | Case No.  12-cv-6361 JST<br><br>PLAINTIFF'S SECOND AMENDED COMPLAINT FOR: |

1. UNLAWFUL GROUP BOYCOTT IN VIOLATION OF 15 U.S.C. § 1 (PER SE RULE);

2. UNLAWFUL GROUP BOYCOTT IN VIOLATION OF 15 U.S.C. § 1 (QUICK-LOOK AND RULE OF REASON);

3. UNLAWFUL GROUP BOYCOTT IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 16720 AND 16726 (PER SE RULE)

4. UNLAWFUL GROUP BOYCOTT IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 16720 AND 16726 (QUICK-LOOK AND RULE OF REASON)

5. UNFAIR BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 *et seq.*

6. TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS

7. TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8.       FALSE ADVERTISING IN VIOLATION
         OF 15 U.S.C. § 1125(a)(1)(B)

9.       FALSE ADVERTISING IN VIOLATION
         OF CALIFORNIA BUSINESS &
         PROFESSIONS CODE § 17500

PRAYER FOR RELIEF

DEMAND OF JURY TRIAL

1

**TABLE OF CONTENTS**

I.      CONCISE STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.     THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-

III.    JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

        A. Subject-Matter Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -3-

        B. Personal Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

        C. Venue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

IV.     COMMON ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

        A.      Overview of the Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -4-

        B.      Household Hardware Products and Hardware Stores. . . . . . . . . . . . . . . . -15-

        C.      Professional and Non-Professional Customers. . . . . . . . . . . . . . . . . . . . . -17-

        D.      The Importance of Power Tools to Hardware Sales. . . . . . . . . . . . . . . . . . -17-

        E.      Milwaukee and Makita Are Leading Suppliers of Power Tools and the Premier
                Suppliers of Professional Power Tools. . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-

        F.      Historic Competition for the Sale of Hardware Products. . . . . . . . . . . . . . -23-

        G.      Orchard's Hardware Stores. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

        H.      The Advent of Home-Improvement Centers. . . . . . . . . . . . . . . . . . . . . . . . -24-

        I.      How The Smaller Sellers Fared. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

        J.      How Orchard Has Fared. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

        K.      Online Sellers: The Amazon Challenge. . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

        L.      Home Depot and Orchard Are Direct Competitors for Hardware Sales. . . . -30-

        M.      Home Depot's Anti-Competitive Response: An Illegal Group Boycott. . . . -31-

        N.      Makita and Milwaukee Are Dependent, Vulnerable Suppliers. . . . . . . . . . -32-

        O.      The Group Boycott, As Implemented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -33-

        P.      The Relevant Geographic Markets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

                1.      The Geographic Markets in California. . . . . . . . . . . . . . . . . . . . . . . -35-

                2.      The Geographic Markets in Oregon. . . . . . . . . . . . . . . . . . . . . . . . . -37-

Q.    The Relevant Product Markets. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-

R.    Harm to Competition in the Relevant Markets. . . . . . . . . . . . . . . . . . . . . . -40-

S.    Orchard's Antitrust Injuries.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -43-

V.    FIRST CAUSE OF ACTION
      (UNLAWFUL GROUP BOYCOTT; PER SE VIOLATION)
      (15 U.S.C. § 1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -45-

VI.   SECOND CAUSE OF ACTION
      (UNLAWFUL GROUP BOYCOTT; RULE-OF-REASON VIOLATION AND
      QUICK-LOOK VIOLATION)
      (15 U.S.C. § 1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -47-

VII.  THIRD CAUSE OF ACTION
      (UNLAWFUL GROUP BOYCOTT; PER SE VIOLATION)
      (CAL. BUS. & PROF. CODE §§ 16720 AND 16726). . . . . . . . . . . . . . . . . . . -49-

VIII. FOURTH CAUSE OF ACTION
      (UNLAWFUL GROUP BOYCOTT;
      QUICK-LOOK AND RULE-OF-REASON VIOLATION)
      (CAL. BUS. & PROF. CODE §§ 16720 AND 16726). . . . . . . . . . . . . . . . . . . -50-

IX.   FIFTH CAUSE OF ACTION
      (UNFAIR BUSINESS PRACTICES)
      (CAL. BUS. & PROF. CODE §§ 172000 ET SEQ.). . . . . . . . . . . . . . . . . . . . . -50-

X.    SIXTH CAUSE OF ACTION
      (TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS). . . . . . . . . . -51-

XI.   SEVENTH CAUSE OF ACTION
      (TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC
      ADVANTAGE). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -52-

XII.  EIGHTH CAUSE OF ACTION
      (FALSE ADVERTISING-LANHAM ACT)
      (15 U.S.C. § 1125(a)(1)(B)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -53-

XIII. NINTH CAUSE OF ACTION
      (FALSE ADVERTISING-CALIFORNIA LAW)
      (CALIFORNIA BUSINESS & PROFESSIONS CODE § 17500). . . . . . . . . . . . -55-

//

//

XIV.   PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -56-

XIX.   DEMAND OF JURY TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -58-

# I. CONCISE STATEMENT OF THE CASE

Home Depot is the leading seller of hardware products in virtually every regional market in the United States, and in particular it has long established itself as the dominant seller of professional power tools and other products to professional tradesmen and other professionals who purchase these products in order to perform their work ("professional customers"). To counter competition from its rivals, it has abused its massive purchasing power to oblige its core suppliers to withhold their necessary products from any competitor that it perceives as a threat to its dominant position in these various product markets.

To this end, Home Depot has successfully prevailed on Makita and Milwaukee, two leading sellers of professional power tools, to stop selling their power tools to various direct competitors. The most recent targeted competitors have been Orchard, which operates a substantial chain of general hardware stores in California and Oregon, and also Amazon, the online retail seller. In the past, Home Depot has prevailed on Makita and Milwaukee to cease selling their power tools to Lowe's and Menards, the two big-box operators that compete directly against Home Depot.

In consequence, the targeted competitors have been greatly hindered and prevented from competing against Home Depot for sales of professional power tools, power tools in general, and seven distinct categories of power tools, and they have suffered a noticeable decline in sales of other hardware products to professional customers.

Because of Defendants' conduct, ordinary competitive processes have been subverted and undermined in the affected product markets. Orchard, which operates ninety stores in California and two in Oregon, has already suffered significant lost profits because it has been greatly hindered from competing in these product markets in various regions of California and Oregon.

The broader aim of Home Depot has been to prevent threatening rivals from emerging as all-purpose providers of hardware products to professional tradesmen. If a rival shows promise and becomes a competitive challenger for these sales, Home Depot prevails on key suppliers of core hardware products to withhold their necessary products from the

1   competitor, so that it ceases to pose a competitive challenge to Home Depot.

2       By coordinating a withholding of core hardware products that Home Depot's

3   competitors require, Defendants have violated Section 1 of the Sherman Act under the per se

4   rule against group boycotts, the rule of reason, and the "quick-look" standard. Their conduct

5   also constitutes related violations of California's Cartwright Act and Unfair Competition

6   Law, and it constitutes actionable tortious interference. Lastly, Home Depot has committed

7   actionable false advertising against Orchard under federal and state law.

8       Home Depot has apparently decided that the best way to preserve its dominant market

9   positions is to strong-arm key suppliers to withhold core supplies from any direct competitor

10  that poses a threat. If Home Depot finds that it can employ this approach with impunity,

11  perhaps by carefully staggering the concerted withholding of core supplies from its

12  competitors, it will continue to undermine and destroy competition among hardware sellers

13  in a broad range of product markets. It is precisely such conduct that the antitrust laws exist

14  to prevent and condemn.

## II. THE PARTIES

16      1.      Orchard Supply Hardware LLC ("Orchard") is a limited liability company and

17  wholly owned subsidiary of Orchard Supply Hardware Stores Corporation, which is

18  organized under the laws of Delaware. Orchard maintains its business headquarters in San

19  Jose, California.

20      2.      Home Depot USA, Inc. ("Home Depot") is a corporation that is organized

21  under the laws of Delaware. Home Depot maintains its business headquarters in Atlanta,

22  Georgia and operates stores throughout North America, including California.

23      3.      Milwaukee Electric Tool Corporation ("Milwaukee") is a corporation that is

24  wholly owned by Techtronic Industries Co. Ltd. ("TTI"). Milwaukee maintains its business

25  headquarters in Brookfield, Wisconsin.

26      4.      Makita USA, Inc. ("Makita") is a corporation that is wholly owned by Makita

27  Corporation of Japan. Makita maintains its business headquarters in La Mirada, California.

28  //

# III. JURISDICTION AND VENUE

5. **A. Subject-Matter Jurisdiction**. Orchard's principal, primary causes of action are its first two causes of action, which it asserts against all three Defendants under Section 1 of the Sherman Act (15 U.S.C. § 1). This Court has original and exclusive subject-matter jurisdiction over these causes of action under Section 4 of the Clayton Act (15 U.S.C. § 15) (authorizing civil, private relief for violations federal antitrust law, and vesting the federal district courts with original, exclusive subject-matter jurisdiction of private claims for violations of federal antitrust law).

6. This Court therefore has subject-matter jurisdiction over Orchard's first two causes of action under 28 U.S.C. § 1331.

7. Orchard's remaining five causes of action arise under the common and statutory laws of California. This Court has supplemental subject-matter jurisdiction over these claims under 28 U.S.C. § 1367 (a): These remaining five causes of action arise from the same transactions, occurrences, and "nucleus of operative fact" that have given rise to Orchard's primary claims, over which this Court has original and exclusive jurisdiction under 15 U.S.C. § 15 and 28 U.S.C. § 1331, as pled above. This Court therefore has supplemental subject-matter jurisdiction over Orchard's remaining claims, nor should the supplemental jurisdiction be denied under 28 U.S.C. § 1367 (c).

8. Lastly, this Court can properly exercise its pendant subject-matter jurisdiction over each of Orchard's state law claims because these claims arise from the same transactions, occurrences, and "common nucleus of operative fact" that have given rise to its primary causes of action, over which this Court has original and exclusive jurisdiction under 15 U.S.C. § 15 and 28 U.S.C. § 1331, as pled above. See *United Mine Workers of America v. Gibbs* (1966) 383 U.S. 715, 725, 86 S.Ct. 1130, 1138 ("Pendent jurisdiction, in the sense of judicial power, exists whenever there is a [federal claim] ..., and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case. The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. The state and federal claims must derive from

a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.")

9.     **B. Personal Jurisdiction**. This Court has personal jurisdiction over each Defendant. Each Defendant conducts business and engages in commerce in this judicial district, and therefore the Court can properly exercise personal jurisdiction over all of them under California's long-arm statute and in accordance with the constitutional doctrine of a defendant's "minimum contacts" with the forum state.

10.     Moreover, this Court is specifically authorized under 15 U.S.C. § 22 to adjudicate Orchard's first two causes of action against all three Defendants, since each of them conducts business and engages in commerce in this judicial district.

11.     **C. Venue**. This Court is the proper venue for the present action because (1) Orchard maintains several of its stores in this judicial district; (2) each Defendant conducts substantial commerce in this judicial district; and (3) Defendants have engaged in the challenged conduct and employed the challenged business practices in this judicial district.

12.     Moreover, the San Francisco Division of this Court is a proper intra-district venue for this case because (1) Orchard maintains several of its stores in the following counties: San Mateo, San Francisco, Marin, Napa, and other counties that are within the San Francisco Division's designated territory; (2) each Defendant conducts substantial commerce in these counties; and (3) Defendants have engaged in the challenged conduct and employed the challenged business practices in these counties.

## IV. COMMON ALLEGATIONS

13.     **A. Overview of the Case**. Plaintiff, Orchard Supply Hardware LLC ("Orchard"), is a wholly-owned subsidiary of Orchard Supply Hardware Stores Corporation, which is a publicly traded company. Orchard owns and operates a chain of all-purpose general hardware stores. Ninety of its stores are located across California and two others are in Oregon.

14.     To remain a viable competitor in the below described lines of commerce, Orchard must carry professional power tools made by two of the Defendants in this case, Milwaukee Electric Tool Corporation ("Milwaukee") and Makita USA, Inc. ("Makita"), which are the two major legacy suppliers of professional power tools in North America.

15.     If a hardware seller lacks power tools made by Milwaukee or Makita, it cannot remain a viable competitor in any of the following product markets: (1) The sale of seven different kinds of power tools (described below), since Makita and Milwaukee jointly account for 31% to 50% of overall sales of these different kinds of tools, and for each kind of tool is there no reasonable substitute product; (2) the sale of professional power tools as a cluster of related products; or (3) the sale of "basket goods" and hardware products in general to professional customers, who over time will increasingly abandon a hardware store that lacks a full line of power tools made by Makita and Milwaukee (as explained below).

16.     Orchard, however, can no longer purchase any power tools from either of these two necessary suppliers because its direct competitor, Defendant Home Depot USA, Inc. ("Home Depot"), has prevailed upon both of them to cease making any sales to it. Moreover, Milwaukee and Makita have instructed their respective distributors not to sell their products to Orchard, so that Orchard has no direct or other access to any products made by Milwaukee or Makita.

17.     Until Home Depot used its purchasing power to induce or coerce Milwaukee and Makita to refuse to make any further sales to Orchard, both of them made substantial, ongoing sales to Orchard, and Orchard for its part was a significant, historic, and excellent customer of both suppliers. Orchard depended upon the supply of their products in order to engage in the below-described lines of commerce, from which it will be progressively disqualified because of Defendants' concerted withholding of these products from it.

18.     In June, 2012, Milwaukee and Makita acted at Home Depot's behest to ensure that Orchard could no longer purchase their respective wares from any source. Acting at around the same time, each supplier announced that it would no longer make sales to Orchard, and both instructed their distributors to refuse to sell any of their products to

Orchard, even though both owed an express contractual obligation under Orchard's master contract to continue selling parts and accessories to Orchard for ten years from the date of their respective terminations of Orchard's account.

19.   At the same time, Makita and Milwaukee also cut off their further supplies to Amazon, the online seller. Both refused to make further sales to it, instructed their distributors not to make further sales to it, and instructed the three major national wholesale cooperatives not to permit their thousands of members (local retailers) to fill "third-party orders" - a restriction whose purpose and effect were to prevent Amazon from filling orders by placing them with any of these thousands of retailers. (Makita was able to obtain one concession from Home Depot: It is permitted to sell to Amazon any product that Home Depot does not place on its list of products for nationwide purchase and distribution, but Home Depot controls this list, and the list includes all of Makita's most popular products, so that Amazon has been effectually cut off from purchasing all of Makita's most popular products.)

20.   Until they acted at Home Depot's behest, Makita and Milwaukee indicated by their statements and commercial conduct that they wished to continue making and increasing their sales to Amazon, Orchard and other targeted competitors. Each had marketing agreements with Orchard and long, successful trading relationships with it. Each was an enthusiastic seller to Amazon and sold their full line of products to it and openly considered how to optimize their sales in the emerging era of e-commerce.

21.   But Makita sells 40% of its annual output to Home Depot, while Milwaukee also sells a substantial share of its annual output to Home Depot. Moreover, Milwaukee's parent company, TIC, makes several lines of product for Home Depot (Home Depot's "house brands"), and it makes annual sales to Home Depot that run into the billions of dollars.

22.   Milwaukee, like Makita, cannot afford to cross Home Depot, however much both manufacturers otherwise wish to continue making and increasing their sales to well-established customers such as Amazon, Orchard, and others.

//

23.     Whenever Home Depot has deemed its dominant positions to be under threat from a direct competitor, it has prevailed on both of them to stop selling their supplies to the competitor in question. In the mid-1990s, Makita and Milwaukee stopped selling their wares to Menards, which operates a chain of big-box stores in the various regions of the Midwest of the United States. In the latter part of the 1990s, these two necessary suppliers similarly acted to withheld their supplies from Lowe's, the other major operator of big-box outlets. Each time, Makita and Milwaukee stopped making direct sales to the targeted competitors and instructed their distributors to refuse to fill orders for them.

24.     In the most recent application of this group boycott, Makita and Milwaukee each agreed at the same time to withhold their products from Orchard, Amazon, and possibly other direct competitors of Home Depot, doing so on the understanding that both would do so at around the same time. In addition, both of them simultaneously instructed their respective distributors not to fill orders for their products placed by the targeted competitors, and both instructed the three major wholesale cooperatives not to permit member retailers (thousands of hardware stores) to fill "third-party orders" – a further restriction calculated to make it impossible for Amazon and other online sellers to act as online sellers of their wares.

25.     The larger pattern is clear. Each time when Home Depot has feared a competitive threat from another seller of hardware products, it has prevailed at the same time on both Milwaukee and Makita to stop selling their respective products to the feared competitor, doing so on the following specific understanding: *A general seller of hardware products will be largely regarded by a very substantial number of professional customers as a deficient provider of general hardware products, if it fails to carry a full line of power tools made by Makita and Milwaukee*.

26.     Professional customers long regarded these two suppliers as the two leading makers of high-quality, durable power tools intended for professional use. More recently, Black & Decker has developed a new brand of professional power tools under the DeWalt name (a trade name previously associated with other products that Black & Decker revived in order to compete against Makita and Milwaukee for the sale of power tools to professional

1   customers).

2       27.     When purchasing power tools, professional customers show extraordinary

3   loyalty to their brand of choice, as is shown by marketing analysis cited below. They

4   continue to revere the legacy and reputation for professional excellence that for successive

5   generations of professional tradesmen set Makita and Milwaukee apart from other makers of

6   power tools.

7       28.     Before launching its DeWalt line of power tools, Black & Decker

8   commissioned a study that showed that professional tradesmen regarded power tools made

9   by Makita and Milwaukee to belong in a separate category - the top tier of power tools and

10  the only power tools specifically designed for professional use. Makita and Milwaukee

11  priced their power tools accordingly, competing against one another on price, quality,

12  durability, and innovation, but largely disregarding other makers of power tools.

13      29.     Black & Decker specifically established the DeWalt brand of power tools in

14  order to challenge Makita and Milwaukee's dominant position as the only two manufacturers

15  of professional-grade power tools. A fourth manufacturer, Bosch, also makes power tools

16  that a lesser number of professionals deem to be professional-grade power tools, at least for

17  certain kinds of work.

18      30.     At present, Makita, Milwaukee, and DeWalt dominate sales of

19  professional-grade power tools, but some professionals regard Bosch as a viable supplier of

20  professional-grade power tools. For a few kinds of power tools, there is the odd additional

21  supplier whose power tool in the particular category might be used by certain kinds of

22  professional tradesmen.

23      31.     Thus the three leading makers of a full line of professional power tools are

24  Makita, Milwaukee, and DeWalt. They account for a predominate share of sales of

25  professional power tools in the United States.

26      32.     When shopping at their preferred provider of hardware products, most

27  professional customers expect to find a prominent display of a full line of power tools made

28  by Makita, Milwaukee, and DeWalt. If the hardware seller entirely lacks any supply of

Makita's and Milwaukee's tools, a substantial percentage of professional customers, easily exceeding 50% to 60% of them, will deem the hardware provider to be deficient and to lack necessary supplies of core products that professionals regularly purchase on an ongoing basis, since they make recurring purchases of power tools, battery packs, related accessories and replacement parts, and when making these purchases also tend to purchase other hardware products – "basket goods".

33.     If a hardware seller is deprived of power tools made by Makita and Milwaukee, it will be greatly hobbled or impeded in its efforts to sell power tools, basket goods or hardware goods in general to professional customers. Moreover, for seven major categories of power tools, the deprived seller will be greatly hobbled or impeded from making sales of power tools to all customers. It is for this reason that Home Depot has shrewdly but improperly used its massive purchasing power in order to strong arm Makita and Milwaukee to stop making sales of their products to the direct competitors of Home Depot that pose a threat to Home Depot's continued dominance in various product markets.

34.     The targeted retailers now include the following hardware retailers: The major online seller (Amazon); the two remaining big-box chains other than Home Depot (Lowe's and Menards); a substantial regional chain of mid-sized hardware stores that has developed a successful new format for brick-and-mortar sales (Orchard); and others. Home Depot instigated the withholding by approaching Makita and Milwaukee and by indicating to both that it was conferring with the other. Makita and Milwaukee, acting against their own self-interest, accomplished the withholding by refusing to make direct sales to the targeted competitors, by instructing their distributors to withhold their products from the targeted competitors, and by taking effectual measures so that all of the retailer members of the leading wholesale cooperatives would not fill Amazon's orders for their products.

35.     By this coordinated withholding of core hardware products, Defendants have harmed competition in the below-described markets in the following manner.

(1)     The targeted competitors have been effectually deprived of supplies that they require in order to be remain viable, successful competitors in the following lines

of commerce and product markets: (1) The sale of seven different categories of power tools, since Makita and Milwaukee jointly account for 31% to 50% of overall sales of these different kinds of tools, and for each kind of tool is there no reasonable substitute product; (2) the sale of professional power tools; and (3) the sale of "basket goods" and hardware products in general to professional customers.

(2)    In these markets, Home Depot has avoided price competition from Amazon, Lowe's, Menards, and others when making sales in the affected markets. Home Depot sells Makita's and Milwaukee's power tools at the prices set by each supplier's minimum advertised prices ("MAPs"). Amazon properly offered lower prices than the MAPs as well as free or inexpensive delivery charges. Home Depot is now insulated from this price competition, nor can Amazon circumvent it by supplying DeWalt or other brands at lower prices, since many professionals purchase only Makita or Milwaukee power tools and have demonstrated their extraordinary "brand loyalty" when making these purchases. Menards and to a lesser extent Lowe's also use aggressive price-cutting and discounts and previously set lower prices and other price promotions when selling Makita's and Milwaukee's products, but they cannot do so any longer because they cannot acquire these products. The other hardware sellers that can acquire Makita's and Milwaukee's products (the retailer members of the wholesale cooperatives and major retailers such as WalMart and Target) either must pay higher prices for them (the cooperatives' retailers) or otherwise do not cater to or have a sufficient inventory of hardware products to compete for sales to professional customers (the giant general retailers and the cooperatives' retailers). By the coordinated withholding, Home Depot has been significantly insulated from price competition in the affected markets.

(3)    Home Depot has also avoided competition on customer service, store layout, and product display in these markets: Amazon provides free or inexpensive delivery to a customer's designated location, including a professional customer's worksite. Home Depot no longer is under pressure to answer this challenge.

1   Moreover, Orchard operates a substantial chain of mid-sized general hardware stores
2   in California and Oregon. Two leading executives of Home Depot (one of whom was
3   its chief operating officer) became the two key executives of Orchard, and they
4   proceeded to revamp its entire operation. They developed a new brick-and-mortar
5   format for displaying and selling hardware products at nine of Orchard's stores.
6   Orchard's new-format stores instantly proved highly popular and successful and drew
7   away substantial sales from the nearby Home Depot outlets, catching Home Depot's
8   attention. Home Depot thereafter treated Orchard as a formidable regional competitor.
9   Now Home Depot has escaped pressure to respond to Orchard's challenge on superior
10  brick-and-mortar retailing practices in the affected product markets.

11          (4)     Consumers and professional customers in particular have increasingly
12  found themselves deprived of the benefits of competition for their continued
13  purchases in the affected product markets. In consequence, they have paid higher
14  prices and been deprived of competition on price, service, product-display, and other
15  competitive innovations. They have also been deprived of choice in the marketplace
16  and constrained to purchase power tools, basket goods, and hardware goods in general
17  from the dominant big-box seller, Home Depot, which offers indifferent service, poor
18  product display, comparatively expensive delivery, and unattractive pricing. All of
19  this constitutes a failure of competition – or rather, it is the foreseeable and intended
20  harm to competition wrought by Defendants' coordinated withholding of supplies
21  from Home Depot's targeted direct competitors.

22  36.     Rather than respond to the emerging competitive threats with new innovations
23  of its own, such as improved product offerings, better prices or improved service, Home
24  Depot has answered its competition by prevailing on two necessary suppliers to cut off their
25  supplies to its feared rivals, so that the rivals can no longer pose formidable competition for
26  the sale of seven kinds of power tools, professional power tools as a related cluster of
27  products, and basket goods and hardware products in general to the most coveted class of
28  purchasers – professional customers who make substantial and recurring purchases in order

to perform their own work.

37.     By the above arrangement, Home Depot, Makita, and Milwaukee have imposed significant, anti-competitive restrictions in the below-pled markets, doing so in order to accomplish the following: (a) restrict and exclude Home Depot's targeted competitors from continuing to operate in well-defined product markets, and (b) spare Home Depot competitive pressures on price, product display, free delivery, customer service, and brick-and-mortar formats in the emerging era of online sales.

38.     Defendants' concerted withholding of these supplies has undermined Orchard's ability to remain a viable competitor in the below-pled lines of commerce, causing it substantial lost profits whose amount will increase significantly over time.

39.     The conduct at issue would have been a "slam-dunk" violation of the rule against boycotts announced in *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705 (1959) and further explained in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613 (1985). In these two cases, the United States Supreme Court confirmed that it is a per se restraint of trade whenever a dominant buyer prevails on key suppliers and their distributors to withhold supplies from a direct competitor so that the competitor cannot continue to compete against the dominant buyer in a given line of commerce.

40.     In *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 119 S.Ct. 493 (1998), however, the Supreme Court imposed a new restriction of horizontal dealing between the cooperating suppliers in order to prevent a disappointed supplier from misusing a *per se* antitrust doctrine in order to sue its former customer and the customer's chosen new supplier.

41.     The ruling in *Discon* should not mean that the blatant group boycott at issue in the present case should suddenly be transformed from (1) a self-evident per se violation to (2) conduct that escapes even a rule-of-reason inquiry.

42.     On the contrary, the necessary horizontal collaboration for an unlawful group boycott occurs when, as here, the instigating retailer communicates to the participating suppliers that it is conferring with the other suppliers, who therefore have reason to know

1    that one or more of them will participate in the contemplated boycott.

2         43.    On information and belief, Home Depot made clear by express and/or implied

3    statements to Makita and Milwaukee that it was conferring with both of them to ensure that

4    neither would sell their products or allow their products to be sold to the targeted competitors

5    – Amazon, Orchard and possibly others. The facts that support this inference are pled below.

6         44.    First, Makita and Milwaukee had a history of acting in tandem to withhold

7    their products in this manner from designated competitors of Home Depot: At Home Depot's

8    behest, they stopped selling to Menards in the mid-1990s and to Lowe's in the late 1990s.

9         45.    Second, at the very time when Makita and Milwaukee shut off their supplies to

10   Orchard and Amazon, Black & Decker Dewalt disclosed that (1) Home Depot had

11   approached it to demand that it too cease to sell its power tools to Orchard and other targeted

12   competitors, and (2) Home Depot threatened to reduce purchases of its products and display

13   fewer of them in its stores if it did not acquiesce in this demand.

14        46.    Third, Home Depot publicly disclosed to investors at a trade convention that it

15   intended to lock down the supply of professional power tools in order to counter emerging

16   competitive threats to its market positions at the very time when Makita and Milwaukee

17   again agreed at its behest to cut off their supplies to yet other targeted competitors.

18        47.    Fourth, two of Orchard's key officers used to be hold significant positions at

19   Home Depot.[1] They understand on the basis of their experience that Home Depot's current

20   management would not make bluntly illegal threats, but that it would adroitly suggest or

21   insinuate to each supplier that it was conferring with its other suppliers about the same

22   matter.

23        48.    Fifth, the very nature of Home Depot's threat meant that the threat would be

24   plausible to each supplier only if it grasped that at least one of the others had agreed to

25   ────────────────────

26        [1]    Mark Baker is the Chief Executive Officer of Orchard. He was employed at Home Depot
     from 1995 until 2001. He held various positions in merchandising and operations at the company and
27   served in various capacities, including the following: Chief Operating Officer; President of Home
     Depot's Midwest Division; Group President; and Executive Vice-President of Merchandising. Steve
28   Mahurin is an Executive Vice-President at Orchard who is in charge of its Merchandising and Marketing
     Divisions. He worked at HD from 1989 until 2002 in various operational and merchandising roles. He
     rose to become a Senior Vice President of Home Depot's Merchandising Division.

withhold its products from the targeted competitors. Again, Home Depot threatened each of the three key suppliers with reduced purchases and product displays unless the supplier consented to the product withholding. It indicated to each supplier that it was conferring with the other concerned suppliers. From this each supplier must have reckoned that one of the others had agreed to participate in the arrangement. Otherwise, Home Depot stood at risk of reducing its purchases and product displays for the three suppliers whose products it must carry in order to remain a fully viable seller of professional power tools and basket goods. Indeed, Home Depot's threat would be debilitating to Home Depot even if it reduced only its purchases and product displays for the two legacy suppliers, Makita and Milwaukee. This would constitute an unacceptable gap in its product offerings to professional customers.

49.   Sixth, Makita and Milwaukee both have an extraordinary dependence on continued good relations with Home Depot, as is pled more fully below. In contrast, Black & Decker makes not only professional power tools, but also "do-it-yourself" and domestic power tools under the Black & Decker name, as well as many other kinds of products. It does not have nearly the same degree of dependence on Home Depot.

50.   Thus Makita and Milwaukee each acted on the understanding that the other had also agreed at Home Depot's behest to cut off the targeted competitors. Neither could afford to allow the other to have favored purchases and displays at Home Depot at its expense, unlike Black & Decker. Both yielded to Home Depot's threat and carried out its demand against their own interest.

51.   Milwaukee and Makita have an excessive dependence on their continued good dealings with Home Depot and so could not afford to reject its demands, even though it was directly contrary to their own legitimate commercial interests in the matter. Makita sells 40% of its annual output to Home Depot. Milwaukee sells a very substantial percentage, and its parent company, TTI, makes several of Home Depot's "house brands," selling it billions of dollars of merchandise each year. Black & Decker, in contrast, is not nearly as beholden to Home Depot and was unwilling to deprive itself of major sales channels and injure its own interest and reputation in order to carry out Home Depot's anti-competitive strategy. It

refused Home Depot's demand and in consequence has lost sales and product placement at Home Depot's stores.

52.     For these reasons and other reasons set forth more fully below, and in light of the past history, the known facts readily indicate that Home Depot approached both Makita and Milwaukee, demanded that they again agree to withhold their supplies from targeted competitors, implied or stated to both that it was speaking with its other concerned suppliers, and in this manner prevailed on both to withhold their necessary products from Orchard, Amazon, and possibly others. The withholding therefore constitutes a per se violation of Section 1 of the Sherman Act.

53.     In addition, the challenged conduct should be deemed a violation of Section 1 of the Sherman Act after a "quick look" analysis of the challenged conduct.

54.     In addition, the challenged conduct should be deemed a violation of Section 1 of the Sherman Act under the rule of reason.

55.     This same conduct also constitutes related violations of California's Cartwright Act (California Business & Professions Code Sections 16720 *et seq.*) and California's Unfair Competition Law (California Business & Professions Code Sections 17200 *et seq.*).

56.     In addition, Home Depot has tortiously interfered with the performance of (1) the master contract between Orchard and Makita; (2) the master contract between Orchard and Milwaukee; and (3) the obvious contractual dealings between Orchard and its customers that Home Depot purposefully sought to undermine by the above conduct.

57.     Orchard requests a jury trial at which it will seek treble damages for its ongoing and predicted lost profits and other damages. It also requests injunctive relief, attorney's fees, pre-judgment interest, and punitive damages for the common-law torts.

58.     **B. Household Hardware Products and Hardware Stores**. "Hardware products" and "home-improvement products" are terms generally recognized by the public at large and in particular by the producers, distributors, retailers, and end-purchasers (consumers) of these products.

//

59.     As used by the general public and industry participants, the terms "hardware products" and "home improvement products" broadly refer to *various kinds of tools, implements, materials, and related products used by professional and non-professional customers in order to fix and improve structures, machines, and yards – or, more specifically, in order make repairs, modifications, and improvements to structures, machines and yards.*

60.     This category of products is very broad, but is commonly recognized and treated as a distinct category of products by the general public as well as by the producers, distributors, retailers, and consumers of these products.

61.     Core household hardware products include the following kinds of goods: Power tools, hand tools, fasteners, builders' hardware, painting supplies, plumbing supplies, electrical supplies, cleaning supplies, outdoor power equipment, and lawn and garden products.

62.     As used by the general public and industry participants, the term "hardware stores" refers to retail stores that specialize in displaying, promoting, and selling hardware products and related products – i.e., hardware products that their customers use to make repairs, modifications, and improvements to structures, machines, and yards, as well as ancillary products that their customers use to furnish, refurbish, decorate, and protect structures and yards.

63.     Many products sold by hardware stores are also available at other kinds of stores, but only hardware stores specialize in displaying, explaining, and selling only hardware products and related products. Until the advent of online retailers (see below), it was only at general hardware stores that a customer could expect to find a reasonably complete range of necessary hardware products, even if other kinds of stores also carried some of these products along with many other kinds of products that are not hardware products nor ancillary or in any way related to hardware products (e.g., many stores carry kitchen cleaning agents, as do hardware stores, but a customer who seeks to purchase tools and materials to make repairs, and who also requires cleaning agents in order to clean up

after making repairs, will typically look only to hardware stores in order to purchase the necessary products for this purpose; this is an example of the "commercial reality" of hardware products and hardware stores.)

64.     Hardware stores sometimes distinguish themselves from other hardware stores by offering a specialty line of hardware products or by offering services or conveniences not offered by their competitors, *but all hardware stores sell goods commonly understood to be "hardware products," and their customers understand that hardware stores stock and offer these kinds of goods for sale and shop at them in order to purchase these kinds of goods.*

65.     The basic concept of a hardware store has always been the same. *Hardware stores provide the tools and implements as well as many of the construction materials and ancillary products that professional and non-professional customers require to make repairs and improvements to structures, machines, and yards.*

66.     **C. Professional and Non-Professional Customers**. Hardware stores broadly recognize two distinct classes of customers: (1) Non-professional customers, who typically seek to purchase a general inventory of appropriate hardware products for future use, or who seek to purchase specific items in order to perform a "do-it-yourself" project or repair at a property or yard or to a machine; and (2) professional customers, who typically make recurring purchases of specialized tools and construction materials that they require in order to perform construction and mechanical work, such as general contracting, mechanical work of all kinds, carpentry, framing, masonry, flooring, roofing, painting, insulating, plumbing, dry-walling, electrical work, interior decoration, landscaping, and a full range of other, related lines of work in the construction and mechanical trades. (Hardware stores typically do not sell products for industrial use. Large construction companies that perform infrastructure work and major commercial developments largely purchase their materials and implements from specialized suppliers. These sales are commonly referred to as industrial sales.)

67.     **D. The Importance of Power Tools to Hardware Sales**. Power tools rank among the most important categories of products offered by a hardware store. They are one of the core "clusters" of products sold by sellers of hardware products, along with hand tools,

fasteners, builders' hardware, painting supplies, plumbing supplies, electrical supplies, cleaning supplies, outdoor power equipment, and lawn and garden products.

68. A hardware seller that lacks a reasonably complete line of power tools likely cannot remain a fully viable seller of power tools and in particular cannot remain a fully viable seller of power tools to the most important category of purchasers of these products, who are professional customers.

69. **E. Milwaukee and Makita Are Leading Suppliers of Power Tools and the Premier Suppliers of Professional Power Tools**. Milwaukee and Makita collectively make a substantial percentage of the principal kinds of power tools sold and used in the United States.

70. Of the principal categories of power tools sold in the United States each year to all customers (professional and non-professional), Makita and Milwaukee collectively make the following percentages of them:

| Kind of power tool | Milwaukee and Makita's combined market share of overall sales in the United States |
| --- | --- |
| 12v impact drivers | 50% |
| Reciprocating saws | 46% |
| 12v cordless tools and combo kits | 44% |
| 18v cordless tools and combo kits | 36% |
| direct and circular drive saws | 34% |
| 18v impact drivers | 34% |
| grinders | 31% |
| sanders | 22% (finished sanders); 17% (orbital sanders) |
| hammer drills | 15% |
| jig saws | 9% |

71. Many customers and most professional customers will cease to shop for power tools at a store that does not carry any power tools made by Milwaukee and Makita, given

that these two sellers jointly account for such a large portion of the above kinds of power tools, which are the most commonly purchased kinds of power tools.

72.     Moreover, many purchasers of power tools generally regard them to be a common grouping of products, which they tend to purchase only from sellers that carry a reasonably full line of the principal kinds and brands of power tools.

73.     At present, professional customers generally regard Makita, Milwaukee, and DeWalt to be the three key brands that make a full line of professional grade power tools. Bosch under its own name and under the name Skil makes some power tools that are favored by certain professionals, particularly for cement work. One or two other brands make a particular kind of power tool that certain specialized professionals tend to use. Broadly speaking, however, there are only three leading makers of a full line of professional-grade power tools – Makita, Milwaukee, and DeWalt.

74.     Since there are only three leading brands for a full line of professional power tools (with Bosch lagging behind in sales and reputation), a hardware seller that lacks two of the three major brands will find itself at an enormous, insuperable disadvantage if it tries to compete for sales of professional power tools.

75.     Moreover, a very substantial percentage of professional customers purchase only power tools made by Makita and Milwaukee.

76.     Of the remainder, a substantial percentage wish to compare the latest offerings and prices of Makita and Milwaukee power tools before deciding whether they will instead purchase a DeWalt (or, less frequently, a Bosch power tool). This is because Makita and Milwaukee are the two companies that have the legacy brands that have set the standard for professional-grade power tools for successive generations of professional tradesmen. This circumstance is especially significant because professional customers have exhibited extraordinary "brand loyalty" when purchasing power tools. These matters are alleged more fully directly below.

77.     Before launching (or reinventing) its DeWalt brand in the early 1990s, Black & Decker prepared a market analysis of sales of power tools to professional tradesmen in 1990.

It made the following findings: Makita and Milwaukee jointly accounted for the following market shares of sales of the following major categories of power tools to professional tradesmen: *App. 85% of all sales of cordless drivers; 70% of corded drivers; 70% of circular saws; 60% of reciprocating saws; 45% of miter saws (all Makita, since Milwaukee did not offer a miter saw); 40% of jig saws; app. 50% of chop saws; and app. 65% of finishing sanders.* Source: Harvard Business School, Case Study 9-595-057 ("The Black & Decker Corporation (A):Power Tools Division").

78.     At around the same time, Black & Decker conducted a survey of professional tradesmen, seeking their evaluation of power tools made by Makita, Milwaukee and Black & Decker. Among the representative sampling of professional tradesmen interviewed by Black & Decker's market analysts, the overwhelming consensus was that Milwaukee and Makita made the best, most durable, and most proficient power tools. The interviewed professionals in this study ranked the makers of power tools as follows: Milwaukee and Makita alone occupied the first tier – called "highest quality." The second tier of power tool makers was limited to Bosch, Hitachi, Porter Cable, and Panasonic. The third tier was occupied by Black & Decker, Ryobi, Skil, and Craftsmen; and the lowest-ranking tier was the rank accorded to Wen. Source: Harvard Business School, Case Study 9-595-057 ("The Black & Decker Corporation (A): May 11, 2013Power Tools Division").

79.     Thereafter, Black & Decker developed its "DeWalt" brand of power tools, which has since joined the upper tier, so that there are now three brands that most professional customers agree make a full line of professional-grade power tools – Makita, Milwaukee, and DeWalt (Bosch has striven to join this elite group, but without gaining widespread acceptance as a fourth maker that belongs in the top tier).

80.     The three key suppliers – Makita, Milwaukee, and DeWalt – dominate sales of professional power tools. The first two, Makita and Milwaukee, alone have the legacy brands that continue to serve as the benchmark and standard of reference for product excellence in power tools intended for use by professional customers. This circumstance is explained by the lasting "brand loyalty" that professional customers exhibit when purchasing and

considering the different brands of power tools.

81.     According to a very recent study performed in May, 2013 for the National Retail Hardware Association, professional customers have far more "brand loyalty" when purchasing power tools than they do when purchasing any other kind of hardware product. The findings of the study are unequivocal: 69% of professional customers purchase only one brand of power tools, but their brand loyalty for other categories of hardware products are dramatically lower, with brand loyalty for each other category of hardware products ranging from 47% to 16%  of these purchasers. Source: Hardware Retailing )publication of the North American Retail Hardware Association, May, 2013) at the following URL: http://hardwareretailing.epubxp.com/i/122980/13

82.     Thus the matter can be fairly summarized as follows. Makita and Milwaukee were the only two suppliers of professional-grade power tools for an extended duration that spanned several generations of professional tradesmen and other professional customers. These customers exhibit extraordinary "brand loyalty" when considering and purchasing professional power tools. They tend to regard Makita and Milwaukee as the two legacy brands for professional power tools and the two brands by which any other brand is judged.

83.     Since Milwaukee, Makita, and DeWalt are the three key producers of a full line of professional power tools, and since Milwaukee and Makita make the legacy brands, a hardware seller that cannot carry Milwaukee and Makita brands is greatly hindered or entirely prevented from competing effectually for the sale of professional power tools.

84.     A hardware seller that cannot carry Milwaukee and Makita brands will find that its profits and margins are unacceptably low in comparison to those enjoyed by a seller that can offer the three key brands of professional power tools. Many professional customers purchase only power tools made by one or the other manufacturer. They will not shop for power tools at a hardware outlet that lacks either brand. For each of the Seven Categories of Power Tools, this circumstance is debilitating and crippling for a hardware seller's overall sales. For professional power tools as a cluster of products, it is also debilitating and ruinously injurious.

85.     During the present calendar year, Orchard's sales of every category of product except power tools has increased by 15% to 50% from the previous year, but its sales of power tools has declined by approximately 50%. Orchard attributes the increase in sales of the other product categories to various specific causes. It attributes the severe decline in sales of power tools to Defendants' group boycott, which has crippled its sale of professional power tools and undermined even its ability to sell power tools in general to all classes of customers.

86.     There is yet more to this matter. If a hardware seller lacks a reasonably full line of professional power tools, or even if it lacks a reasonable range of choice for the Seven Categories of Power Tools, a substantial percentage of professional customers will conclude that the seller is not an adequate or viable destination for their general purchasing requirements. Lowe's and Menards, which operate the other two major chains of big-box outlets, have seen their sales and growth consistently dwarfed by Home Depot precisely because they have failed to generate the same foothold among professional customers, who predictably make large, ongoing purchases. Lowe's and Menards have lost the battle to Home Depot for making sales of professional power tools, and their inability to carry two of the three key brands of professional power tools has been significantly detrimental to their ability to compete for sales of other hardware products to professional customers, even if they remain substantial sellers. Home Depot has eclipsed them.

87.     Professional customers tend to make "basket purchases" when purchasing power tools and related accessories (i.e., purchases of other hardware goods when visiting a hardware seller in order to purchase professional power tools). Defendants' group boycott plainly undercuts each targeted competitor's "basket sales" to the professional customers.

88.     More generally, professional customers generally regard a hardware seller as a deficient, non-viable alternative if it lacks Makita's and Milwaukee's power tools, which, as pled above, are two of the three key brands for a full line of professional power tools and alone serve as the legacy brands and benchmark for the other brands. Hardware sellers that are deprived of their power tools are greatly hindered or excluded from competing for sales

of professional power tools and also find that they lose basket sales and make less sales of hardware products in general to professional customers, since these customers increasingly abandon its stores on the understanding that they are not really top-tier professional providers.

89.     **F. Historic Competition for the Sale of Hardware Products**. Historically, hardware stores competed only against one another to make sales of household hardware products. The competition among these sellers was intense and unrelenting, and even the largest stores made only a small percentage of overall sales of hardware products in the United States. There was no single brand or chain of hardware stores that dominated sales across the country, even if particular stores might command a high percentage of sales in certain isolated locales.

90.     Some hardware stores sought to establish niches for themselves by catering to certain kinds of professional tradesmen or by offering services and conveniences calculated to appeal to non-professional customers.

91.     The common denominator was that all hardware stores at all times devoted themselves to the display and sale of tools, implements, materials, and related items used to modify, improve, or repair structures, machines, and yards. No other kind of seller competed for these sales, even if certain products generally sold at hardware stores were also carried by other kinds of sellers.

92.     **G. Orchard's Hardware Stores**. One substantial hardware seller was Orchard, which from the 1930s onward operated a chain of mid-size general hardware stores located throughout California, particularly in the San Francisco Bay Area, various inland valleys of California, and in various parts of Southern California. Historically, Orchard's stores were profitable, but they always operated in intensely competitive local markets. Orchard has been widely regarded in the hardware industry as the operator of a well-known, significant chain of general hardware stores in California.

93.     Orchard currently operates ninety hardware stores in California and two stores in Portland, Oregon. Orchard's stores serve as general, all-purpose hardware stores that sell a

full range of hardware products to both professional and non-professional customers. Orchard has had a long history of making substantial, ongoing sales of power tools and all manner of hardware products to professional customers.

94.   **H. The Advent of Home-Improvement Centers:** Competition for the sale of hardware products has changed dramatically since the late 1970s, which is when Defendant Home Depot pioneered the use of "home-improvement centers" or "big-box" hardware outlets. Home Depot's innovation was to build hardware stores that were vastly larger than conventional hardware stores (by square footage, Home Depot's outlets typically were to ten to twenty times larger than conventional hardware stores). Home Depot's big-box stores offered a wider range of hardware products in greater supply and at lower prices than did the conventional hardware stores.

95.   In addition, Home Depot's stores offered certain basic construction materials that professional customers had previously purchased at lumber yards and professional builders' outlets. These materials included basic lumber products, flooring, roofing, insulation, masonry, drywall, and other such products.

96.   Home Depot's new approach to selling hardware products proved highly successful.

97.   Home Depot's big-box approach was successfully emulated by another firm, Lowe's Companies, Inc. ("Lowe's"), which had long operated hardware stores, and which adopted the big-box format and became the second largest operator of home-improvement centers in the United States. A third firm, Menards, established a series of big-box outlets in the north Midwest region of the United States, leading to a further concentration of sales of hardware products in the United States.

98.   From the early 1990s onward, the big-box outlets increasingly dominated all retail sales of hardware products, especially the ones operated by Home Depot. By 2005, Home Depot and Lowe's collectively accounted for more than 50% of all sales of hardware products in the United States.

//

99.     The big-box firms, especially Home Depot, purchased hardware supplies in enormous bulk volume directly from the manufacturers. Each offered to its customers an enormous array of seemingly every possible kind of hardware product as well as basic building materials and many ancillary offerings. The huge big-box outlets typically remained open for much longer hours than traditional hardware stores, and they were situated on sprawling, busy lots that frequently received incoming and huge shipments of products, which they would sell in enormous volumes to an endless procession of professional and non-professional customers.

100.     Owing to their enormous and growing size, and owing especially to the extraordinary volume of their continual sales, the big-box sellers were able to negotiate purchases of hardware products at steep discounts that smaller stores could not receive, so that the big boxes not only offered more hardware products in greater supply, but did so at substantially lower prices.

101.     Home Depot even established regional purchasing offices and then a national purchase office that coordinated all purchases for its stores in each designated region of the United States.

102.     Customers who required hardware products increasingly frequented the big-box sellers to the exclusion of other stores, doing so on the assumption that at the big-boxes they would find what they required at the most competitive prices on offer.

103.     Using their superior revenues, the big-boxes were able to obtain steep discounts on core products, fund effective advertising and promotional campaigns, and offer a broader range of hardware products and sell them at lower prices than could the traditional hardware stores.

104.     These trends reinforced one another. The big boxes enjoyed success after success and went from strength to strength when offering products, promotions, sales, discounts, and related offerings.

105.     In 2011, Home Depot's stores in the United States sold an estimated $70 billion of hardware products, building materials, and ancillary products. Lowe's made more

than $47 billion in sales. A third operator of big-box outlets, Menards, made an estimated $7 billion in sales. These sales easily dwarfed those made by all of the other hardware sellers combined and accounted for more than 50% of all sales of hardware products in the United States.

106.   **I. How The Smaller Sellers Fared**. After the big-box sellers came to dominate hardware sales, many smaller hardware stores went out of business entirely. They could not match the competition of the big-box vendors. Other stores adopted an alternative strategy, aiming to fill certain niches by specialty or location.

107.   The most common strategy for the smaller hardware outlets was to become a local neighborhood provider: The big-box outlets by definition are situated on enormous, sprawling complexes. If a customer does not live near one,  or if he lives very close to a smaller store, or if he wishes merely to purchase only a few items and does not care to make his way through an enormous, busy complex, he can purchase many if not all of his required hardware items at the smaller, nearby store and visit a big-box only when appropriate to acquire items for a more substantial project. The smaller stores offer far fewer products and usually charge substantially higher prices for them, but they have succeeded by concentrating on these local sales, which they mostly make to non-professional customers.

108.   By 2005, most of the small, local hardware retailers had joined one of the three national wholesale cooperatives – which operate under the names "Do-It-Best," "True Value Hardware," and "Ace Hardware." These cooperatives had been long established, but membership in them became all the important after the emergence of Home Depot and the other big-box sellers. Retailers who belong to the wholesale cooperatives usually cannot obtain the same price discounts that the big-boxes enjoy: The wholesale cooperatives purchase the hardware products from the manufacturers and resell them at a mark-up to their retailer members. Home Depot and the other big-boxes, in contrast, make direct purchases from the manufacturers, as does Orchard, but in lesser quantities. (For power tools, the pricing is simpler: Home Depot and Orchard both charge the manufacturers' minium advertised prices, while Amazon, Lowe's, and Menards lawfully offer even lower prices.)

109.    In recent years, moreover, a few giant retailers, such as Walmart and Target, opened hardware sections in their sprawling retail outlets. These sellers can purchase products at favorable prices, and they have been able to make substantial sales to non-professional customers for certain kinds of hardware products, but professional customers have never regarded them as adequate or viable destinations for their purchasing requirements. Broadly speaking, the giant general retailers do not compete for sales to professional customers.

110.    Thus hardware products were increasingly sold by the big-box sellers, especially Home Depot, as well local retailers that belonged to one of the three large retailers' cooperatives. In addition, some large general retailers, especially Walmart and Target, established expansive hardware sections in their stores. Many traditional hardware stores could not withstand these competitive pressures and simply went out of business. But some mid-size hardware chains, such as the one successfully operated by Orchard, were able to remain profitable and successful because of their long-term goodwill, loyal base of returning customers, appealing customer service, and specialization in certain niche product markets.

111.    As a rule, professional customers frequented only the big-box sellers or certain remaining mid-sized general sellers such as Orchard.

112.    **J. How Orchard Has Fared**. As for Orchard, its stores were able to remain modestly successful even after the advent of big-box sellers: Orchard's stores offered a reasonably full assortment of most categories of hardware goods used to maintain and repair properties, machines, and yards. It enjoyed excellent goodwill and a loyal customer base. Its stores served as the "friendly, go-to" hardware outlet for many customers (professional and non-professional) that were performing repairs and maintenance work as opposed to new construction and substantial remodeling. Orchard was also sufficiently large in order to negotiate reasonable, competitive prices for most of the hardware products that it purchased. Orchard's prices for power tools was competitive because it charged the minimum advertised prices for each leading brand of power tools.

113. Even so, the big-box era posed competitive problems for Orchard. In response, in 2011 Orchard recruited two highly ranked officers from Home Depot – Mark Baker (the former chief operating officer of Home Depot) and Steve Mahurin (a former Executive Vice-President for Merchandising at Home Depot). These two officers and their new team oversaw a complete makeover of Orchard's operations and developed a new format for its stores that relied on superior product offerings, customer-friendly layouts, attentive customer service, competitive pricing, and convenient locations.

114. Orchard introduced the new format at nine of its stores. This new approach instantly became popular, generating outsized profits for Orchard and drawing away significant sales from nearby Home Depot outlets, which in response began for the first time to regard Orchard as a notable regional competitor. After this promising start, Orchard decided that it would build several new-format stores, convert some of its existing stores to the new format, and close its remaining stores, so that after its transformation all of its operating stores would be new-format stores.

115. Orchard's new format, if fully developed, will allow Orchard to establish an exceptionally profitable operation. Many professionals and some non-professional customers will purchase certain kinds of hardware products from online sellers such as Amazon. For other products, they will continue to make purchases at brick-and-mortar stores where they can see, examine, and make their own comparison of products. Since they can make some purchases online, they will have a lesser need for mammoth big-box outlets that carry every conceivable product. It will suffice to shop at a well-appointed, conveniently located store that offers superior product display, a logical layout, helpful staff, and an inviting shopping experience. This is precisely the model used at Orchard's new-format stores.

116. **K. Online Sellers: The Amazon Challenge**. During the last few years, Amazon, the online seller, has opened enormous warehouses on the outskirts of major metropolitan regions. Using state-of-the-art logistics, it has put into place a next-day and two-day delivery system, by which its customers can order products online and receive them in their homes or at their place of business on the following day or two days later. Amazon

charges a low fee or nothing for its delivery of hardware products, which have included the full range of hardware products and building materials that Home Depot has offered to its customers, except that now Amazon's customers cannot purchase Makita or Milwaukee products. Amazon delivers these products directly to a customer's home or office or to a professional customer's worksite, typically doing so in one or two days if not on the same day. It offers the widest possible range of hardware products and the lowest prices: Its entire business strategy is premised on offering any product at the lowest price offered by anyone, or at a lower price. It uses state-of-the art software to "crawl" the web to spot, match and beat prices for all of its products. It lawfully uses a proper system in order to avoid and undersell minimum advertised prices, which are the prices that Home Depot, Orchard and others have charged for Makita and Milwaukee's products.

117.   Home Depot charges higher delivery fees when it makes deliveries. Its logistics, delivery service, and online operations are markedly inferior to those offered by Amazon. It generally charges higher prices for its products, and in particular it charges higher prices for Makita's and Milwaukee's products than Amazon did when it was permitted to sell them.

118.   The big-box sellers, especially Home Depot, fear that many customers will visit their stores, examine their products, and then purchase them from Amazon, using their cell-phone or computer tablet on the spot to complete the purchase.

119.   Professional customers have increasingly begun to make many of their purchases from Amazon and, in Orchard's experience, many of them would prefer to make their remaining purchases and examine products in stores that offer superior product display, such as Orchard's new-format stores.

120.   Thus Amazon's sales model might definitively undermine the big-box model that Home Depot has employed with such resounding success. The future of brick-and-mortar sales in this environment might devolve to the nimbler competitors that develop alternative sales models, such as Orchard's promising new format, which Orchard was just beginning to deploy when Home Depot spotted it as a genuine competitive threat and tried to

1  sabotage it by shutting off Orchard's access to the necessary supplies provided by Makita

2  and Milwaukee.

3      121.   At present, online shopping for hardware products has not overtaken brick-and-

4  mortar sales. Home Depot remains the largest purchaser and reseller of most kinds of

5  hardware products, and it holds a commanding position in the markets for power tools,

6  professional power tools, basket sales to professionals that purchase professional power

7  tools, and the sale of hardware goods in general to professional customers.

8      122.   **L. Home Depot and Orchard Are Direct Competitors for Hardware Sales.**

9      After Orchard's new-format stores began to enjoy substantial success, Home Depot

10  started to treat Orchard as one of its formidable regional competitors. Appended as Exhibit 1

11  to this complaint is a true and correct copy of a photograph recently taken at one of Home

12  Depot's big-box outlets in California. In this photograph, Home Depot offers a financial

13  incentive to any customer who cuts in half his membership card to Orchard's stores.

14      123.   Appended as Exhibit 2 to this complaint is a true and correct copy of a

15  photograph recently taken of a Home Depot promotion, in which Home Depot boasts of

16  "crushing the competition" posed by Orchard's stores.

17      124.   Appended as Exhibit 3 to this complaint are true and correct copies of

18  photographs recently taken of postings in Home Depot outlets that provide inaccurate

19  comparisons of Home Depot's prices and Orchard's prices for specified products.

20      125.   The photos appended as Exhibits 1-3 demonstrate that Home Depot regards

21  Orchard as a significant regional competitor worthy of its attention and efforts (they might

22  also reveal Home Depot's culture of trying to "crush" and "destroy" perceived rivals, and

23  Exhibit 3 is evidence of actionable false advertising).

24      126.   For Home Depot the twin threat is as follows. The online sellers will win

25  steady, significant orders from professionals and non-professionals when they know in

26  advance what they must purchase. At the same time, Orchard's new stores and others that

27  emulate this approach will win the custom of family shoppers (non-professionals) and

28  professional customers who, when they wish to visit a store, will increasingly tend to prefer

1   the helpful product display, pleasing environment, and knowledgeable staff that they can find

2   at Orchard's new-format stores and other, similar stores that follow Orchard's example.

3       127.   **M. Home Depot's Anti-Competitive Response: An Illegal Group Boycott**.

4       Home Depot could have chosen to respond to these threats to its market positions by

5   developing a new, superior approach to selling hardware products that would set it apart from

6   online sellers and smaller brick-and-mortar rivals such as Orchard.

7       128.   Rather than do so, Home Depot has returned to its favored tactic of choking off

8   key supplies to any competitor that poses a direct threat to its sales to professional customers:

9   As before with Lowe's and Menards, Home Depot has once again prevailed on Makita and

10  Milwaukee to stop selling their products to Amazon, Orchard and others.

11      129.   In the spring or early summer of 2012, key officers of Home Depot approached

12  key officers of the three key suppliers of a full line of professional power tools – Makita,

13  Milwaukee, and Black & Decker. It stated or implied to each supplier that it was conferring

14  about the same matter with the others. It demanded that each supplier cease to sell its

15  products to Orchard, Amazon and possibly other of its direct competitors. It threatened to

16  reduce its purchases and cease to display the full product line of any supplier that refused to

17  participate in this coordinated withholding of professional power tools from the targeted

18  competitors.

19      130.   Makita and Milwaukee, mindful that Home Depot was making the same

20  overture to the other at the same time, agreed to stop selling their products to the targeted

21  competitor. Specifically, each agreed to stop making direct sales, to instruct their respective

22  distributors to stop selling their products to the targeted competitors, and to require the three

23  national wholesale cooperatives to instruct their members (thousands of local retailers across

24  the United States) not to fill "third-party orders" – a restriction that made it virtually

25  impossible for Amazon to fill an order for their products. Makita was able to carve a limited

26  exception for itself: Home Depot agreed that it could sell any product that was not listed in

27  Home Depot's system as a national stock-unit item ("SKU"), but Home Depot controls this

28  list, and it lists all of Makita's most popular products, so that Makita cannot sell any of its

1    most popular products to Amazon or a local retailer that seeks to fill an order arranged by

2    Amazon (a third-party order).

3        131.    As pled more at length above, Home Depot made clear by express and/or

4    implied statements to Makita and Milwaukee that it was conferring with both of them to

5    ensure that neither would sell their products or allow their products to be sold to the targeted

6    competitors – Amazon, Orchard and possibly others. Mindful of this, Makita and Milwaukee

7    agreed at the same time to boycott the targeted competitors. Unlike Black & Decker, both

8    were so dependent on Home Depot that neither could afford to have Home Depot favor the

9    other at its expense, and both had an established history of shutting off supplies to Home

10   Depot's targeted competitors at Home Depot's behest.

11       132.    **N. Makita and Milwaukee Are Dependent, Vulnerable Suppliers**. Makita is

12   peculiarly dependent on Home Depot and therefore vulnerable to its threats because it sells

13   approximately 40% of its annual output to Home Depot.

14       133.    Milwaukee is similarly dependent on Home Depot's favor. Like Makita, its

15   sells a substantial percentage of its annual output to Home Depot. Moreover, Milwaukee's

16   parent company, TTI, makes several brands of products directly for Home Depot (these are

17   so-called "house brands"). Milwaukee and TTI together make annual sales to Home Depot

18   that run into the billions of dollars. For Milwaukee and its parent, the Home Depot account is

19   so valuable to their business that they must yield to Home Depot's demand that they not

20   make sales to targeted direct competitors of Home Depot.

21       134.    Abusing its purchasing power over these two suppliers, Home Depot has

22   prevailed on them to refuse to sell their products and to instruct their distributors to withhold

23   their products from every hardware retailer whose operations Home Depot has deemed to be

24   a competitive threat.  The targeted competitors now include Lowe's, Menards, Amazon,

25   Orchard, and possibly other direct competitors.

26       135.    Before this coordinated withholding, Makita and Milwaukee each sold their

27   entire line of products to Amazon and Orchard, and, like most other manufacturers, both

28   actively looked for ways to increase their online sales by cultivating and improving their

1    relationship with Amazon and other, less successful online sellers. Moreover, both had

2    enjoyed long, uninterrupted trading histories with Orchard, and both had agreed to participate

3    in a strategic marketing program with Orchard under which Orchard would prominently

4    display and promote their respective products in its stores to its many customers.

5        136.    By halting their sales to Orchard, and by making it impossible for Orchard to

6    acquire their products from any source, Makita and Milwaukee each committed a blatant

7    breach of Orchard's master contract, which governed their respective dealings with Orchard.

8    Section 7.1 of this master contract required each supplier to continue selling parts and

9    accessories to Orchard for a ten-year period after it stopped selling any given power tool to it,

10   save where it no longer sold the products in question. Appended to this complaint as Exhibit

11   4 are true and correct copies of these master contracts, which at § 7.1 sets forth the above

12   contractual obligation that Makita and Milwaukee gratuitously breached when cutting off all

13   further sales to a long-established, historic customer.

14       137.    Thus Makita and Milwaukee acted against their own interest by yielding to

15   Home Depot's demand to stop selling to Amazon, Orchard, and possibly others.

16       138.    **O. The Group Boycott, As Implemented**. On its own admission, Home Depot

17   plans to organize, coordinate, and use group boycotts in order to fortify its market positions

18   and rid itself of competitive threats.

19       139.    On June 7, 2012, a key executive of Home Depot, Mr. Craig Menear, publicly

20   announced to investors and others at a trade convention in Atlanta, Georgia that Home Depot

21   would take appropriate measures to answer the competitive threats that now confront it. Mr.

22   Menear indicated that to this end Home Depot would lock down the supply of professional

23   power tools. Appended as Exhibit 5 to this complaint is a true and correct copy of a

24   newspaper article that disclosed this matter.

25       140.    Shortly after Mr. Manear's announcement on June 7, 2012, Makita informed

26   Orchard on June 19, 2012 that Makita would cease to make further sales of any of its

27   products to Orchard, ending a long-term relationship that had been in place for at least fifteen

28   years. During this successful relationship, Orchard had made substantial, ongoing purchases

1   and always paid its bills on time to Makita. Appended to this complaint as Exhibit 6 is a true

2   and correct copy of the correspondence by which Makita gave this notice to Orchard.

3        141.   Since then, Makita has successfully pressured or instructed its distributors to

4   refuse to deliver any of its products or any of its accessories to any of Orchard's stores, and

5   Orchard has been unable to obtain any of Makita's products, not even parts or accessories,

6   despite Makita's above-pled contractual obligation to continue selling parts and accessories

7   to Orchard.

8        142.   Very shortly afterwards, on June 28, 2012, Milwaukee informed Orchard that

9   Milwaukee would likewise cease to make further sales of any of its products to Orchard,

10  thereby ending its own long-term relationship with Orchard, which had been in place for at

11  least fifteen years, and under which Orchard had made substantial, ongoing purchases and

12  always timely paid its bills to Milwaukee. Appended to this complaint as Exhibit 7 is a true

13  and correct copy of the correspondence by which Milwaukee gave this notice to Orchard.

14       143.   Since then Milwaukee has successfully pressured or instructed its distributors

15  to refuse to deliver any of its products or any of its accessories to any of Orchard's stores,

16  and Orchard has been unable to obtain any of Milwaukee's products, not even parts or

17  accessories, despite Milwaukee's above-pled contractual obligation to continue selling parts

18  and accessories to Orchard.

19       144.   Shortly after Milwaukee gave its announcement to Orchard on June 28, 2012, a

20  third supplier of power tools, Black & Decker, disclosed to Orchard that Home Depot had

21  requested that Black & Decker refuse to sell its power tools and related accessories to

22  Orchard and others, including its DeWalt brand of professional power tools. Black & Decker

23  further disclosed that it had rejected Home Depot's demand, and that in retaliation Home

24  Depot had lessened its purchases of Black & Decker products and now carries fewer of its

25  products.

26       145.   At around the same time, Makita and Milwaukee each notified Amazon that it

27  would cease to make further sales to Amazon, and both instructed their distributors not to fill

28  orders placed by Amazon, and, lastly, both notified the national wholesale cooperatives that

1  their members must cease to fill "third-party orders" of their products, effectually making it

2  impossible for Amazon to acquire or sell professional power tools made by Makita or

3  Milwaukee (save that Makita wrested a derisory concession from Home Depot, by which it

4  can sell certain unpopular products to Amazon, but Home Depot controls the list of allowed

5  and forbidden Makita products, and Home Depot has listed all of Makita's most popular

6  products on the list of products that Makita must not sell or allow to be sold to Amazon).

7      146.    Thus Home Depot, which competes directly against Amazon and Orchard, and

8  which openly regards both as threatening competitors, has successfully prevailed upon two

9  key suppliers of core hardware products to withhold their necessary products from Amazon,

10  Orchard and others.

11      147.    **P. The Relevant Geographic Markets**. For antitrust purposes, the relevant

12  geographic markets in this case are the following regions of California and Oregon, in each

13  of which there is effective competition among existing and potential sellers of the hardware

14  products at issue in this case, including existing competition between local Orchard stores

15  and local Home Depot stores:

16              **1. The Geographic Markets in California (In Alphabetical Order)**

17      (1)    The "Central Regions" (Various Regions in the Interior of California): Orchard

18  operates twenty-nine hardware stores in various regions in the interior of California. These

19  stores are located in the following areas, where they compete for sales of hardware products,

20  including power tools and professional power tools: Antelope, Bakersfield, Chico,

21  Clovis, Elk Grove, Fairfield, Folsom, Fresno, N.E. Fresno, Granada Hills, Hanford, Lodi,

22  Manteca, Merced, Modesto, East Modesto, Napa, Redding, Sacramento, Sonora, Stockton,

23  Tracy, Turlock, Van Nuys, Visalia, Woodland, and Yuba City. Home Depot operates outlets

24  in each of these regions that compete for the above sales against Orchard's above-listed

25  stores.

26      (2)    The Central-South Coast/Los Angeles County Regions: Orchard operates

27  twenty-two hardware stores in the Central-South Coast/Los Angeles County Regions. These

28  stores are located in the following areas, where they compete for sales of hardware products,

1 including power tools and professional power tools: Burbank, Canoga Park, Citrus Heights,

2 Goleta, Hesperia, Hollywood, Huntington Beach, La Crescenta, La Verne, Long Beach,

3 Midtown District (Los Angeles), La Brea District (Los Angeles), Pasadena, Paso Robles,

4 Pismo Beach, Santa Clarita, Santa Maria, South Pasadena, Torrance, Thousand Oaks, and

5 West Los Angeles. Home Depot operates outlets in these regions that compete for the above

6 sales against Orchard's above-listed stores.

7      (3)    The "East Bay" Region (East San Francisco Bay): Orchard operates thirteen

8 hardware stores in the East Bay Region of California. These stores are located in the

9 following areas, where they compete for sales of hardware products, including power tools

10 and professional power tools: Berkeley, Concord, Dublin, El Cerrito, Fremont, Livermore,

11 Moraga, Newark, Pinole, San Leandro, San Lorenzo, and San Ramon. Home Depot operates

12 outlets in this region that compete for the above sales against Orchard's above-listed stores.

13      (4)    The "Monterey Bay" Region: Orchard operates four hardware stores in the

14 Monterey Bay Region. These stores are located in the following areas, where they compete

15 for sales of hardware products, including power tools and professional power tools: Capitola,

16 Salinas, Sand City, and Watsonville. Home Depot operates outlets in this region that compete

17 for the above sales against Orchard's above-listed stores.

18      (5)    The "Orange County Region": Orchard operates three hardware stores in the

19 Orange County Region. These stores are located in the following areas, where they compete

20 for sales of hardware products, including power tools and professional power tools: Fountain

21 Valley, Santa Ana, and Yorba Linda. Home Depot operates outlets in this region that

22 compete for the above sales against Orchard's above-listed stores.

23      (6)    The San Francisco Peninsula Region: Orchard operates nine hardware stores in

24 the Orange County Region. These stores are located in the following areas, where they

25 compete for sales of hardware products, including power tools and professional power tools:

26 Antioch, Foster City, Millbrae, Petaluma, Redwood City, San Rafael, Santa Rosa, South San

27 Francisco, and Vacaville. Home Depot operates outlets in this region that compete for the

28 above sales against Orchard's above-listed stores.

1   (7)   The "Silicon Valley" Region: Orchard operates ten hardware stores in the

2   Orange County Region. These stores are located in the following areas, where they compete

3   for sales of hardware products, including power tools and professional power tools: Milpitas,

4   Mountain View, San Jose, Santa Clara, and Sunnyvale. Home Depot operates outlets in this

5   region that compete for the above sales against Orchard's above-listed stores.

6   **2. The Geographic Markets in Oregon (In Alphabetical Order)**

7   (1)   The "Portland" Region (Portland, Oregon and its environs). Orchard operates

8   two hardware stores in this region. These stores are located in the following areas, where

9   they compete for sales of hardware products, including power tools and professional power

10   tools: Portland and Tigard, Oregon. Home Depot operates outlets in this region that compete

11   for the above sales against Orchard's above-listed stores.

12   148.   The above-listed regions encompass most of California by population and

13   territory as well as the largest metropolitan area in Oregon (Portland).

14   149.   Of Orchard's ninety stores in California, seventy-seven of them are located

15   within six miles of a Home Depot outlet.

16   150.   In each of the above-listed regions of California and Oregon, there exists

17   active, ongoing competition between Orchard and Home Depot for the sale of hardware

18   products in general, the sale of power tools in general, the sale of each kind of the Seven

19   Categories of Power Tools, the sale of professional power tools, and the sale of "basket

20   goods" and hardware products in general to professional customers.

21   151.   **Q. The Relevant Product Markets**. For antitrust purposes, there is a separate

22   product market for each of the Seven Categories of Power Tools, which, as pled above, are

23   the following ones: 12v impact drivers, 18v impact drivers, 12v cordless tools and combo

24   kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular drive saws,

25   and grinders.

26   152.   Each kind of the Seven Categories of Power Tools belongs to a separate

27   relevant product market because each of the Seven Categories of Power Tools lacks any

28   reasonably interchangeable substitute. The purchasers of each kind of the Seven Categories

of Power Tools do not turn to other products or services in response to significant price increases for each kind of power tool, nor turn away from alternatives in response to price decreases for each kind of power tool.

153. Rather, there is little or no cross-elasticity of demand between (1) each of the Seven Categories of Power Tools; and (2) any other kind of product or service.

154. If, for example, a purchaser requires a reciprocating saw, there is no other product or service that can serve as a reasonably interchangeable substitute, and the purchaser will view his options as limited to the different kinds of reciprocating saws on offer. The same is true for each of the remaining kinds of the Seven Categories of Power Tools.

155. Therefore, there exists a relevant product market for each of the Seven Categories of Power Tools.

156. For antitrust purposes, moreover, power tools and their necessary accessories may be deemed a relevant "cluster" of products that constitute a distinct product market. Professional and non-professional customers treat "power tools" as a specific, recognized cluster of products that a substantial percentage of them purchase only from sellers that carry a reasonably full line of power tools and related accessories. A seller of power tools that lacks a reasonable supply and full range of them will find that it either cannot remain a viable seller of them or will be greatly hindered in its efforts to act as a viable seller of them, as has been the case for Orchard since it lost its access to power tools made by Makita and Milwaukee. Power tools and their necessary accessories may therefore be treated as a relevant "cluster" of products for antitrust purposes. See *Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1204-05 (9th Cir., 1997) ("[A] cluster approach [to market definition in antitrust cases] is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately.")

157. Even if power tools cannot be treated as a distinct "cluster" of relevant products for antitrust purposes, sellers that offer them are engaged in a distinct line of

commerce for purposes of analyzing an alleged group boycott. The purpose and foreseeable effect of Defendants' concerted refusal to sell professional power tools to Orchard has been to diminish and undermine its ability to remain a viable seller of power tools. The entire point of Defendants' conduct has been to deprive Home Depot's targeted direct competitors of supplies that they require in order to remain viable sellers of (1) power tools in general, (2) each kind of the Seven Categories of Power Tools, (3) professional power tools, and (4) basket sales and hardware products in general for sale to professional customers.

158.   For antitrust purposes, moreover, the sale of professional power tools may be deemed a distinct sub-market in accordance with the principles set forth in *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1523-24 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.")

159.   Every factor listed in *Brown Shoe* favors a finding that there exist distinct submarkets for the sale of professional power tools. These matters are alleged more fully above.

160.   On Milwaukee's public website, moreover, the very first text that appears states the following: *"Milwaukee Electric Tool Corp. is an industry-leading manufacturer and marketer of heavy-duty, portable electric power tools and accessories for professional users worldwide. Since its founding in 1924, Milwaukee has focused on a single vision: To produce the best heavy-duty electric power tools and accessories available to the professional user. Today, the Milwaukee name stands for the highest quality, most durable and most reliable professional tools money can buy."* Source:

1 | http://www.milwaukeetool.com/About/MilwaukeeStory/Default.aspx (December 11, 2012).

2 | 161.   Similarly, Makita's public website offers the following description of Makita's

3 | business:  *"Makita applies the latest innovation to engineer and manufacture the best power

4 | tools in the world. Makita Power Tools have more power and less weight, and are more

5 | compact and more efficient than any other. At jobsites around the world, professional users

6 | are dumping the old, getting the new and gearing-up with Makita. Makita offers more

7 | solutions for the professional trade."*  Source:

8 | http://www.makitausa.com/en-us/Modules/Company/FeelInnovation.aspx (December 11,

9 | 2012.)

10 | 162.   For antitrust purposes, then, the following relevant markets exist: The sale in

11 | the above listed regions of California and Oregon of the following products and clusters of

12 | products: (1) each kind of the Seven Categories of Power Tools; (2) power tools as a product

13 | cluster; and (3)  professional product tools as a product cluster.

14 | 163.   The antitrust laws are not supposed to be construed in a formulaic, rigid

15 | manner, but rather are supposed to be applied so as to prevent major competitors from acting

16 | in concert in order to sabotage and undermine competition on the merits in actual lines of

17 | commerce in order to defend their own market positions in a manner that is calculated to

18 | increase prices, stifle innovation, lessen the quality of service or deprive consumers of

19 | meaningful choice and the benefits of competition on the merits for their favor.

20 | 164.   **R. Harm to Competition in the Relevant Markets**. Because of the successive

21 | use of the above-pled group boycott against any competitor that threatens or appears poised

22 | to threaten Home Depot's dominant position in the above-pled markets, existing competitors

23 | have been severely restricted or entirely prevented from competing against Home Depot for

24 | the sale of (1) professional power tools; (2) other hardware products for sale to professional

25 | customers (who make basket purchases and otherwise trust and prefer to shop at a hardware

26 | store that carries the leading and only legacy brands for professional power tools); (3) each

27 | kind of the Seven Categories of Power Tools (each of which exists in a separate product

28 | market for antitrust purposes, as pled above); and (4) power tools in general (as a cluster of

1    related products that consumers expect to find on offer at the same outlet).

2           165.   Orchard has been so restricted and prevented in the above-pled geographic

3    markets. Others have been prevented in these same geographic markets and/or other markets.

4    These others include Lowe's, Menards, and Amazon.

5           166.   Any time a rival seller of hardware products threatens Home Depot's position

6    in the above product markets, it swiftly prevails on Makita and Milwaukee to stop selling

7    their products to the emerging competitor. The competitive process in these markets has been

8    thereby restrained, restricted, and prevented.

9           167.   Home Depot has used the coordinated withholding to avoid price competition

10   from Amazon, Lowe's and Menards, thereby insulating itself improperly from pressure to

11   match or beat prices that would otherwise be offered by these direct competitors for each of

12   the Seven Categories of Power Tools and professional power tools.

13          168.   Amazon uses sophisticated software and a proven business format in order to

14   continually monitor prices offered by others and to match or beat those prices for most or all

15   of its products. It also uses lawful, proper methods to offer prices that are lower than a

16   manufacturer's minimum advertised price (or "MAP"). It offers free or inexpensive delivery

17   of products to the customer's site. Amazon seeks to increase price competition for the sale of

18   power tools, professional power tools, and basket goods and general hardware products for

19   sale to professional customers.

20          169.   Lowe's, which operates a national chain of big-box outlets, has long employed

21   aggressive discounting and price competition in effort to win customers and market share

22   from its most significant rival, Home Depot.

23          170.   Menards operates a chain of big-box outlets in the Midwest region of the

24   United States. Its essential business premise has been that it will match or beat the price of

25   any product offered by any other hardware seller.

26          171.   By Defendants' conduct, Amazon, Lowe's and Menards have been prevented

27   from increasing price competition in the affected markets, and collectively these three sellers

28   and Home Depot account for a very significant if not overwhelming percentage of sales of

professional power tools and a significant percentage of sales of power tools generally.

172.   The harm to price competition cannot be avoided by the offer of other brands or the availability of Makita's and Milwaukee's brands at other retailers.

173.   Many professionals will not shop for power tools at stores that lack these two brands (as alleged above), and with limited exceptions professionals cannot meet their other purchasing requirements at the remaining stores that can carry the Milwaukee and Makita brands (giant general retailers and local retailers that belong to national wholesale cooperatives). In addition, the local retailers purchase their products from the wholesale cooperatives at a mark-up and so cannot introduce price competition in the affected markets. Orchard is a direct competitor that imposed competitive pressure in the affected markets to provide improved product display, superior customer service, a more "customer-friendly" shopping experience, and an easier way to shop for hardware goods at a brick-and-mortar outlet when many customers no longer make all of their purchases at brick-and-mortar outlets. Home Depot has avoided the pressure to match these innovations in service and product display by depriving Orchard of the supplies it requires in order to continue offering them in the affected markets.

174.   In the affected markets, non-professional and professional customers have been effectually and increasingly deprived of choice of supplier or the benefits of robust competition for their ongoing business. They have been and will continue to find themselves deprived of the benefits of this competition – lower prices, more attentive and helpful customer service, innovations in product display and customer convenience, and experimentation with alternative brick-and-mortar formats in the evolving era of increasing internet sales.

175.   As a matter of antitrust economics, if professional customers and others find themselves constrained to acquire any of the Seven Categories of Power Tools at Home Depot, Home Depot can set its prices for these products without regard to (1) Menard's aggressive discounting; (2) Lowe's formidable price competition; (3) Amazon's market-beating price competition and free or inexpensive delivery of products; (4) Orchard's

1  innovative product display, customer convenience, and enhanced customer service at its new-

2  format stores; or (5) any other competitive threat that Home Depot deems serious enough so

3  that it will summon Makita and Milwaukee to subject the competitor to the ongoing,

4  crippling group boycott.

5      176.   In this manner, Defendants' conduct has harmed and tended to undermine

6  competition on the merits in the above product markets, including these product markets in

7  the above-pled regions of California and Oregon.

8      177.   By the challenged conduct, Defendants have unreasonably and unlawfully

9  restricted and blocked access and distribution of necessary supplies for hardware sellers who

10 sell to professional customers and others. Defendants have done so in a manner that has

11 purposefully undermined and suffocated competition in the above product markets, including

12 these product markets located in the above-pled regions of California and Oregon. In direct

13 consequence, there has been significant, ongoing, and worsening harm to the restricted and

14 excluded competitors as well as the purchasers of the affected products.

15     178.   **S. Orchard's Antitrust Injuries**. By their above-pled group boycott,

16 Defendants have harmed competition on the merits in each of the above-pled relevant

17 markets, submarkets, and distinct lines of commerce.

18     179.   In so doing, they have caused Orchard to lose substantial sales and profits that

19 it otherwise would have made as well as related damages. These lost profits and related

20 damages are directly linked to the anti-competitive character of their challenged conduct:

21 Home Depot and two of the three key suppliers of professional power tools have

22 purposefully withheld necessary supplies from a succession of Home Depot's targeted direct

23 competitors, one of whom is Orchard.

24     180.   In consequence, Orchard has suffered lost profits and related damages because

25 it has been excessively hindered or prevented from competing in the above-pled relevant

26 markets and lines of commerce.

27     181.   As a proximate consequence of Defendants' challenged conduct, Orchard

28 estimates that it has lost and will continue to lose profits from the sale of (1) each of the

Seven Categories of Power Tools, (2) power tools in general, (3) professional power tools, (4) basket sales for sale to professional customers, and (5) hardware products for sale to professional customers. In addition, professional customers and will increasingly abandon its stores altogether.

182.    Orchard reports that an increasing number of professional customers have largely or entirely stopped making purchases at its stores. Some have inquired why Orchard no longer carries power tools made by Makita and Milwaukee. Orchard has noted a similar, but less pronounced trend among non-professional customers.

183.    Except for power tools, Orchard's sales of every category of hardware products have significantly improved during the present calendar year. At the same time, its sales of power tools have dramatically declined.

184.    During the calendar year from January 1, 2013, Orchard's sales of every category of product except power tools have increased by 15% to 50% from the previous year. Its sales of professional power tools have declined by approximately 50% during this same period.

185.    Orchard attributes the increase in sales of the other categories to its new-format stores, refurbished operations, and improved management, and also to a general improvement in housing and construction markets in California, favorable weather last winter, and other favorable commercial circumstances. Despite these trends, Orchard has experienced a severe decline in sales of power tools, which it attributes solely to Defendants' group boycott. Moreover, Orchard's sales of other kinds of products would have been even better had it not been subjected to the group boycott, as it has lost basket sales and ongoing sales of general hardware products to professional customers.

186.    Using conservative estimates, Orchard calculates that Defendants' group boycott will cause it to lose net profits of approximately $2 million per year from July, 2012 onward, and that its lost profits and related damages will significantly increase over time.

187.    Moreover, Orchard's lost profits and related damages will likely increase significantly when it cannot compete effectually for the above-pled sales during the emerging

1    recovery of the housing and construction markets now underway throughout California and

2    Oregon.

3                              **V. FIRST CAUSE OF ACTION**
                  **(UNLAWFUL GROUP BOYCOTT; PER SE VIOLATION)**
4                               **(15 U.S.C. § 1)**

5        188.    Orchard re-pleads and incorporates by reference each of the preceding

6    allegations.

7        189.    Milwaukee and Makita collectively make a substantial percentage of the

8    following kinds of power tools: 12v impact drivers, 18v impact drivers, 12v cordless tools

9    and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular

10   drive saws, and grinders (defined above as the "Seven Categories of Power Tools"). These

11   two suppliers jointly account for 50% to 31% of overall sales of each kind of the Seven

12   Categories of Power Tools.

13       190.    For each of these categories of power tools, there exists no reasonably

14   interchangeable substitute.

15       191.    Home Depot and Orchard are direct competitors with one another. They

16   directly compete for sales in the following relevant product markets in the above-pled

17   geographic regions: (1) Each kind of the Seven Categories of Power Tools; (2) power tools in

18   general (as a related cluster of products); (3) professional power tools for sale to professional

19   customers (as a related cluster of products); (4) basket sales for sale to professional

20   customers; and (5) hardware products for sale to professional customers.

21       192.    Acting in concert as pled above, Defendants have withheld all of Milwaukee's

22   and Makita's power tools and related parts and accessories from various competitors of

23   Home Depot, one of which is Orchard.

24       193.    Owing to Defendants' withholding of these kinds of power tools, Orchard has

25   ceased to be or soon will cease to be a viable competitor in the above-pled regional markets

26   for the following categories of products: 12v impact drivers, 18v impact drivers, 12v

27   cordless tools and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct

28   and circular drive saws, and grinders (i.e., each kind of the Seven Categories of Power

1   Tools).

2   194.   Moreover, Defendants' concerted withholding of these power tools from

3   Orchard has undermined its ability to remain a viable seller of professional power tools,

4   which constitute a relevant "cluster" of products for antitrust purposes, as pled above.

5   195.   Moreover, Defendants' concerted withholding of these power tools from

6   Orchard has greatly hindered its ability to remain a viable seller of power tools, which

7   constitute a relevant "cluster" of products for antitrust purposes, as pled above.

8   196.   Moreover, Defendants' concerted withholding of supplies has undermined

9   Orchard's ability to make "basket sales" to professional customers who otherwise would

10  purchase power tools, related accessories, and other hardware products from Orchard.

11  197.   The purpose of Defendants' conduct has been clear – to deprive Home Depot's

12  targeted competitors, including Orchard, of supplies that they require in order to remain

13  viable competitors in the above product markets.

14  198.   Defendants lack a compelling business reason for their concerted withholding

15  of these necessary supplies from Orchard or the other targeted competitors.

16  199.   Home Depot approached Milwaukee and Makita to prevail on both to stop

17  selling their products to Amazon and Orchard. When doing so, it informed each one that it

18  was conferring with the other. Milwaukee and Makita would not have abandoned sales to

19  Amazon and Orchard, unless it understood from Home Depot that the other would do the

20  same at around the same time and in the same manner: Both suppliers have excessive

21  dependence on Home Depot. But Home Depot could make a credible threat to reduce

22  purchases from either supplier only by indicating that the other alone would take its place at

23  Home Depot's stores. Home Depot's threats to these two suppliers would be far more

24  credible if it indicated to both that it was talking with each one and expected to maintain or

25  increase its purchases and improve its product display only for the supplier that agreed to

26  withhold products from the targeted competitor.

27  200.   In proximate consequence of Defendants' concerted withholding of these

28  necessary supplies, Orchard has lost profits and related damages that will foreseeably

1   increase in amount over time.

2       201.   By engaging in the above-pled group boycott of Orchard, and in light of the

3   above-pled matters, Defendants have committed a per se violation of Section 1.

4       WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for

5   Relief, which appears below.

6

7                    **VI. SECOND CAUSE OF ACTION**
       **(UNLAWFUL GROUP BOYCOTT; RULE-OF-REASON**
       **VIOLATION AND QUICK-LOOK VIOLATION)**
8                        **(15 U.S.C. § 1)**

9       202.   Orchard re-pleads and incorporates by reference each of the preceding

10  allegations.

11      203.   Orchard re-pleads and incorporates by reference each of the preceding

12  allegations.

13      204.   Milwaukee and Makita collectively make a substantial percentage of the

14  following kinds of power tools: 12v impact drivers, 18v impact drivers, 12v cordless tools

15  and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and circular

16  drive saws, and grinders (defined above as the "Seven Categories of Power Tools"). These

17  two suppliers jointly account for 50% to 31% of overall sales of each kind of the Seven

18  Categories of Power Tools.

19      205.   For each of these categories of power tools, there exists no reasonably

20  interchangeable substitute.

21      206.   Home Depot and Orchard are direct competitors with one another. They

22  directly compete for sales in the following relevant product markets in the above-pled

23  geographic regions: (1) Each kind of the Seven Categories of Power Tools; (2) power tools in

24  general (as a related cluster of products); (3) professional power tools for sale to professional

25  customers (as a related cluster of products); (4) basket sales for sale to professional

26  customers; and (5) hardware products for sale to professional customers.

27      207.   Acting in concert as pled above, Defendants have withheld all of Milwaukee's

28  and Makita's power tools and related parts and accessories from various competitors of

1    Home Depot, one of which is Orchard.

2         208.   Owing to Defendants' withholding of these kinds of power tools, Orchard has

3    ceased to be or soon will cease to be a viable competitor in the above-pled regional markets

4    for the following categories of products: 12v impact drivers, 18v impact drivers, 12v cordless

5    tools and combo kits, 18v cordless tools and combo kits, reciprocating saws, direct and

6    circular drive saws, and grinders (i.e., each kind of the Seven Categories of Power Tools).

7         209.   Moreover, Defendants' concerted withholding of these power tools from

8    Orchard has undermined its ability to remain a viable seller of professional power tools,

9    which constitute a relevant "cluster" of products for antitrust purposes, as pled above.

10        210.   Moreover, Defendants' concerted withholding of these power tools from

11   Orchard has greatly hindered its ability to remain a viable seller of power tools, which

12   constitute a relevant "cluster" of products for antitrust purposes, as pled above.

13        211.   Moreover, Defendants' concerted withholding of supplies has undermined

14   Orchard's ability to make "basket sales" to professional customers who otherwise would

15   purchase power tools, related accessories, and other hardware products from Orchard.

16        212.   The purpose of Defendants' conduct has been clear – to deprive Home Depot's

17   targeted competitors, including Orchard, of supplies that they require in order to remain

18   viable competitors in the above product markets.

19        213.   Defendants lack a compelling business reason for their concerted withholding

20   of these necessary supplies from Orchard or the other targeted competitors.

21        214.   Defendants' conduct has harmed competition in each of the above-pled

22   regional product markets, as pled above.

23        215.   By the challenged conduct, Defendants have unreasonably and unlawfully

24   restricted and blocked access and distribution of necessary supplies for hardware sellers who

25   sell to professional customers and others. Defendants have done so in a manner that has

26   purposefully undermined and suffocated competition in the above product markets, including

27   these product markets located in the above-pled regions of California and Oregon. In direct

28   consequence, there has been significant, ongoing, and worsening harm to the restricted and

1 excluded competitors as well as the purchasers of the affected products.

2      216.   Defendants lack a compelling or even any genuine, legitimate business reason

3 for their concerted withholding of these necessary supplies from Lowe's, Menards, Amazon,

4 Orchard and possibly other direct competitors of Home Depot. Even if they had a legitimate

5 business purpose for the concerted withholding, this purpose could be readily accomplished

6 by less restrictive measures.

7      217.   In proximate consequence of Defendants' anti-competitive withholding of

8 these necessary supplies, Orchard has lost profits and related damages that will foreseeably

9 increase in amount over time.

10      218.   By engaging in the above-pled group boycott of Orchard and others, and in

11 light of the above-pled matters, Defendants have imposed a restraint of trade that violates

12 Section 1 because it fails to satisfy the rule of reason.

13      219.   Since Defendants' conduct is apparently anti-competitive in intended effect and

14 practical application, it should be condemned as a violation of Section 1 under the "quick-

15 look" approach to rule-of-reason violations. See *California Dental Ass'n v. F.T.C.,* 526 U.S.

16 756, 770 (1999) (an "abbreviated or quick-look analysis under the rule of reason" is

17 appropriately used to condemn trade restraints "when the great likelihood of anticompetitive

18 effects can easily be ascertained.")

19      WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for

20 Relief, which appears below.

21                      **VII. THIRD CAUSE OF ACTION**
     **(UNLAWFUL GROUP BOYCOTT; PER SE VIOLATION)**
22          **(CAL. BUS. & PROF. CODE §§ 16720 AND 16726)**

23      220.   Orchard re-pleads and incorporates by reference each of the preceding

24 allegations.

25      221.   By engaging in the above-pled group boycott, and in light of the above-pled

26 matters, Defendants have committed a per se violation of California Business & Professions

27 Code Sections 16720 and 16726. Defendants' unlawful group boycott has caused proximate

28 injury to Orchard, which is therefore entitled to relief under California Business &

1  Professions Code Sections 16720 et seq.

2      WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for

3  Relief, which appears below.

4
5                    **VIII. FOURTH CAUSE OF ACTION**
                      **(UNLAWFUL GROUP BOYCOTT;**
                 **QUICK-LOOK AND RULE-OF-REASON VIOLATION)**
6                **(CAL. BUS. & PROF. CODE §§ 16720 AND 16726)**

7      222.   Orchard re-pleads and incorporates by reference each of the preceding

8  allegations.

9      223.   By engaging in the above-pled group boycott, and in light of the above-pled

10  matters, Defendants have committed a violation of California Business & Professions Code

11  Sections 16720 and 16726 under both the rule of reason and a "quick-look" analysis of their

12  conduct. Defendants' unlawful group boycott has caused proximate injury to Orchard, which

13  is therefore entitled to relief under California Business & Professions Code Sections 16720 et

14  seq.

15      WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for

16  Relief, which appears below.

17

18                     **IX. FIFTH CAUSE OF ACTION**
                       **(UNFAIR BUSINESS PRACTICES)**
19              **(CAL. BUS. & PROF. CODE §§ 172000 ET SEQ.)**

20      224.   Orchard re-pleads and incorporates by reference each of the preceding

21  allegations.

22      225.   By the above-pled conduct, and in particular by their coordinated withholding

23  of supplies that Orchard requires in order to remain a viable competitor in the above-stated

24  lines of commerce, Defendants have committed unfair business practices in violation of

25  Sections 17200 *et seq.* of the California Business & Professions Code (the "UCL").  Their

26  above-pled conduct has caused proximate injury to Orchard's business and continues to do

27  so.

28  //

226. This Court has authority under Section 17203 of the UCL to "make such orders as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

227. Moreover, this Court possesses the inherent power to provide such injunctive relief as may be necessary to protect the interests of the parties pending trial of this matter on the merits.

WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

## X. SIXTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS)

228. Orchard re-pleads and incorporates by reference each of the preceding allegations.

229. By the above-pled conduct, which is wrongful under the antitrust laws of the United States and California, each defendant has foreseeably interfered with, impaired, and/or incited the termination of existing contractual relations between Orchard and those of its former regular customers who, as a consequence of Defendants' above-pled conduct, have stopped making any purchases or regular purchases at its stores.

230. Orchard does not track the names of those of its customers who purchase power tools or other hardware products from it, nor does it have executory contracts with these customers that it contends have been disrupted by Defendants' conduct. Rather, Orchard maintained ongoing business dealings with professional customers and others that have been disrupted in the manner pled above. Many of its customers, particularly its professional customers, have foreseeably ceased to make regular purchases at its stores because they no longer carry professional power tools made by Makita or Milwaukee, exactly as Defendants foresaw and intended.

231. Even so, many professional tradesmen and other professional customers formerly maintained commercial accounts at Orchard. Orchard can provide a list of these accounts as soon as an appropriate protective order is in place.

232.    Orchard's own sales figures confirm that many of the businesses listed in its commercial accounts no longer purchase power tools or basket tools from Orchard or simply have stopped making any purchases at all from it.

233.    Orchard can provide a reasonable estimate of the profits that it has lost from all of the sales that it otherwise would have made to these customers. But for Defendants' above-pled wrongful conduct, Orchard would continue to have regular trading relationships with these customers and continue to improve its good-will by having them make purchases at its new stores.

234.    At all relevant times, Defendants understood that Orchard had in place ongoing commercial dealings with its established customers, and that many of these commercial dealings would foreseeably be disrupted, impaired, interfered with, and breached because of their above-pled conduct.

235.    In addition, Home Depot has impaired, interfered with, and wrongly induced the termination of the master sales contract/ancillary contracts between Orchard and Makita and the master sales contract/ancillary contracts Orchard and Milwaukee. Home Depot has done so for an improper purpose and by improper means, and by so acting it has caused substantial harm to Orchard.

236.    Orchard has lost profits and borne related damages in consequence of the foregoing.

237.    In this matter, Defendants have acted with fraud, malice and/or oppression of the kind that subjects each of them to liability for punitive damages under Section 3294 of the California Civil Code.

WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

## XI. SEVENTH CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

238.    Orchard re-pleads and incorporates by reference each of the preceding allegations.

239.    By the above-pled conduct, which is wrongful under the antitrust laws of the United States and California, each defendant has foreseeably interfered with, impaired, and/or incited the termination of prospective economic and contractual relations between Orchard and prospective customers who would otherwise make substantial and recurring purchases of professional power tools and other hardware products from its stores.

240.    At all relevant times, Defendants understood that their conduct likely would have the above-pled detrimental and potentially ruinous effect on Orchard's business. This is precisely why they have engaged in the conduct.

241.    Orchard has lost profits and borne related damages in consequence of the foregoing.

242.    In this matter, Defendants have acted with fraud, malice and/or oppression of the kind that subjects each of them to liability for punitive damages under Section 3294 of the California Civil Code.

WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

## XII. EIGHTH CAUSE OF ACTION
## (FALSE ADVERTISING-LANHAM ACT)
## (15 U.S.C. § 1125(a)(1)(B))

243.    Orchard re-pleads and incorporates by reference each of the preceding allegations.

244.    Home Depot has engaged in a pattern of significant and ongoing false advertising that has harmed Orchard's business by making inaccurate price comparisons between dissimilar products sold by Home Depot and Orchard.

245.    Several of Home Depot's stores at various locations in Southern California have displayed advertisements and promotions in which Home Depot purports to make direct price comparisons, showing how much it charges and how much Orchard charges for the same exact products. These advertisements and promotions are materially misleading, since they purport to compare each seller's prices for identical products, but in fact compare (1) Home Depot's prices for products generally sold at lesser prices with (2) Orchard's prices for

1   products generally sold at comparatively higher prices.

2       246.    For example, Home Depot has posted one advertisement in its stores that

3   purports to show the following direct price comparison:

4               "SKU 265-699
                250 W Portable Work Light
5               HD $9.96 vs. OSH $14.99"

6   The posting includes a photo of a portable work light. The unmistakable and only implication

7   is that Home Depot charges $9.96 and OSH $14.99 for the exact same portable work light -

8   the one that Home Depot lists under its inventory number SKU 265-699. This implication,

9   however, is false. This comparison is between two different kinds of portable work lights

10  made by two different companies, not identical products. Orchard's price is given for the

11  more expensive of the two products, and Home Depot's price is given for the less expensive

12  of the two products.

13      247.    The same is true again and again for various other Home Depot price

14  comparisons, which purport to show the "HD Advantage" on pricing, but which make

15  materially misleading comparisons between different products.

16      248.    For example, Home Depot's advertisements compare Home Depot's price and

17  Orchard's price for "SKU 540-425 Wood Toilet Seat Round," but the comparison is made

18  between two different products that are manufactured by two different suppliers. It is not a

19  comparison of the prices that Home Depot and Orchard charge for the same identical item, as

20  is deliberately implied by the reference to a specific inventory number (SKU 540-425) and

21  by a purported direct comparison of the prices that Home Depot and Orchard charge for this

22  specific inventory item.

23      249.    Another example is Home Depot's misleading price comparison for "SKU

24  170-156," a 40-gallon gas water heater. Home Depot does not disclose in its direct price

25  comparison that the comparison is made between a less expensive unit made by General

26  Electric and a more expensive unit made by Kenmore. Home Depot provides its price for the

27  less expensive unit and Orchard's price for the more expensive one, yet it purports to provide

28  a direct price comparison for the same specific inventory item – "SKU 170-156."

250.    Another example is Home Depot's misleading price comparison for "SKU 461-541" (a submersible sump pump). Here again the price comparison is made between Home Depot's price for a less expensive product with Orchard's price for a more expensive product.

251.    These advertisements have already caused harm to Orchard, and its losses will increase if Home Depot does not cease and desist from displaying these false and misleading advertisements in its stores.

252.    Home Depot and Orchard compete directly against one another in order to sell hardware products and other products, including the kinds of products about which Home Depot has given the misleading price comparisons described above.

253.    In a commercial advertising or promotion, Home Depot has misrepresented important information concerning the nature, characteristics and/or qualities of its or a direct competitor's goods and commercial activities.

254.    By so doing, Home Depot has caused Orchard to lose sales and suffer harm to its business goodwill, causing it to suffer quantifiable lost profits.

255.    Thus Home Depot has committed violations of 15 U.S.C. § 1125(a)(1)(B) that have caused Orchard to suffer lost profits and related damages.

WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

### XIII. NINTH CAUSE OF ACTION
### (FALSE ADVERTISING-CALIFORNIA LAW)
### (CALIFORNIA BUSINESS & PROFESSIONS CODE § 17500)

256.    Orchard re-pleads and incorporates by reference each of the preceding allegations.

257.    By displaying the above-pled misleading price comparisons and thereby causing harm to Orchard, Home Depot has committed actionable violations of California Business & Professions Code § 17500 (false advertising under California law).

WHEREFORE, Orchard seeks the redress for which it has prayed in its Prayer for Relief, which appears below.

**XIV. PRAYER FOR RELIEF**

Orchard now prays to this Court for the following relief in order to redress each of the legal wrongs that it has alleged above against all three Defendants.

**First Cause of Action**:

1.   Compensatory damages, trebled under 15 U.S.C. § 15.

2.   Pre-judgment interest.

3.   Costs of suit.

4.   Reasonable attorney's fees, as authorized by 15 U.S.C. § 15.

5.   Injunctive relief under 15 U.S.C. § 26.

6.   Such other relief as the Court deems appropriate and just.

**Second Cause of Action**:

1.   Compensatory damages, trebled under 15 U.S.C. § 15.

2.   Pre-judgment interest.

3.   Costs of suit.

4.   Reasonable attorney's fees, as authorized by 15 U.S.C. § 15.

5.   Injunctive relief under 15 U.S.C. § 26.

6.   Such other relief as the Court deems appropriate and just.

**Third Cause of Action**:

1.   Compensatory damages, trebled under California Business & Professions Code § 16750.

2.   Pre-judgment interest.

3.   Costs of suit.

4.   Reasonable attorney's fees, as authorized by California Business & Professions Code § 16750.

5.   Injunctive relief under California Business & Professions Code § 16750.

6.   Such other relief as the Court deems appropriate and just.

//

//

**Fourth Cause of Action**:

1. Compensatory damages, trebled under California Business & Professions Code § 16750.

2. Pre-judgment interest.

3. Costs of suit.

4. Reasonable attorney's fees, as authorized by California Business & Professions Code § 16750.

5. Injunctive relief under California Business & Professions Code § 16750.

6. Such other relief as the Court deems appropriate and just.

**Fifth Cause of Action**:

1. Restitution, as authorized under California Business & Professions Code Restitution §§ 17200 et seq.

2. Appropriate injunctive relief, as authorized under California Business & Professions Code Restitution §§ 17200 et seq.

3. Such other relief as the Court deems appropriate and just.

**Sixth Cause of Action**:

1. Proximate damages.

2. Pre-judgment interest.

3. Costs of suit.

4. Punitive damages, as authorized under California Civil Code § 3294.

5. Such other relief as the Court deems appropriate and just.

**Seventh Cause of Action**:

1. Proximate damages.

2. Pre-judgment interest.

3. Costs of suit.

4. Punitive damages, as authorized under California Civil Code § 3294.

5. Such other relief as the Court deems appropriate and just.

//

1    **Eighth Cause of Action**:

2    1.    Damages and other relief, as allowed under 15 U.S.C. § 1117 or otherwise for a

3        violation of 15 U.S.C. § 1125(a)(1)(B).

4    2.    Pre-judgment interest.

5    3.    Costs of suit.

6    4.    Reasonable attorney's fees, as authorized by 15 U.S.C. § 1117.

7    5.    Injunctive relief under 15 U.S.C. § 1116.

8    6.    Such other relief as the Court deems appropriate and just.

9    **Ninth Cause of Action**:

10    1.    Injunctive relief and other equitable relief, as allowed for violations of California

11        Business & Professions Code § 17500.

12    2.    Costs of suit.

13    3.    Such other relief as the Court deems appropriate and just.

14    **XIX. DEMAND OF JURY TRIAL**

15    So far as the law allows, Orchard demands that a jury of its peers try its claims against

16    Defendants.

17

18    DATED:  May 15, 2013    Respectfully submitted,

19

20    LAW OFFICES OF WILLIAM MARKHAM

    /s/ William Markham

21    By:    _____

22    William A. Markham,
Attorneys for Plaintiff,

23    ORCHARD SUPPLY HARDWARE LLC.

24

25

26

27

28

EXHIBIT 1



EXHIBIT 2



EXHIBIT 3





# Home Depot Advantage
## HD vs. OSH

04.08.13

2

# Important Message

- The HD Advantage *HD* vs. *OSH* is a living document and will be updated periodically, depending upon the needs of the business.

- Adhering to Merchandising standards, utilize any <u>extra</u> metal carts to display product shown in this ppt.

- It's not necessary to purchase the metal carts; utilize extra ones in your building currently, as you replace the wood ones, purchase the metal.

- <u>CRUSH</u> the competition!



# HD Advantage



## SKU 594-204

BAYER ROSE & FLOWER

5 LB

HD $8.97 vs. OSH $9.99



## SKU 651-699

MIRACLE-GRO 5 LB
ALL-PURPOSE

HD $10.48 vs. OSH $11.99



# HD Advantage

## SKU 768-090
### 6' FIBERGLASS LADDER

**HD $42 VS. OSH $56.99**



## SKU 265-699
### 250W PORTABLE WORK LIGHT

**HD $9.96 VS. OSH $14.99**





# HD Advantage

## SKU 845-130
### CLOROX ULTRA GERMICIDAL BLEACH 18OZ



HD $4.27 vs. OSH $5.99

## SKU 540-425
### WOOD TOILET SEAT ROUND



HD $5.98 vs. OSH $9.99





6

# HD Advantage

## SKU 433-949
GOOF-OFF HEAVY
DUTY SPOT REMOVER
HD $5.97 vs. OSH $7.99



## SKU 435-909
SIMPLE GREEN
22OZ
HD $4.97 vs. OSH $5.49



# HD Advantage

## SKU 626-197

SPECTRACIDE WASP&
HORNET 20 OZ BONUS SZ

HD $2.97 vs. OSH $5.99



## SKU 241-417

CADET 3
ROUND BOWL

HD $139.00 vs. OSH $219.98





# HD Advantage

**SKU 365-343**

ORBIT

4 STATION TIMER

HD $37.97 vs. OSH $42.00



**SKU 625-250**

SCOTT'S TURF BUILDER

PLUS 2 – 5000 SF

HD$17.98 vs. OSH $19.99

# HD Advantage

## SKU 915-068  12"X12" RED STEP STONE
## SKU 556-211 12"X12" GREY STEP STONE

### HD $.98 vs. OSH $1.29

$1.15







# HD Advantage



## SKU 170-156
## 40GAL/38K BTU ULN GAS TALL 12YR W/H
## HD $598.00 vs. OSH $659.99

558.00





# HD Advantage

## SKU 461-541

## 1/2HP SUBMERSIBLE SUMP PUMP

## HD $144.00 vs. OSH $189.99





EXHIBIT 4

## ORCHARD SUPPLY HARDWARE CORPORATION
### UNIVERSAL TERMS AND CONDITIONS

The terms and conditions contained herein (the "UTC") shall be effective for all Merchandise (as hereinafter defined) sold by the undersigned vendor ("Seller"), directly or indirectly through Seller's dealers or distributors, to Orchard Supply Hardware Corporation ("OSH") on or after the date set forth below.

Seller and OSH hereby agree as follows:

1.    DEFINITIONS. The following terms used in the UTC shall have the meanings described below: (a) "Change of Control" shall mean (i) a sale of all or substantially all of the assets of Seller, whether in a single transaction or a series of transactions; (ii) the merger or consolidation of Seller with or into any corporation or the merger of another corporation into Seller if the effect is that fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of the surviving or new corporation is held by a person or persons other than the shareholders of Seller immediately prior to such transaction, or (iii) the occurrence of any other event which results in fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of Seller being held by a person or persons other than the shareholders of Seller who, individually or as a group, held 50% or more of such voting power immediately prior to such event; (b) "Merchandise" shall mean the goods provided to OSH by Seller, directly or indirectly through Seller's dealers or distributors, as described in any applicable Specifications, including all packaging, tags, labels, hangers, and containers used in connection therewith, all parts relating to such goods provided to OSH and all literature (including owner manuals and training materials) pertaining to such goods, if applicable, whether or not any of such items are set forth separately on invoices to OSH; (c) "Purchase Order" shall mean a written or electronic order for Merchandise, setting forth price, quantities of Merchandise, delivery terms and payment terms or any other equivalent process by which OSH orders quantities of merchandise; (d) "Specification" shall mean all, and any part, of the detailed description of Merchandise agreed upon by Seller and OSH, or contained in any vendor guide developed by OSH; (e) "Vendor Agreements" shall mean all written agreements between OSH and Seller relating to the purchase of Merchandise, including all Purchase Orders, agreements for selling assistance (including agreements for advertising, point of sale or promotional service or funding), buying agreements, exclusivity agreements, letter agreements, Specifications and any written amendments, waivers and consents relating to any of the foregoing; provided, however, that Vendor Agreements shall not include any response by Seller purporting to modify or supplement any Purchase Order issued by OSH unless such response is in writing and executed or consented to in writing by OSH. Terms used herein and not otherwise defined shall have the meaning given them in the Uniform Commercial Code as in effect in the State of Illinois (the "UCC"), including but not limited to Article 2 thereof.

### 2.    VENDOR AGREEMENTS

2.1 Purchase Orders. The execution of the UTC shall not give rise to any commitment on the part of OSH to purchase any Merchandise, except as may be expressly set forth in another Vendor Agreement. In the absence of such other Vendor Agreement, a commitment to purchase Merchandise shall arise only at such time as OSH issues a Purchase Order to Seller for specified quantities of Merchandise, and OSH obligation to purchase Merchandise shall be limited to the quantities contained in Purchase Orders issued by it. When issued by OSH and accepted by Seller, all Purchase Orders shall become part of and be subject to the terms of the applicable Vendor Agreements, including the UTC. Any estimates or forecasts of OSH future needs for Merchandise which may be provided to Seller by OSH are for long range planning purposes only and shall not in any way represent a commitment of OSH. OSH shall have no responsibility for any actions taken by Seller based on such estimates or forecasts.

2.2 Construction and Amendment. Except as otherwise expressly provided in any Vendor Agreement executed after the date hereof, the UTC shall apply to all Vendor Agreements and is hereby incorporated into the Vendor Agreements, whether existing on the date hereof or hereafter executed. The Vendor Agreements, as supplemented and amended by the UTC, contain the entire understanding of the Seller and OSH with respect to the subject matter of such Vendor Agreements and may not be supplemented or modified by course of dealing, course of performance, any oral communication between the parties, or any response by Seller, whether oral or written, purporting to modify or supplement the terms of a Purchase Order issued by OSH unless such response is in writing and executed or consented to in writing by OSH. The Vendor Agreements may be amended or supplemented only by the UTC or another Vendor Agreement, which Vendor Agreement must be in writing and signed by an authorized representative of each party. The UTC supersedes all previous Vendor Agreements, communications, and understandings between the parties that are inconsistent with the terms hereof. With respect to any particular line of Merchandise, the applicable Vendor Agreements, the UTC and shall be deemed a series of installments in one and the same transaction and deemed to constitute a single contract between OSH and Seller within the meaning of Section 9-318(1) of the UCC.

2.3 Waiver. No right of either party under a Vendor Agreement, as modified by this UTC, may be waived except as expressly set forth in a writing signed by an authorized representative of the party waiving such right. No waiver of any provision shall be implied by a party's failure to enforce any of its rights or remedies herein provided, and no express waiver shall affect any provision other than that to which the waiver is applicable and only for that occurrence.

### 3.    BUSINESS TERMS.

3.1 Specifications. Specifications shall be in writing. By agreeing to and/or using any Specification or any design, product modification or other manufacturing or production suggestion, whether originating with OSH or elsewhere, Seller adopts as its own, accepts full responsibility for, and relieves OSH of all responsibility for such Specification, design, modification or suggestion.

3.2 Price and Shipping. The price specified in the applicable Purchase Order shall include all costs of packing Merchandise and all costs of delivery of Merchandise to the "F.O.B. point" or other delivery point specified in the applicable Purchase Order, including: (a) all duties and taxes (including excise and withholding taxes) payable in any country where production or delivery takes place; (b) any commissions to selling agents; and (c) other incidental charges, whether or not such charges are itemized separately on invoices to OSH. Seller shall ship only the quantities of Merchandise ordered by OSH in the applicable Purchase Order. Seller shall not make any substitutions without OSH prior written approval. Seller shall bill OSH for the Merchandise at the price specified in the applicable Purchase Order.

4.    CODE OF CONDUCT. Seller acknowledges that Seller has been furnished a copy of Sears Code of Business Conduct (the "Code of Conduct") and that OSH associates are required to follow the Code of Conduct. Seller shall support the Code of Conduct and shall not take any action which may cause a OSH associate to violate the Code of Conduct. Seller shall report to OSH any violation of or attempted violation of the Code of Conduct.

### 5.    PACKAGING, LABELING, SHIPPING AND BILLING; RISK OF LOSS.

5.1 Packaging, Labeling, Shipping and Billing. Seller shall be responsible for providing adequate packaging, tagging, labeling, packing, shipping and billing. Seller shall comply with all packaging, tagging, labeling, packing, shipping and billing requirements reasonably requested by OSH or established by applicable laws, regulations, carrier tariffs and classifications. For Merchandise to be shipped to OSH from a point of origin within the United States, Seller shall deliver Merchandise to the designated carrier on or before the "ship date(s)" specified in the applicable Purchase Order. For Merchandise to be shipped to OSH from a point of origin outside the United States, Seller shall deliver Merchandise in accordance with the delivery terms specified in the applicable Purchase Order, and such delivery shall be made on or

before the "ready date(s)" specified in the Purchase Order. Delivery times set forth in a Purchase Order shall be of the essence of the Vendor Agreement. Seller shall ship all Merchandise in full packs and full shipments in accordance with OSH requirements.

5.2 Risk of Loss. All risk of loss or damage to Merchandise shall remain with Seller until delivery of such Merchandise in accordance with the delivery or purchase terms specified by OSH in the applicable Purchase Order.

6. MANUFACTURING. Upon OSH request, Seller shall provide OSH with specific information, in such detail as OSH may reasonably request, as to the location(s) and method(s) of manufacturing Merchandise. Seller shall provide OSH with prior written notice of any change in the location(s) of manufacturing Merchandise, and Seller shall be fully responsible for all costs and/or delays resulting from such changes. Without advance notice but during regular business hours, OSH, its designated representatives and any independent inspectors approved by OSH may inspect any production facilities at which any Merchandise or any components for Merchandise are being produced (including any facilities of Seller, its subcontractors and suppliers) and any and all Merchandise at any stage of production or delivery (including at the delivery point specified in the applicable Purchase Order). OSH may require Seller to have Merchandise inspected prior to its shipment to the United States, such inspection to be performed at Seller's sole expense, by an independent inspector approved by OSH. Any inspection, any documentation thereof, and any corrective actions taken by Seller with respect to any Merchandise shall not be deemed an acceptance of any Merchandise, or a waiver of any nonconformities or defects in any Merchandise and shall not excuse any failure by Seller to deliver Merchandise in accordance with the terms of the applicable Vendor Agreement.

7. PARTS AND SERVICE.

7.1 Parts. Seller shall sell to OSH any and all parts shown on Merchandise parts lists referenced or included in any Vendor Agreement applicable to the Merchandise (if any) for a period of at least ten (10) years after the date such Merchandise is last produced by Seller for OSH; provided, however, that if Seller discontinues manufacturing or supplying any part shown on any such Merchandise parts list, Seller shall give OSH at least ninety (90) days prior written notice of such discontinuance and Seller shall promptly fulfill any and all orders placed by OSH within such 90-day period. The price of parts shall be specified on the applicable Purchase Orders, but in no event shall Seller charge OSH a price greater than the lowest price charged by Seller to any other customer for the same or similar parts sold on substantially similar terms.

7.2 Service. Seller shall provide OSH with all available information relating to Merchandise, including product specifications, parts lists and all training materials, service manuals and instructions developed by or for Seller. Seller authorizes OSH to reproduce such training materials, service manuals and instructions without payment of any royalties or other fees to Seller. Seller authorizes OSH to provide repair and maintenance services for all Merchandise sold to customers, and OSH may advertise that it is authorized to provide such services. OSH shall provide such repair and maintenance services in conformity with reasonable standards and guidelines. OSH may use its subsidiaries and independent subcontractors or licensees to provide such repair and/or maintenance services. Seller represents and warrants that the provision of such services by OSH will not violate the rights of any third party.

8. REPRESENTATIONS AND WARRANTIES. The provisions of this Section 8 shall survive the cancellation or termination of all Vendor Agreements between the parties relating to Merchandise.

8.1 Merchandise Warranties. Without in any way disclaiming implied remedies or limiting remedies for breach thereof, Seller represents and warrants that all Merchandise shall: (a) conform to the Specifications for such Merchandise; (b) be merchantable; (c) be free from defects in workmanship, materials and packaging; (d) be free from defects in construction and design; (e) be fit and sufficient for the purpose for which it is intended and/or which is stated on any packaging, labeling or advertising; and (f) be equivalent in materials, quality, fit, finish, workmanship, performance and design to any samples submitted to and approved by OSH.

8.2 Compliance with Law. Seller represents and warrants that: (a) all patents, trademarks, trade names, trade dress, copyrights, trade secrets, right of publicity and other proprietary rights (other than proprietary rights owned by OSH) used by Seller in connection with Merchandise or the development or manufacture of Merchandise are owned by Seller or that Seller has been properly authorized by the owner of such proprietary rights to use such rights in connection with such Merchandise and to sell such Merchandise as incorporates such proprietary rights to OSH for use or further resale; (b) all Merchandise has been or shall be produced, packaged, tagged, labeled, packed, shipped and invoiced in compliance with the applicable requirements of federal, state and local laws, regulations, ordinances and administrative orders and rules of the United States, its territories and all other countries in which Merchandise is produced or delivered; (c) Seller and all subcontractors and agents involved in the production or delivery of Merchandise strictly adhere, and shall continue throughout the term of each Vendor Agreement to strictly adhere, to all applicable federal, state and local laws, regulations and prohibitions of the United States, its territories and all countries in which Merchandise is produced or delivered with respect to the operation of their production facilities and their other business and labor practices, including laws, regulations and prohibitions governing the working conditions, wages, hours and minimum age of the work force; and (d) Merchandise has not been and shall not be produced or manufactured, in whole or in part, by child labor or by convict or forced labor. Seller shall provide OSH with any guaranty of compliance with the foregoing in such form as OSH may designate with respect to Merchandise. Seller represents and warrants that all sales of Merchandise to OSH are or shall be made at no less than fair value under the United States Antidumping Law. As long as Merchandise is not subject to a United States antidumping investigation on the date of this Agreement (as first set forth above), Seller represents and warrants that it shall indemnify OSH for all antidumping duties imposed on such Merchandise which is (i) sold prior to the date of publication of the International Trade Administration's preliminary determination of sales at less than fair value; and (ii) exported before the date of publication of the International Trade Administration's final determination of sales at less than fair value. Seller also represents and warrants that it shall indemnify OSH for any expenses (including reasonable attorneys' fees) and administrative costs incurred by OSH in its participation in any United States antidumping proceeding involving such Merchandise.

8.3 Century Compliance. Seller represents and warrants that all information, data transmissions and transactions, regardless of form, originating from Seller or any of its contractors or subcontractors or otherwise controlled by Seller or any of its contractors or subcontractors relating to the Merchandise or otherwise required or permitted under any Vendor Agreement shall utilize and include four digit year elements. The year must encompass a two digit century that precedes and is contiguous with, a two digit year of a century (e.g. 1999, 2000, etc.).

9. ELECTRONIC PROCESSING. Until January 1, 1998, OSH shall order Merchandise from Seller by delivery to Seller of signed purchase orders in forms provided by OSH. From and after January 1, 1998, unless otherwise agreed to by OSH, the parties shall process Purchase Orders and other related documents (including invoices and ship notices) and installment payments and advances in respect of all monetary obligations between OSH and Seller electronically, through electronic data interchange ("EDI"), either directly or through a third party provider satisfactory to both parties. Each party shall be responsible for its own costs, including the costs of any provider with which it contracts. All EDI transactions shall be in accordance with standards approved by the Accredited Standards Committee X 12 (ASCX12), and in accordance with any instructions and procedures which OSH may supply from time to time. Each EDI invoice (or ship notice, in the absence of an invoice) or non-EDI invoice or ship notice if OSH waives the EDI processing requirement shall contain an appropriate, agreed upon code, symbol or statement affirming Seller's compliance with all applicable requirements of the Fair Labor Standards Act (as amended), the regulations and orders of the United States Department of Labor issued pursuant thereto and of any similar state laws and regulations. All electronic fund transfers and wire transactions shall be in accordance with National Automated Clearing House Association (NACHA) rules, and in accordance with the instructions and procedures established by OSH from time to time. Neither party shall be liable to the other for any special, incidental, exemplary or consequential damages arising from or as a result of any delay, omission or error in the electronic transmission or receipt of any

documents, even if the other party has been advised of the possibility of such damages.

10. OSH IDENTIFICATION. If OSH directs Seller to mark or label any Merchandise with a trade name, trademark, logo or service mark owned by or licensed to OSH ("OSH Identification"), such marking or labeling shall be limited to the indicated quantities of such Merchandise and shall be done in accordance with OSH specific instructions. Seller shall not sell or otherwise dispose of, nor permit the sale or disposal of, any Merchandise bearing any OSH Identification (including any rejected Merchandise) to anyone other than OSH without first obtaining OSH express written consent and then removing all OSH Identification prior to such sale or disposal. OSH may elect, but shall have no obligation, to purchase from Seller any surplus labels, packaging or other materials bearing OSH Identification. All such materials not purchased from Seller by OSH shall be destroyed at the cancellation or termination of the Vendor Agreement. Seller shall have no interest or rights in any OSH Identification except as expressly granted in a Vendor Agreement. The provisions of this Section 10 shall survive the cancellation or termination of each Vendor Agreement.

11. DEFENSE OF CLAIMS. Seller shall, at its own cost and expense, defend OSH, its subsidiaries, and the officers, directors, employees, licensees, agents, distributors and independent contractors of OSH and its subsidiaries (each an "Indemnified Party") from and against all allegations (even though such allegations may be false, fraudulent or groundless) asserted in any claim, action, lawsuit or proceeding between any Indemnified Party and any third party arising out of any of the following (collectively, the "Claims"), whether actual or alleged and whether or not Seller's Indemnity and Contribution Obligations (as defined below) shall apply: (a) infringement or misappropriation of any patent, trademark, trade name, trade dress, copyright, trade secret, right of publicity or other proprietary right in connection with Merchandise, or any unfair competition involving Merchandise; (b) death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged defect in Merchandise, whether latent or patent, including actual or alleged improper construction, installation, repair or design of Merchandise, or actual or alleged failure of Merchandise to comply with any specifications or samples or with any express or implied warranties of Seller, or any claim of strict liability in tort relating to any Merchandise; (c) violation by Merchandise in its manufacture, possession, use or sale, of any federal, state or local laws, regulations, ordinances or administrative orders or rules of the United States, its Territories or any other country in which Merchandise is produced or delivered; (d) defect involving the packaging, tagging, labeling, packing, shipping and/or invoicing of Merchandise; (e) failure to warn or inadequate warnings and/or instructions; or (f) display, assembly or installation of Merchandise. Seller shall use counsel reasonably satisfactory to OSH in the defense of such Claims. OSH may, at its election, take control of the defense and investigation of the Claims, and may employ and engage attorneys of its own choice to manage and defend such Claims, at Seller's cost, risk and expense, provided that OSH and its counsel shall proceed with diligence and good faith with respect thereto. The obligations of Seller under this Section 11 (collectively, "Defense Obligations") shall survive the cancellation or termination of each Vendor Agreement.

12. INDEMNIFICATION AND CONTRIBUTION. Seller shall hold harmless and indemnify the Indemnified Parties from and against any and all claims, demands, actions, lawsuits, proceedings, liabilities, losses, costs and expenses (including reasonable attorneys' fees and disbursements and costs of investigation) incurred by any of the Indemnified Parties in any claim, demand, action, lawsuit, or proceeding between Seller and any Indemnified Party or between any Indemnified Party and any third party or otherwise arising out of any Claims, including but not limited to claims of negligent acts or omissions by any Indemnified Party. In any case to which the Seller's indemnity obligation set forth in the preceding sentence is not enforceable under applicable law and in which either (a) any Indemnified Party or (b) Seller is found to be liable to a third party with respect to Merchandise, then OSH and Seller shall each contribute to the payment of any judgment awarded in favor of such third party in proportion to the comparative degree of culpability of the Indemnified Parties and Seller. The obligations of Seller and OSH under this Section 12 (collectively, "Indemnity and Contribution Obligations") shall survive the cancellation or termination of each Vendor Agreement.

13. INSURANCE. Seller shall obtain and maintain, at its expense, a policy or policies of Commercial General Liability Insurance covering liabilities relating to Merchandise, including products and completed operations, with a broad form Vendor's Endorsement naming OSH, in such amounts and with such companies and containing such other provisions satisfactory to OSH. All such policies shall provide that the coverage thereunder shall not be terminated without at least thirty (30) days prior written notice to OSH. Certificates of insurance evidencing such coverage shall be submitted in advance of or concurrent with the execution of the UTC by Seller and upon each policy renewal. Approval of any of Seller's insurance policies by OSH shall not relieve Seller of any obligations contained herein, including Seller's Defense and Indemnity and Contribution Obligations set forth above, even for claims in excess of Seller's policy limits. If at any time Seller does not provide OSH with the certificates of insurance required hereunder or if, in OSH opinion, such policies do not provide adequate protection for OSH, and Seller does not furnish evidence of acceptable coverage within fifteen (15) days after OSH so notifies Seller, OSH shall have the right to: (a) immediately terminate or cancel each Vendor Agreement or any part of OSH obligations under such agreements, or cancel all or any outstanding orders for Merchandise, upon written notice to Seller; and (b) withhold making any payment or advance in respect of any OSH monetary obligations which may be outstanding under the applicable Vendor Agreements until evidence of acceptable coverage is provided.

14. OSH REMEDIES. In addition to all other remedies available to OSH under the UCC or otherwise, any Merchandise may be rejected by OSH and abandoned, returned or held at Seller's expense and risk, when such Merchandise: (a) is not produced, sold, shipped and/or delivered in compliance with the terms of the applicable Vendor Agreements, or otherwise does not conform to the applicable Vendor Agreements; (b) is delivered in excess of the quantities ordered, in broken packs or partial shipments, or in packages or assortments other than as specified; (c) allegedly violates any federal, state or local laws, regulations issued pursuant to such laws, or any governmental administrative orders, rules or regulations, of the United States, its territories or any other country in which Merchandise is produced or delivered; or (d) allegedly infringes any patent, trademark, trade name, trade dress, copyright, trade secret, right of publicity or other proprietary right, or allegedly involves any unfair competition. OSH right to reject and return or hold Merchandise at Seller's expense shall, without limiting such right, extend to Merchandise sold to OSH hereunder which was returned by a OSH customer for any reason entitling OSH to reject or revoke acceptance of such Merchandise. OSH may, at its option, require Seller to replace any nonconforming Merchandise or grant OSH a full refund or full credit (collectively, "Refund Credit"). At its election, OSH may accept nonconforming Merchandise, and Seller shall be liable for any reduced value of such Merchandise and to repair the same. Acceptance of Merchandise by OSH shall not relieve Seller of any of its warranty or other obligations hereunder. OSH may also charge to Seller all direct and indirect costs incurred by OSH as a result of any nonconforming Merchandise or delivery, or an administrative fee in an amount reasonably related to such costs whether or not the Merchandise is rejected by OSH (collectively, "Return Costs"). All Refund Credits, Return Costs, Defense Obligations, Indemnity and Contribution Obligations and other monetary obligations owing by Seller to OSH under the UTC (collectively, "Seller's Monetary Obligations"), may, at OSH's option, be deducted and recouped from any monetary obligations which may be owing by OSH at any time pursuant to the Vendor Agreements. Acceptance by OSH of replacement Merchandise, of a full or partial credit or refund, or of Return Costs, shall not relieve Seller of liability for other damages sustained by OSH as a result of Seller's failure to deliver in a timely manner conforming Merchandise or arising as a result of any other breach by Seller.

15. CANCELLATION AND TERMINATION. OSH shall have the right to cancel or terminate immediately the related Vendor Agreements for any particular line or lines of Merchandise or any part of OSH obligations under such agreements, or cancel or terminate all or any outstanding orders for Merchandise under such Vendor Agreements if: (a) OSH reasonably believes that Seller does not have Merchandise which conforms to the terms hereof, and is ready for shipment in the specified quantities and at the delivery dates specified; (b) it is alleged that Merchandise infringes any patent, trademark, trade name, trade dress, copyright, trade secret, right of publicity or other proprietary rights; (c) it is alleged that Merchandise was manufactured or to be sold to OSH in violation of any applicable federal, state or local laws, regulations, ordinances or administrative orders or rules of the United States, its territories or any country in which the Merchandise is produced or delivered or in violation with the UTC; (d) Seller shall refuse to furnish appropriate guaranties to protect OSH as may be requested by OSH pursuant to Section 8.2; (e) Seller shall

fail to maintain the insurance required hereunder or fail to produce evidence thereof; (f) Seller becomes the subject of a case under the Federal Bankruptcy Code or similar state or federal insolvency laws; any creditor of Seller commences action to enforce or foreclose upon a lien or security interest in property of Seller; or any property of Seller passes into the hands of a creditor of Seller, receiver, or assignee for the benefit of creditors, becomes the subject of a levy for taxes or to satisfy a judgment, or otherwise is attached for the benefit of a creditor of Seller (excluding the consensual granting of a lien or security interest by Seller to secure a debt); (g) Seller ceases operating the manufacturing or assembly line(s) applicable to the Merchandise or necessary components incorporated into the Merchandise, or announces its intention to do so prior to fulfilling all outstanding Purchase Orders, or otherwise becomes unable for any reason timely to fulfill outstanding Purchase Orders; (h) Seller commits a material breach of any Vendor Agreements relating to such Merchandise; (i) a Change of Control occurs with respect to Seller; (j) Seller shall fail to comply with the four digit year element requirement in Section 8.3; (k) Seller changes the location(s) of manufacturing Merchandise or (l) cancellation or termination is otherwise permitted by the UCC or other applicable law. For any imported Merchandise which is subject to a customs embargo or quota restriction, OSH may cancel or terminate any Purchase Order or delay any installment payment or advance in respect of OSH monetary obligations to Seller, if any, under each applicable Vendor Agreement until the embargo is lifted or necessary quota becomes available.

16. RECOUPMENT AND SET-OFF. OSH and Seller acknowledge and agree that OSH monetary obligations to Seller under the Vendor Agreements shall at all times be net of Seller's Monetary Obligations, and any installment payment or advance made by OSH to Seller in respect of any Purchase Order while any Seller's Monetary Obligations are outstanding shall be deemed to be an overpayment to Seller to the extent of such outstanding Seller's Monetary Obligation and be subject to recoupment by OSH. Without limiting the foregoing, OSH shall have the right, at all times, to deduct any Seller's Monetary Obligations from any amounts owed to Seller by OSH, and to pay only the net sum due, if any. Any Seller's Monetary Obligations which remain outstanding after any exercise by OSH of its recoupment and/or set-off rights shall be paid by Seller promptly upon demand by OSH. For the purpose of OSH exercise of the right of recoupment and/or setoff only, any raw materials, components and parts sold by Seller to OSH for use in Merchandise, if applicable, shall be deemed to be sold to OSH pursuant to a Purchase Order.

17. CONFIDENTIALITY. All Proprietary Information (as hereinafter defined) is the sole and exclusive property of OSH. Seller shall not in any manner use, reproduce or disclose, directly or indirectly, to any third party at any time any Proprietary Information, except in connection with Seller's performance under the Vendor Agreements. Upon demand by OSH, Seller shall deliver to OSH immediately all materials containing Proprietary Information in Seller's possession (whether prepared by OSH or Seller). Proprietary Information shall consist of: (a) all information relating to OSH sales, pricing, cost, inventory, operations, plans and programs; (b) all trade secrets of OSH, including any and all customer lists, customer survey responses and any other information concerning any of OSH customers; (c) Specifications, to the extent furnished by OSH; (d) patent applications, copyrights and other OSH intellectual property; and (e) any other information that is not publicly available and designated by OSH as Proprietary Information. The provisions of this Section 17 shall survive the cancellation or termination of each Vendor Agreement.

18. ASSIGNMENT BY SELLER. Seller shall not assign (by contract, operation of law or otherwise) its rights or obligations under any Vendor Agreement or grant a security interest in or pledge as collateral any interest herein or therein, except with OSH prior written consent, and the failure of Seller to obtain OSH prior written consent shall render any such attempt to assign, or grant a security interest or lien in its rights or obligations void and of no force and effect; provided, however, that Seller may assign its right to receive installment payments or advances from OSH in respect of any monetary obligations of OSH to Seller under any Vendor Agreement, subject to the terms and conditions contained herein. Any factor or permitted assignee, secured creditor or pledgee of Seller shall acquire such interest subject to all of OSH recoupments, set-offs, claims and defenses and all of the terms and conditions contained herein, and Seller shall notify any such factor, assignee, secured creditor or pledgee of such fact. OSH shall have no obligation to make payments to anyone other than Seller unless and until Seller: (a) notifies OSH in writing of the assignment of such installment payments or advances along with the name and address of the person to whom such installment payments or advances should be sent; (b) obtains a separate OSH accounts payable number for such installment payments or advances; and (c) uses such accounts payable number on every invoice which OSH is to pay directly to the third party. Seller retains responsibility for all allegedly misdirected installment payments or advances which result from Seller's failure to comply with the terms and conditions hereof.

19. SEVERABILITY. If any provision of any Vendor Agreement or this UTC is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, then such provision shall be deemed modified to the extent necessary to make such provision enforceable by such court, and the invalidity in whole or in part of any portion of such Vendor Agreement or this UTC shall not impair or affect the validity or enforceability of the remaining provisions of such Vendor Agreement or this UTC.

20. CUMULATIVE RIGHTS. All rights and remedies under the Vendor Agreements are cumulative, and the exercise of any right or remedy herein provided shall be without prejudice to the right to exercise any other right or remedy provided for herein or at law or in equity.

21. APPLICABLE LAW AND JURISDICTION. The Vendor Agreements and the UTC shall be construed and enforced in accordance with the internal laws of the State of Illinois, without regard to its conflict of law principles. The rights and obligations of the parties hereto shall not be governed by the provisions of the United Nations Convention on Contracts for the International Sale of Goods. The UTC shall not be effective until the UTC has been received and executed by OSH. The federal and/or state courts of Illinois shall have personal and subject matter jurisdiction over, and the parties each hereby submit to the venue of such courts with respect to, any dispute arising pursuant to any Vendor Agreement, and all objections to such jurisdiction and venue are hereby waived. Seller consents to service of process permitted under Illinois law or by certified mail, return receipt requested.

IN WITNESS WHEREOF, Seller and OSH have each caused the UTC to be executed by its duly authorized representative as of the date written below and such execution evidences each party's acceptance of and agreement with the terms and conditions set forth herein.

Dated: *NOVEMBER 11, 1997*

ORCHARD SUPPLY HARDWARE CORPORATION

By: _____
       (Signature)

Title: _____

SELLER

*MAKITA USA INC.*
(Company Name)

By: _____
       (Signature)

Title: *Key Account Manager*

[PLACE SELLER'S NAME LABEL HERE]

# OSH

Orchard Supply Hardware
## EDI PROFILE SHEET

**VENDOR STATUS:** ___ NEW VENDOR ___ ID CHANGE
*(CHECK ONE)* ___ CONTACT/ADDRESS /PHONE CHANGE
___ NETWORK/SOFTWARE CHANGE
___ CHANGING SERVICE BUREAU
___ COMING OFF SERVICE BUREAU

---

**AFTER COMPLETION OF THIS FORM, FAX IMMEDIATELY TO 408 / 629-2438 UPON RECEIPT, ORCHARD SUPPLY HARDWARE WILL ISSUE EDI IMPLEMENTATION MATERIALS**

---

COMPANY NAME __Makita U.S.A., Inc.__

CORPORATE CONTACT __Mary Devlin__          PHONE __(714) 522-8088__

STREET
ADDRESS __14930-C Northam Street__          FAX __(714) 522-8194__
(NO POST OFFICE BOX ADDRESS)

CITY / STATE / ZIP __La Mirada, CA 90638__

LIST ALL DIVISIONS AND SUBSIDIARIES DOING BUSINESS WITH Orchard Supply Hardware or SEARS UNDER ANOTHER NAME:

_____          _____          _____

---

TECHNICAL EDI CONTACT __Mary Devlin__

PHONE __(714) 522-8088 Ext. #4011__ FAX __(714) 522-8194__

IF EDI CONTACT IS AN OUTSIDE CONSULTANT, PLEASE COMPLETE THIS SECTION

COMPANY NAME _____          PHONE _____

ADDRESS _____
(NO POST OFFICE BOX ADDRESS)
CITY / STATE / ZIP _____

---

## THIS SECTION MUST BE FILLED IN BEFORE WE CAN PROCESS YOUR PROFILE

ISA/GS SENDER/RECEIVER ID: __072715428__          ISA INTERCHANGE ID QUALIFIER __01__

NETWORKS (PLEASE LIST) __Ordernet__          SOFTWARE __Gentran__

X12 VERSION/RELEASE (CIRCLE) 3060          MODEM BAUD RATE __9600__

PLATFORM (CIRCLE)   PC WORKSTATION          PC FRONT END   MID RANGE (MAINFRAME)   OTHER _____

COMMUNICATIONS (CIRCLE)   (ASYNCH)          BISYNCH   3770          GATEWAY

---

Orchard Supply Hardware          Sears Hardware          Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co. 2

It is imperative that we maintain contact with the individual's in your organization responsible for a variety of Orchard Supply Hardware issues. Orchard Supply Hardware will issue correspondence and update the appropriate person's) on policies. In order to ensure the most efficient mailings, please complete the following for the individual's who assume the following responsibilities:

## VENDOR INFORMATION SHEET

| | DUNS NUMBER #07-271-5428 | |
|---|---|---|
| PLEASE TYPE OR PRINT ALL INFORMATION | | |
| ORCHARD SUPPLY HARDWARE BUYER | ORCHARD SUPPLY HARDWARE DEPARTMENT | DATE |
| DESCRIPTION OF MERCHANDISE Power Tools | | |
| PAYMENT TERMS 2% 60 Days FREIGHT TERMS $500 Paid | SOPT (SOURCE ORDER PROCESS TIME) 48 hours | |
| VENDOR NAME Makita U.S.A., Inc. | IF COMPANY IS A SUBSIDIARY, LIST NAME OF PARENT AND ADDRESS | |
| PRESIDENT/CEO Robert T. Cassel / Regional Sls. Mgr. | PARENT NAME | |
| ADDRESS 41850 Christy Street | ADDRESS | |
| CITY, STATE, ZIP Fremont, CA 94538 | CITY, STATE, ZIP | |
| TELEPHONE FAX | TELEPHONE FAX | |

| SHIPPING CONTACT | CONTRACTS TO BE SENT TO: |
|---|---|
| CONTACT NAME Stan Newbold | VENDOR NAME / CONTACT NAME Makita U.S.A., Inc. / Rick Hanson |
| ADDRESS 41850 Christy Street | ADDRESS 41850 Christy Street |
| CITY, STATE, ZIP Fremont, CA 94538 | CITY, STATE, ZIP Fremont, CA 94538 |
| TELEPHONE (510)657-9881 FAX (510)657-7196 | TELEPHONE (510)657-9881 FAX (510)657-7196 |

| ACCOUNTS RECEIVABLE | PURCHASE ORDERS TO BE SENT TO: |
|---|---|
| VENDOR NAME / CONTACT NAME Makita U.S.A., Inc./Suellen Benn | VENDOR NAME / CONTACT NAME Makita U.S.A., Inc. / Carole Detrick |
| ADDRESS 41850 Christy Street | ADDRESS 41850 Christy Street |
| CITY, STATE, ZIP Fremont, CA 94538 | CITY, STATE, ZIP Fremont, CA 94538 |
| TELEPHONE (510)657-9881 FAX (510)657-7196 | TELEPHONE (510)657-9881 FAX (510)657-7196 |

| RETURN GOODS INFORMATION (if applicable) | ACCOUNT REPRESENTATIVE HANDLING ORCHARD SUPPLY HARDWARE |
|---|---|
| VENDOR NAME / CONTACT NAME (person responsible for authorizing return / liquidation of merchandise) Makita U.S.A. Inc./ Rick Hanson | VENDOR NAME / CONTACT NAME Makita U.S.A., Inc. / Rick Hanson |
| ADDRESS 41850 Christy Street | ADDRESS 41850 Christy Street |
| CITY, STATE, ZIP Fremont, CA 94538 | CITY, STATE, ZIP Fremont, CA 94538 |
| TELEPHONE (510)657-9881 FAX (510)657-7196 | TELEPHONE (510)657-9881 FAX (510)657-7) |

Orchard Supply Hardware          Sears Hardware          Orchard Hardware & Gard

# HARDWARE STORES, Sears, Roebuck & Co.  2

Orchard Supply Hardware contracts with Sears Logistics Services Inc. (SLS Inc.) to manage transportation. SLS Inc. will forward routing guides and develop contacts from the information below. If there are more than 4 ship points, please list the additional ship points with the appropriate data either on the back of this sheet or make additional copies.

## SHIPPING/LOGISTICS CONTACT SHEET

**VENDOR NAME**
Makita U.S.A., Inc.

**CONTACT NAME**
Rick Hanson

**ADDRESS**
41850 Christy Street

**CITY, STATE, ZIP**
Fremont, CA 94538

**TELEPHONE**                    **FAX**
(510)657-9881          (510) 657-7196

### FREIGHT COLLECT UNLESS BUYER APPROVED

| SHIPPING POINT #1 | SHIPPING POINT #2 |
|---|---|
| SHIPPING TO SEARS DEPT. # | SHIPPING TO SEARS DEPT. # |
| SHIP POINT DUNS # | SHIP POINT DUNS # |
| VENDOR NAME<br>Makita U.S.A., Inc. | VENDOR NAME |
| CONTACT NAME<br>Rick Hanson | CONTACT NAME |
| ADDRESS<br>41850 Christy Street | ADDRESS |
| CITY, STATE, ZIP<br>Fremont, CA 94538 | CITY, STATE, ZIP |
| TELEPHONE          FAX<br>(510)657-9881    (510)657-7196 | TELEPHONE          FAX |
| SEND ROUTING GUIDE TO SHIP POINT CONTACT?  YES __X__  NO ____ | SEND ROUTING GUIDE TO SHIP POINT CONTACT?  YES ____  NO ____ |
| **SHIPPING POINT #3** | **SHIPPING POINT #4** |
| SHIPPING TO SEARS DEPT. # | SHIPPING TO SEARS DEPT # |
| SHIP POINT DUNS # | SHIP POINT DUNS # |
| VENDOR NAME | VENDOR NAME |
| CONTACT NAME | CONTACT NAME |
| ADDRESS | ADDRESS |
| CITY, STATE, ZIP | CITY, STATE, ZIP |
| TELEPHONE          FAX | TELEPHONE          FAX |
| SEND ROUTING GUIDE TO SHIP POINT CONTACT?  YES ____  NO ____ | SEND ROUTING GUIDE TO SHIP POINT CONTACT?  YES ____  NO ____ |

Orchard Supply Hardware     Sears Hardware     Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co. 2

Please indicate the returned goods contact and address where returned merchandise is to be shipped (street address). If there are multiple locations please list.

## RETURNED GOODS SHIP TO LOCATIONS

| VENDOR NAME | |
|---|---|
| Makita U.S.A., Inc. | |
| RETURNED GOODS CONTACT | |
| Rick Hanson | |
| PHONE | FAX |
| (510)657-9881 | (510)657-7196 |
| RETURNED GOODS ADDRESS | |
| 41850 Christy Street | |
| CITY, STATE, ZIP | |
| Fremont, CA 94538 | |

| LOCATION #2 | |
|---|---|
| RETURNED GOODS CONTACT | |
| PHONE | FAX |
| RETURNED GOODS ADDRESS | |
| CITY, STATE, ZIP | |

| LOCATION #3 | |
|---|---|
| RETURNED GOODS CONTACT | |
| PHONE | FAX |
| RETURNED GOODS ADDRESS | |
| CITY, STATE, ZIP | |

**ORCHARD SUPPLY HARDWARE HANDLING/CONSOLIDATION CHARGES FOR RETURNED GOODS ARE 15% OF MERCHANDISE COST**

Orchard Supply Hardware       Sears Hardware       Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co.

# 3

## Form A

## VENDOR FAIR LABOR STANDARDS ACT CERTIFICATION

The undersigned hereby agrees that whenever any merchandise is sold by the undersigned to Orchard Supply Hardware, which is subject to the Fair Labor Standards Act (the "Act"), the undersigned, and all subcontractors and agents involved in the production or delivery of such merchandise, shall strictly adhere to the Act. Additionally, the undersigned shall include on any invoice therefor a separate guaranty of compliance in accordance with the provisions relating to such guaranties contained in the Rules and Regulations promulgated under the Act.

Attached hereto is a copy of guaranty language covering compliance with the Act as it will appear on the undersigned's invoices. The undersigned hereby agrees to notify Sears promptly in writing if the undersigned makes any deletions or changes in such language.

Makita U.S.A., Inc.
Name of Vendor

By _____, Key Account Manager
Name and Title

41850 Christy Street, Fremont, CA 94538
Address

November 11, 1997
Date

Orchard Supply Hardware     Sears Hardware     Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co. 3

**Form B** <u>NOT APPLICABLE</u>

## VENDOR CONTINUING GUARANTY CERTIFICATION

The undersigned hereby certifies that a continuing guaranty under the following Federal Acts, if applicable, was filed with the appropriate commission on the dates set forth below, covering all merchandise subject to such Acts sold by the undersigned to Orchard Supply Hardware:

DATE CONTINUING
GUARANTY FILED WITH
FEDERAL TRADE
COMMISSION

<u>ACT</u>
1. Textile Fiber Products
   Identification Act

2. Wool Products Labeling Act

3. Fur Products Labeling Act

DATE CONTINUING
GUARANTY FILED WITH
CONSUMER PRODUCT
SAFETY COMMISSION

4. Flammable Fabrics Act

All vendors providing textile items covered by these Acts must comply with this requirement.

It is recognized that continuing guaranties under the Flammable Fabrics Act must be renewed every three years. Continuing guaranties under the other Acts continue in effect until revoked. Further, continuing guaranties under all Acts must be updated in writing whenever any change occurs in the legal business status of the person or firm filing the guaranty. Any change in the address of the undersigned's principal office or place of business must also be promptly reported to the appropriate Commission, in order to keep the guaranty in force. If this certification indicates that the undersigned has filed a continuing guaranty under the Flammable Fabrics Act, the undersigned agrees to notify Orchard Supply Hardware promptly in writing of all renewals of such guaranty and the dates of such renewals.

The undersigned also agrees to give to Orchard Supply Hardware prompt notice in writing should any of the above-designated continuing guaranties be revoked or terminated.

<u>Makita U.S.A., Inc.</u>
Name of Vendor

By <u>⟋⟋⟋⟋⟋⟋⟋⟋⟋</u> **Key Account Manager**
Name and Title

<u>41850 Christy Street, Fremont, CA 94538</u>
Address

<u>NOvember 11, 1997</u>
Date

Orchard Supply Hardware     Sears Hardware     Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co.

**3**

## Form C

<u>NOT APPLICABLE</u>

### FTC CARE LABELING RULE - VENDOR CERTIFICATION
Textile and Apparel Products

The purpose of this letter is to certify to Orchard Supply Hardware, that the care instructions provided on all textile wearing apparel labels supplied by us to Orchard Supply Hardware, fully conform to the requirements of the Federal Trade Commission's amended rule on Care Labeling which became effective on January 2, 1984. Please refer to Sears Apparel Product Performance Manual for specific requirements relating to this Rule. Copies of this Manual (# SS F-17) are available from Sears Product Quality Assurance, Department 817, 847-286-3255, or 800-817-9165.

We base our certification on reliable information as follows (check where applicable):

_____ Developed through testing

_____ Reported in technical literature

_____ Validated through industry experience

This Letter of Certification will remain effective until either has changed or rescinded by us in writing to Orchard Supply Hardware. Our records in support of this certification will be retained as long as we sell the affected goods to Orchard Supply Hardware plus an additional two years. We will produce for Orchard Supply Hardware, on request, all records bearing on this certification.

**Makita U.S.A., Inc.**
Name of Vendor

By: _____, **Key Account Manager**
Name and Title

**41850 Christy Street**
Address

**Fremont, CA 94538**
City, State, Zip

**November 11, 1997**
Date

Orchard Supply Hardware        Sears Hardware        Orchard Hardware & Garden

Case3:12-cv-06361-JST Document53 Filed05/24/13 Page93 of 123

# HARDWARE STORES, Sears, Roebuck & Co.

# 3

## Form D

## FEDERAL FOOD, DRUG AND COSMETIC ACT

If products are sold which are covered by the Federal Food, Drug, and Cosmetic Act, furnish the Orchard Supply Hardware Buyer with a seller-to-buyer continuing guaranty, in the form set for the below. This guaranty remains in effect until revoked by the vendor.

The article comprising each shipment or other delivery hereafter made by (Name of Vendor)_____ to, or on the order of Orchard Supply Hardware, San Jose Ca. 95119 is hereby guarantied as of the date of such shipment or delivery, to be, on such date, not adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, and not an article which may not, under the provisions of Section 404 to 505 of such Act, be introduced into interstate commerce.

Makita U.S.A., Inc.
Name of Vendor

By _____, Key Account Manager
Name and Title

41850 Christy Street, Fremont, CA 94538
Address

November 11, 1997
Date

Orchard Supply Hardware          Sears Hardware          Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co.

**3**

NOT APPLICABLE

## Form E

## WOMEN AND MINORITY OWNERSHIP VERIFICATION

For many years, Orchard Supply Hardware has recognized its responsibility to develop sources and suppliers owned by women and minorities, The actual ownership of these sources and not their employment statistics, is the qualifying requirement. The accepted government definition for this group is that 51% or more of the enterprise must be owned by a woman or women, or by a minority or minorities. A minority is defined as an American citizen who is Black, Hispanic, Native American, Eskimo, Aleutian or Asian Pacific Islander American.

Please indicate below if the ownership of your company qualifies as a Woman or Minority Owned Enterprise by placing a check mark in the appropriate space. This information will become part of a total compilation, and may infrequently be used to individually identify your company outside of Sears as needed by Sears-Vendor Diversity.

Our Enterprise is at least 51% owned, operated and controlled by (please check (X) one):

_____ A Woman or Women (Caucasian Women Only)

_____ A Minority or Minorities

Specify:_____
(see list in paragraph above)

_____ A Minority Woman or Minority Women

Specify:_____
(see list in paragraph above)

_____ None of the above

Makita U.S.A., Inc.
**Name of Vendor**

By _____, Key Account Manager
**Name and Title**

41850 Christy Street, Fremont, CA 94538
**Address**

November 11, 1997

Orchard Supply Hardware          Sears Hardware          Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co. 3

## POISON CONTROL

### Form G

Prior to the introduction of any chemical product into the Orchard Supply Hardware system, the vendor must submit to the required information to our contractor 3E company, to be incorporated into their data base for Material Safety Data Sheets (MSDS).

The attached form for "MSDS on Demand" must be mailed or faxed to 3E Company Prior to shipment of the opening order.

**Mailing Address:**

3E Company
Attn: MSDS Department
4920 Carroll Canyon Road
San Diego, Ca. 92121

1-800-451-8346

**Fax Number:**

619-677-0270

The economic poisons comprising each shipment or other delivery hereafter made by (Name of Vendor) _____ to, or on the order of Orchard Supply Hardware, San Jose, Ca. 95119, are hereby guarantied to be lawfully registered with the appropriate state and federal agencies and to comply with all the requirements for the Federal Insecticide, Fungicide and Rodenticide Act, as of the date of such shipment or delivery.

Makita U.S.A., Inc.
Name of Vendor

By _____, Key Account Manager
Name and Title

41850 Christy Street, Fremont, CA 94538
Address

November 11, 1997
Date

Orchard Supply Hardware        Sears Hardware        Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co. **3**

### MSDS ON DEMAND™ <u>NOT AVAILABLE AT THIS TIME</u>
### Product Inventory List Questionnaire

## Please complete and return questionnaire as soon as possible via fax or mail

**Facility Product Inventory List**

An inventory list is not mandatory and utilizing 3E's program is not contingent on receiving your inventory list, however, receipt of a complete inventory list enables 3E to accurately cross-reference it in our database and assure you have the most current MSDS Available.

I.  Please forward us a complete copy of your product inventory list on diskette.  The inventory list should include the following information:

  Full Label name

  Product number/code (if applicable).

  <u>NOT AVAILABLE AT THIS TIME</u>

  Manufacture name.

  Product UPC# (bar code - if applicable).

  Product SKU# (if applicable).

  Manufacture's city, state, & contact name (if applicable).

II.  3E can import data from any of the following programs:

  dBASEIII

  Excel 5.0

  Excel 2.0 - 4.0

  FoxPro 2.0

  Lotus (WK1)

  Paradox 3.X

  Text (Delimited)

III.  When will 3E receive the product inventory list on diskette?_____

IV.  How will your diskette be formatted?_____

V.  How will you update this inventory (i.e. via diskette, fax, mail or phone)?_____

VI.  When will you update this inventory (e.g. monthly, quarterly, annually?_____

## NOTE: Please contact Eugene Lai or Frank Jablonski in 3E's system department for further assistance additional program options at 800-451-8346.

| Orchard Supply Hardware | Sears Hardware | Orchard Hardware & Garden |

# HARDWARE STORES, Sears, Roebuck & CO. 4

## CENTURY COMPLIANCE SURVEY

1. Does your company have a century compliance plan in place today?

   Circle one:  (Yes)  No

2. If yes, what is your target date for completion?

   Specify date (mo./yr.)  **December 1997**

3. Will your company be ready to transact business electronically with Orchard Supply Hardware using a century compliant version (4010) of EDI standards? [Orchard Supply Hardware has targeted August 1, 1998, to support version 4010. Please specify the date your company will be ready to support 4010.]

   Circle one:  (Yes)  No

   Specify date (mo./yr.):  **June 1998**

4. Who is your executive officer accountable for century compliance? Please print.

   | | |
   |---|---|
   | Contact name | **Mickey Takahashi** |
   | Title | **Senior Manager Information Systems** |
   | Company name | **Makita U.S.A., Inc.** |
   | Address | **14930-C Northam Street** |
   | City, State, Zip | **La Mirada, CA 90638-5753** |
   | Telephone | **(714)522-8088** |
   | Fax | **(714)552-8133** |

5. Will you ensure that the products, systems and services that you deliver to Orchard Supply Hardware will function properly with dates encountered after December 31, 1999?

   Circle one:  (Yes)  No

   NOTE: The Orchard Supply Hardware Vendor Information Guide and all Orchard Supply Hardware purchasing agreements require century compliance in all information, data transmissions and transactions with Orchard Supply Hardware.

   | | |
   |---|---|
   | Company name | **Makita U.S.A., Inc.** |
   | CEO/COO name | **Mickey Takahashi** |
   | Signature | *Mickey Takahashi* |
   | Date | **November 11, 1997** |

Orchard Supply Hardware         Sears Hardware         Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co.   5

**INSURANCE GUIDELINES**

Orchard Supply Hardware is committed to selling only high-quality, well designed, safe and reliable products. Vendors must indemnify, defend and hold Orchard Supply Hardware harmless for all actions, liabilities, expenses and costs arising out of their products. To ensure that the vendor can meet this obligation, Orchard Supply Hardware requires each vendor to provide evidence of adequate products liability insurance.

The terms of a vendor's indemnity and insurance obligations require, among other things, the vendor to defend and pay all costs and expenses arising from any claim whatsoever brought against such vendor or Orchard Supply Hardware regarding the merchandise sold to Orchard Supply Hardware. It is, therefore, to the vendor's advantage to carry insurance that protects both the vendor <u>and</u> Orchard Supply Hardware against possible losses of this type.

Every vendor's products liability policy must include the Additional Insured - Vendor Endorsement (ISO Form CG 20 15 11 88) or its equivalent. This endorsement obligates the insurance carrier to provide a defense and coverage for Orchard Supply Hardware when a claim or lawsuit is brought against Orchard Supply Hardware that arises from such vendor's merchandise.

**Before purchase orders can be issued, you <u>must</u> return with this packet a Certificate of Insurance covering Orchard Supply Hardware as an additional insured. The Certificate of Insurance must state your company's name and Orchard Supply Hardware as the additional insured, even if you are a subsidiary. Failure to comply with these requirements could delay the issuance of purchase orders or result in the revocation or termination of an existing contract.**

☐ **GENERAL REQUIREMENTS**

  ▪ Orchard Supply Hardware included as Additional Insured

  ▪ Certificate of products liability insurance required

☐ **MINIMUM REQUIREMENTS FOR ALL PRODUCT LINES**

  ▪ Bodily Injury $2,000,000 Each Occurrence/$2,000,000 Aggregate

  ▪ Property Damage $2,000,000 Each Occurrence/$2,000,000 Aggregate

  ▪ Carrier rating of at least "A-10" or better

☐ **SELF-INSURANCE REQUIREMENTS**

  ▪ Acceptable under certain conditions

Orchard Supply Hardware        Sears Hardware        Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co.  5

- Must be approved by Orchard Supply Hardware Risk Management Department

The following requirements apply to products liability insurance policies for *all* Orchard Supply Hardware product lines.

1. Additional Insured

    All products liability insurance policies must include the Additional Insured - Vendors endorsement (Insurance Services Office Form CG 20 15 11 88 shown in Appendix B), or its equivalent. This endorsement obligates the insurance carrier to provide coverage and a defense for Orchard Supply Hardware when a claim or lawsuit arises from the vendor's products.

2. Certificate of Insurance

    Initial certificates for products liability insurance coverage are to be returned with the Vendor Buying Agreement /New Vendor Start-up Kit.

    Evidence of Products liability insurance coverage, in the form of a Certificate of Insurance, must be submitted to the following address *when a policy is renewed:*

    **Orchard Supply Hardware.**
    **Risk Management Department**
    **P. O. Box 49027**
    **San Jose, Ca. 95161-9027**

    The standard ACORD Certificate of Insurance is acceptable. The certificate should state that Orchard Supply Hardware is to be provided with 30 days notice of cancellation. A new Certificate of insurance must be furnished each year prior to the expiration of your products liability insurance policy.

## ☐ SELF-INSURANCE REQUIREMENTS

In some special situations, Orchard Supply Hardware will allow levels of self-insurance. Self-insurance is subject to Orchard Supply Hardware prior approval, and requires the vendor to meet certain conditions.

In order to be approved, the vendor must submit to Orchard Supply Hardware a Request for Approval of Self-Insurance. The Risk Management Department will review the risk potential of all vendor's product lines, as well as its financial position and record of handling claims. If a vendor is approved for self insurance by the Orchard Supply Hardware Risk Management Department, a Self Insurance Amendment (see Appendix C) must be executed by the vendor amending the vendor's insurance requirements and documenting the terms and conditions of the self-insurance agreement.

If a vendor is not approved for self-insurance, or if the vendor is unwilling to execute appropriate documentation describing the self-insurance agreement, the vendor must provide evidence of the requisite insurance coverage in order to do business with Orchard Supply Hardware.

## ☐ FOR FURTHER INFORMATION

For further information regarding insurance guidelines, contact the Orchard Supply Hardware Risk Management Department.

Orchard Supply Hardware     Sears Hardware     Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co.    5

## APPENDIX B

POLICY NUMBER:                                    COMMERCIAL GENERAL LIABILITY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY

# ADDITIONAL INSURED - VENDORS

This endorsement modifies insurance provided under the following:

    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

#### SCHEDULE

Name of Person or Organization (Vendor)

Your Products:

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

Orchard Supply Hardware        Sears Hardware        Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co.    5

WHO IS AN INSURED (Section II) is amended to include as an insured any person or organization (referred to below as "vendor") shown in the Schedule but only with respect to "bodily injury" or "property damage" arising out of "your products" shown in the Schedule which are distributed or sold in the regular course of the vendor's business, subject to the following additional provisions:

1. The insurance afforded the vendor does not apply to:

   a. "Bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages that the vendor would have in the absence or the contract or agreement.

   b. Any express warranty unauthorized by you;

   c. Any physical or chemical change in the product made intentionally by the vendor;

   d. Repackaging, unless unpacked solely for the purpose or inspection, demonstration, testing, or the substitution of parts under instructions from the manufacturer, and then repackaged in the original container;

   e. Any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products;

   f. Demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale for the product;

   g. Products which after distribution or sale by you , have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor.

2. This insurance does not apply to any insured person or organization, form whom you have acquired such products, or any ingredient, part or container entering into, accompanying or containing such products.

**CG 20 15 11 88**



Makita U.S.A., Inc.   Corporate Office

14930 Northam Street, La Mirada, California 90638-5753, (714) 522-8088, Fax. (714) 522-8133

November 11, 1997

Ms. Kathy Guthormsen
Orchard Supply Hardware
6450 Via Del Oro
P.O. Box 49027
San Jose, CA 95161-9027

Re:    Certificate of Insurance

Dear Ms Guthormsen:

Please be advised that a certificate of insurance was issued to Orchard Supply
Hardware on April 11, 1997 and mailed to Orchard shortly thereafter. A sample
certificate is attached.

Sincerely,

Jeanné Waddell
Legal Secretary

:jw

Encl.

714 522 8194 P.03

MAKITA

**TOKIO MARINE**

2-1. Marunouchi 1-Chome, Chiyoda-ku, Tokyo, 100-50 Japan Phone: Tokyo(03)3212-6211

ORIGINAL

70071

# CERTIFICATE OF INSURANCE

This is to certify that

(Name)

–

(Address)

is, at the date of this certificate, insured as an additional insured per Vendor Clause by the Company for the type of insurance and in accordance with the limits of liability, exclusions, conditions, and other terms of policy hereinafter described.

## Policy Information

| Name of Insured | Name: Makita Corporation |  |
| --- | --- | --- |
|  | Address: 3-11-8, Sumiyoshi-cho, Anjyo-shi, Aichi-pref., Japan. | |
| Type of Insurance | Products Liability Insurance | |
| Policy Number | 9858270591 | |
| Policy Period | From March 31, 1997 . To March 31, 1998 | |
|  | Limits of Liability | Amount of Deductible |
| Limits of Liability & Amount of Deductible | Combined Single Limit | |
|  | US$10,000,000 per occurrence | per occurrence |
|  | aggregate in excess of the underlying insurance (Tokio Marine Management Policy No. CLM9711846-00 ) | |
| Policy Territory | World-wide except Japan | |
| Special Endorsement | Claims Made Basis and Retroactive Date Clause Additional Insured Clause-Vendors Limited Form Amendment of Supplementary Payments Provision Punitive Damages Exclusion Earthquake Exclusion Clause Nuclear Energy Liability Exclusion Absolute Seepage, Pollution and Contamination Exclusion Asbestos Exclusion Clause including the Company's standard | |

THE TOKIO MARINE AND FIRE INSURANCE CO., LTD.

K. Nakajima

Date: April 11, 1997 By: ............................
Authorized Representative

TOTAL P.03

# HARDWARE STORES, Sears, Roebuck & Co.      6

## ORCHARD SUPPLY HARDWARE CODE OF CONDUCT

Orchard Supply Hardware associates are required to follow the Orchard Supply Hardware's Code of Business Conduct. As an Orchard Supply Hardware vendor/source you are expected to support the proper business conduct . The complete Code can be found in the Vendor Information Guide (call 408-365-2796) , if you do not have a copy.

The following areas are key to Orchard Supply Hardware relations with vendors:

1. Orchard Supply Hardware associates may not accept free travel on a vendor's aircraft. Orchard Supply Hardware will reimburse the vendor for the cost of travel.

2. Orchard Supply Hardware associates must charge Orchard Supply Hardware for their travel and lodging expenses.

3. Orchard Supply Hardware associates may not accept gifts in excess of $25.00.

4. Acceptance of vehicles, appliances, other merchandise or the free use of such items from an individual or organization that conducts business or seeks to do business with Orchard Supply Hardware is clearly improper.

5. Hospitality that may include meals, sporting events, or conference facilities provided in the context of bona fide business meetings that are customary in the trade are acceptable and permitted.

**Orchard Supply Hardware associates are not permitted to accept anything of value offered to them in an attempt to influence their business judgment.**

As a vendor for Orchard Supply Hardware, we agree to the spirit of Orchard Supply Hardware Code of Conduct and promise to report to Orchard Supply Hardware any violation or attempt to violate this code.

Makita U.S.A., Inc.
Name of Vendor

By _____, Key Account Manager
Name and Title

41850 Christy Street, Fremont, CA 94538
Address

November 11, 1997
Date

Orchard Supply Hardware          Sears Hardware          Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & C0.                    7

### DEFECTIVE MERCHANDISE RETURNS

---

### ☐ RETURN OF DEFECTIVE MERCHANDISE

This section addresses requirements for merchandise returns. Unless instructed otherwise by Orchard Supply Hardware's Buyer, defective merchandise will be returned to you.

■ Orchard Supply Hardware will issue a debit for the full cost of the product via a claim debit.

■ Orchard Supply Hardware will charge you a consolidation fee to process the return if handled by the Central Return Center (CRC). (Not Applicable—All Defectives are to be shipped <u>directly</u> to Makita U.S.A., Inc.)

■ Orchard Supply Hardware will charge you for all outbound transportation.

### ☐ STANDARD RETURN AUTHORIZATION

Orchard Supply Hardware requires the following information for shipping merchandise back to vendors.

■ Return authorization number

■ Street address, city, state, zip code

■ Specific receiving area designation

■ Name or attention designation

Orchard Supply Hardware requests a standing RA (return authorization) number be established for use in returning merchandise to its vendors. An assigned RA number reduces handling costs and delays in processing returned goods.

### ☑ DEFECTIVE MERCHANDISE

#### <u>RETURNED TO VENDOR FROM DISTRIBUTION CENTERS</u>

Orchard Supply Hardware terms of purchase require that all goods must be first quality and salable. Unless otherwise designated by the Orchard Supply Hardware Buyer, merchandise that is deemed defective will be returned for:

■ 100% cost credit

■ 100% inbound transportation credit

■ 100% outbound transportation credit

# HARDWARE STORES, Sears, Roebuck & C0.

# 7

NOT APPLICABLE

### RETURNED TO VENDOR FROM STORES/CRC'S

Orchard Supply Hardware implemented a return process for merchandise found to be defective at the store level. Orchard Supply hardware has three (3) Central Return Centers (CRC's) which will process returns of defective merchandise from the Orchard Supply Hardware Retail units. The following merchandise categories will not currently be processed through the CRC's:

- Pipe, including PVC, Drain, CPVC, Corrugated, Galvanized, Black Steel, Copper and Conduit

- Light Bulbs and Lamp Glass

- Die Hard Batteries

- Bagged Concrete and Masonry items

- Household Chemicals

- Bottled Water, Candy and any Food Items

- Flammable Items - Including Lamp Oil, Lighter Fluid, BBQ Briquettes

- Lawn and Garden bagged Fertilizers, Soils and Hazardous Materials

Merchandise processed through the CRC's will be processed according to the buyer-vendor instructions. A consolidation fee for processing will be charged to the vendor for defective goods in addition to the 100% cost credit. The amount and basis for calculating that fee will be negotiated by the Orchard Supply Hardware Buyer and Vendor as a condition of purchase. Merchandise processed at the CRC's will be handled one of the following ways:

- Returned to the Vendor

- Sold for Salvage

- Donated to charity

- Destroyed based on terms previously negotiated by the Vendor and the Orchard Supply Hardware Buyer.

Attached Vendor Information Form is to completed and return with the Orchard Supply Hardware Buying Agreement.

# HARDWARE STORES, Sears, Roebuck & C0.

7

# VENDOR RETURN INFORMATION – FOR DEFECTIVE
## FORM H

MERCHANDISE
ONLY!

**Vendor Name** Makita      **Vendor #** 001      **Account Payable #**

**Department** Garden

| | | | |
|---|---|---|---|
| **Mailing Address:** | 41850 Cherry St | **RAR Fax Number** 510-657-7196 | |
| | Fremont, CA 94538 | **RAR Primary Contact** Rick Hanson | |
| **Billing Address:** | | **RAR Phone Number** 510-657-9881 | |
| | Same | **RAR Secondary Contact** | |
| **Shipping Address:** | Same | **RAR Phone Number** | |

**Is Return Authorization Required ?**      YES    (NO)

**Standing RA Number**    N/A

**Disposition of Merchandise:** (1.) Return to Vendor, 2. Sold to Salvage,
(circle one)      3. Donate to Charity, 4. Destroy

**Return Freight:** (1.) Prepaid and Deduct, 2. Collect

**Maximum Shipping Criteria:**    Dollar – **None**
Amount_____ Days_____ Pallets_____ Cartons_____

            Quantity_____ OR Weight_____

**Fees and or Percentage: N/A**

| | Fees | Percentage |
|---|---|---|
| Consolidation | | |
| Disposal | | |
| Landfill | | |
| Storage | | |
| Pallet Charge | | |

**NOTE ANY SPECIAL
INSTRUCTION:**_____

**Authorized Vendor Representative (please
print)** Richard L. Hanson

     **Signature** _____ **Date** November 11, 1997

**Orchard Supply Hardware**    **Sears Hardware**    **Orchard Hardware & Garden**

# HARDWARE STORES, Sears, Roebuck & C0.

## Recommended OSH Support

Do You Provide:

1.  Display/Graphic Allowances     **Yes** [ ]   **No** [ X ]

Details: _____

_____

2.  In-Store Service Programs     **Yes** [ X ]   **No** [ ]

Details: Retail Service Reps. available for Demos / Product

Knowledge Sessions and Merchandising assistance

3.  Product Knowledge And In-Store Demos     **Yes** [ X ]   **No** [ ]

Details: _____

_____

4.  Competitive Shopping Assistance     **Yes** [ x ]   **No** [ ]

Details: _____

_____

5.  Source Tagging (Sensormatic)     **Yes** [ X ]   **No** [ ]

Details: _____

_____

6.  Space Management System     **Yes** [ ]   **No** [ X ]

Pegman [ ]

Spaceman [ ]

Other _____

**Required OSH Support:**

60 Day Price Change Notice

Recall/Stock Balance/Buy Backs

Details: _____

_____

**Orchard Supply Hardware**    **Sears Hardware**    **Orchard Hardware & Garden**

# HARDWARE STORES, Sears, Roebuck & Co.    9

# Growth Incentive Plan

**Growth Incentive plan for Vendor** <u>Makita U.S.A., Inc.</u>
**Long range stepped incentive based on percentage increase on purchases:**

Dept#:_____ Soucrce#:_____ AP#:_____

95' Purchases$ <u>3.5 mil</u>.  97' Purchases$ <u>Proj.-5.5</u>mil.

96' Purchases$ <u>4.8 mil</u>.  98' Purchases$ <u>Proj.- 8 mil</u>.

| Purchase Plateaus | | %Rebate | | $Rebate |
|---|---|---|---|---|
| $_____ | = | %_____ | = | $_____ |
| $_____ | = | %_____ | = | $_____    − SEE ATTACHED |
| $_____ | = | %_____ | = | $_____ |
| $_____ | = | %_____ | = | $_____ |

(All rebate levels are retroactive to dollar $1.00)

**Contract Period:** <u>April 1, 1997 − March 31, 1998</u>

**Vendor Contact:** <u>Richard L. Hanson</u>
**Comments**

_____

_____

## Approvals

| **Vendor** | **OSH** |
|---|---|
| Company: <u>Makita U.S.A., Inc.</u> | Buyer:_____ Dept#:_____ |
| Signature: | Date:_____ |
| Title:  <u>Key Acct. Mgr</u>. | M.M.:_____ |
| Date:  <u>11/11/97</u> | VP Merch:_____ |

ORCHARD SUPPLY HARDWARE    SEARS HARDWARE    ORCHARD HARDWARE & GARDEN

# Hardware Stores, Sears, Roebuck & Co.

**10**

## OSH
## PARTNERS FOR
## GROWTH

### NEW STORE MERCHANDISING AGREEMENT:

With 1998 just around the corner it is time to finalize the parameter of next years program. 1997 year to date has been very positive for Orchard Supply Hardware. Together with Sears we are excited about our success in 1997 and our growth in 1998.

( See comments below)

### MERCHANDISE DISCOUNT:

### 25% NEW STORE OPENING ORDER DISCOUNT

_____ DEDUCT OFF INVOICE

_____ DEDUCT OFF CREDIT MEMO

_____ OTHER

### PRE-OPENING ALLOWANCE (PER STORE)

Annual Volume:          Charge:

$ _____                 $ _____

### ORCHARD SUPPLY HARDWARE WILL DEDUCT PRIOR TO STORE OPENING

### PAYMENT TERMS

2% / 90 day   DATING ON NEW STORE OPENING ORDERS

### COMMENTS

Makita will deduct 5% off the invoice of opening orders up to $40,000 per new store either shipping to a OSH/ Sears Distribution Center or direct to the store _____

### APPROVALS:

**VENDOR APPROVAL:**

Company: Makita USA Inc.

Signature: _____

Title: Key Account Manager

Date: 11/14/97

**OSH APPROVAL:**

Buyer: _____

Department: _____

Date: 11/17/97

Vendor# 881   AP# 139758

ORCHARD SUPPLY HARDWARE      SEARS HARDWARE      ORCHARD HARDWARE & GAR

TOTAL P.02

## ORCHARD SUPPLY HARDWARE UNIVERSAL TERMS AND CONDITIONS

It is Orchard Supply Hardware's policy to obtain written agreements with all of its vendors that set out terms and conditions governing their relationships with Orchard Supply Hardware. This policy ensures that vendors understand Orchard Supply Hardware's expectations and requirements. In addition, it helps Orchard Supply Hardware fulfill its commitment to purchase quality merchandise that is safe and complies with Orchard Supply Hardware specifications and with the laws of the United States and other countries where merchandise is produced and delivered.

Attached is a copy of Orchard Supply Hardware's Universal Terms and Conditions which sets forth the basic terms and conditions to which every Orchard Supply Hardware must agree. The Following are some of the features of the Universal Terms and Conditions:

- There are no references to price or quantity of merchandise, rather these are "generic" terms and conditions that apply with every vendor relationship and supplement other agreements and documents. It is anticipated that vendors and Orchard Supply Hardware Buyers will also negotiate separate purchase orders, specification sheets or other documents with specific commitments relating to the respective merchandise and relationship.

- There is no term or limit. Once executed, these terms remain in effect for all purchases between the parties.

**We are requesting that sign and return two (2) copies of this document in order to do business with Orchard Supply Hardware.** Upon receipt, Orchard Supply Hardware will execute and return one (1) copy back to you.

If you have any questions regarding the Universal Terms and Conditions or the process described above, please contact your Orchard Supply Hardware Buyer.

Orchard Supply Hardware          Sears Hardware          Orchard Hardware & Garden

# HARDWARE STORES, Sears, Roebuck & Co.

## THIS SPACE FOR ORCHARD SUPPLY HARDWARE USE ONLY

| REQUESTED BY | ESTIMATED DOLLAR VOLUME OF SHIPMENTS FROM SOURCE IN NEXT 12 MONTHS |
|---|---|
| | $ 200,000 |
| **APPROVALS** | |
| BUYER | MERCHANDISE MANAGER |
| **REVIEWED BY** | |
| FINANCIAL DIRECTOR | DATE |
| SOPT (LEAD TIME) | TERMS |

**SECTION COMPLETE**

1.☐ 2.☐ 3.☐ 4.☐   6.☐ 6.☐ 7.☐ 8 ☐   9.☐ 10.☐ 11.☐

**COMMENTS**

**Orchard Supply Hardware**          **Sears Hardware**          **Orchard Hardware & Garden**

# ORCHARD SUPPLY HARDWARE CORPORATION
# UNIVERSAL TERMS AND CONDITIONS

The terms and conditions contained herein (the "UTC") shall be effective for all Merchandise (as hereinafter defined) sold by the undersigned vendor ("Seller"), directly or indirectly through Seller's dealers or distributors, to Orchard Supply Hardware Corporation ("OSH") on or after the date set forth below.

Seller and OSH hereby agree as follows:

1. DEFINITIONS. The following terms used in the UTC shall have the meanings described below: (a) "Change of Control" shall mean (i) a sale of all or substantially all of the assets of Seller, whether in a single transaction or a series of transactions; (ii) the merger or consolidation of Seller with or into any corporation or the merger of another corporation into Seller if the effect is that fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of the surviving or new corporation is held by a person or persons other than the shareholders of Seller immediately prior to such transaction, or (iii) the occurrence of any other event which results in fifty percent (50%) or more of the total voting power entitled to vote in the election of the board of directors of Seller being held by a person or persons other than the shareholders of Seller who, individually or as a group, held 50% or more of such voting power immediately prior to such event; (b) "Merchandise" shall mean the goods provided to OSH by Seller, directly or indirectly through Seller's dealers or distributors, as described in any applicable Specifications, including all packaging, tags, labels, hangers, and containers used in connection therewith, all parts relating to such goods provided to OSH and all literature (including owner manuals and training materials) pertaining to such goods, if applicable, whether or not any of such items are set forth separately on invoices to OSH; (c) "Purchase Order" shall mean a written or electronic order for Merchandise, setting forth price, quantities of Merchandise, delivery terms and payment terms or any other equivalent process by which OSH orders quantities of merchandise; (d) "Specification" shall mean all, and any part, of the detailed description of Merchandise agreed upon by Seller and OSH, or contained in any vendor guide developed by OSH; (e) "Vendor Agreements" shall mean all written agreements between OSH and Seller relating to the purchase of Merchandise, including all Purchase Orders, agreements for selling assistance (including agreements for advertising, point of sale or promotional service or funding), buying agreements, exclusivity agreements, letter agreements, Specifications and any written amendments, waivers and consents relating to any of the foregoing; provided, however, that Vendor Agreements shall not include any response by Seller purporting to modify or supplement any Purchase Order issued by OSH unless such response is in writing and executed or consented to in writing by OSH. Terms used herein and not otherwise defined shall have the meaning given them in the Uniform Commercial Code as in effect in the State of Illinois (the "UCC"), including but not limited to Article 2 thereof.

2. VENDOR AGREEMENTS

2.1 Purchase Orders. The execution of the UTC shall not give rise to any commitment on the part of OSH to purchase any Merchandise, except as may be expressly set forth in another Vendor Agreement. In the absence of such other Vendor Agreement, a commitment to purchase Merchandise shall arise only at such time as OSH issues a Purchase Order to Seller for specified quantities of Merchandise, and OSH obligation to purchase Merchandise shall be limited to the quantities contained in Purchase Orders issued by it. When issued by OSH and accepted by Seller, all Purchase Orders shall become part of and be subject to the terms of the applicable Vendor Agreements, including the UTC. Any estimates or forecasts of OSH future needs for Merchandise which may be provided to Seller by OSH are for long range planning purposes only and shall not in any way represent a commitment of OSH. OSH shall have no responsibility for any actions taken by Seller based on such estimates or forecasts.

2.2 Construction and Amendment. Except as otherwise expressly provided in any Vendor Agreement executed after the date hereof, the UTC shall apply to all Vendor Agreements and is hereby incorporated into the Vendor Agreements, whether existing on the date hereof or hereafter executed. The Vendor Agreements, as supplemented and amended by the UTC, contain the entire understanding of the Seller and OSH with respect to the subject matter of such Vendor Agreements and may not be supplemented or modified by course of dealing, course of performance, any oral communication between the parties, or any response by Seller, whether oral or written, purporting to modify or supplement the terms of a Purchase Order issued by OSH unless such response is in writing and executed or consented to in writing by OSH. The Vendor Agreements may be amended or supplemented only by the UTC or another Vendor Agreement, which Vendor Agreement must be in writing and signed by an authorized representative of each party. The UTC supersedes all previous Vendor Agreements, communications, and understandings between the parties that are inconsistent with the terms hereof. With respect to any particular line of Merchandise, the applicable Vendor Agreements, the UTC and shall be deemed a series of installments in one and the same transaction and deemed to constitute a single contract between OSH and Seller within the meaning of Section 9-318(1) of the UCC.

2.3 Waiver. No right of either party under a Vendor Agreement, as modified by this UTC, may be waived except as expressly set forth in a writing signed by an authorized representative of the party waiving such right. No waiver of any provision shall be implied by a party's failure to enforce any of its rights or remedies herein provided, and no express waiver shall affect any provision other than that to which the waiver is applicable and only for that occurrence.

3. BUSINESS TERMS.

3.1 Specifications. Specifications shall be in writing. By agreeing to and/or using any Specification or any design, product modification or other manufacturing or production suggestion, whether originating with OSH or elsewhere, Seller adopts as its own, accepts full responsibility for, and relieves OSH of all responsibility for such Specification, design, modification or suggestion.

3.2 Price and Shipping. The price specified in the applicable Purchase Order shall include all costs of packing Merchandise and all costs of delivery of Merchandise to the 'F.O.B. point" or other delivery point specified in the applicable Purchase Order, including: (a) all duties and taxes (including excise and withholding taxes) payable in any country where production or delivery takes place; (b) any commissions to selling agents; and (c) other incidental charges, whether or not such charges are itemized separately on invoices to OSH. Seller shall ship only the quantities of Merchandise ordered by OSH in the applicable Purchase Order. Seller shall not make any substitutions without OSH prior written approval. Seller shall bill OSH for the Merchandise at the price specified in the applicable Purchase Order.

4. CODE OF CONDUCT. Seller acknowledges that Seller has been furnished a copy of Sears Code of Business Conduct (the "Code of Conduct") and that OSH associates are required to follow the Code of Conduct. Seller shall support the Code of Conduct and shall not take any action which may cause a OSH associate to violate the Code of Conduct. Seller shall report to OSH any violation of or attempted violation of the Code of Conduct.

5. PACKAGING, LABELING, SHIPPING AND BILLING; RISK OF LOSS.

5.1 Packaging, Labeling, Shipping and Billing. Seller shall be responsible for providing adequate packaging, tagging, labeling, packing, shipping and billing. Seller shall comply with all packaging, tagging, labeling, packing, shipping and billing requirements reasonably requested by OSH or established by applicable laws, regulations, carrier tariffs and classifications. For Merchandise to be shipped to OSH from a point of origin within the United States, Seller shall deliver Merchandise to the designated carrier on or before the "ship date(s)" specified in the applicable Purchase Order. For Merchandise to be shipped to OSH from a point of origin outside the United States, Seller shall deliver Merchandise in accordance with the delivery terms specified in the applicable Purchase Order, and such delivery shall be made on or

before the "ready date(s)" specified in the Purchase Order. Delivery times set forth in a Purchase Order shall be of the essence of the Vendor Agreement. Seller shall ship all Merchandise in full packs and full shipments in accordance with OSH requirements.

**5.2 Risk of Loss.** All risk of loss or damage to Merchandise shall remain with Seller until delivery of such Merchandise in accordance with the delivery or purchase terms specified by OSH in the applicable Purchase Order.

6.   MANUFACTURING. Upon OSH request, Seller shall provide OSH with specific information, in such detail as OSH may reasonably request, as to the location(s) and method(s) of manufacturing Merchandise. Seller shall provide OSH with prior written notice of any change in the location(s) of manufacturing Merchandise, and Seller shall be fully responsible for all costs and/or delays resulting from such changes. Without advance notice but during regular business hours, OSH, its designated representatives and any independent inspectors approved by OSH may inspect any production facilities at which any Merchandise or any components for Merchandise are being produced (including any facilities of Seller, its subcontractors and suppliers) and any and all Merchandise at any stage of production or delivery (including at the delivery point specified in the applicable Purchase Order). OSH may require Seller to have Merchandise inspected prior to its shipment to the United States, such inspection to be performed at Seller's sole expense, by an independent inspector approved by OSH. Any inspection, any documentation thereof, and any corrective actions taken by Seller with respect to any Merchandise shall not be deemed an acceptance of any Merchandise, or a waiver of any nonconformities or defects in any Merchandise and shall not excuse any failure by Seller to deliver Merchandise in accordance with the terms of the applicable Vendor Agreement.

7.   PARTS AND SERVICE.

**7.1 Parts.** Seller shall sell to OSH any and all parts shown on Merchandise parts lists referenced or included in any Vendor Agreement applicable to the Merchandise (if any) for a period of at least ten (10) years after the date such Merchandise is last produced by Seller for OSH; provided, however, that if Seller discontinues manufacturing or supplying any part shown on any such Merchandise parts list, Seller shall give OSH at least ninety (90) days prior written notice of such discontinuance and Seller shall promptly fulfill any and all orders placed by OSH within such 90-day period. The price of parts shall be specified on the applicable Purchase Orders, but in no event shall Seller charge OSH a price greater than the lowest price charged by Seller to any other customer for the same or similar parts sold on substantially similar terms.

**7.2 Service.** Seller shall provide OSH with all available information relating to Merchandise, including product specifications, parts lists and all training materials, service manuals and instructions developed by or for Seller. Seller authorizes OSH to reproduce such training materials, service manuals and instructions without payment of any royalties or other fees to Seller. Seller authorizes OSH to provide repair and maintenance services for all Merchandise sold to customers, and OSH may advertise that it is authorized to provide such services. OSH shall provide such repair and maintenance services in conformity with reasonable standards and guidelines. OSH may use its subsidiaries and independent subcontractors or licensees to provide such repair and/or maintenance services. Seller represents and warrants that the provision of such services by OSH will not violate the rights of any third party.

8.   REPRESENTATIONS AND WARRANTIES. The provisions of this Section 8 shall survive the cancellation or termination of all Vendor Agreements between the parties relating to Merchandise.

**8.1 Merchandise Warranties.** Without in any way disclaiming implied remedies or limiting remedies for breach thereof, Seller represents and warrants that all Merchandise shall: (a) conform to the Specifications for such Merchandise; (b) be merchantable; (c) be free from defects in workmanship, materials and packaging; (d) be free from defects in construction and design; (e) be fit and sufficient for the purpose for which it is intended and/or which is stated on any packaging, labeling or advertising; and (f) be equivalent in materials, quality, fit, finish, workmanship, performance and design to any samples submitted to and approved by OSH.

**8.2 Compliance with Law.** Seller represents and warrants that: (a) all patents, trademarks, trade names, trade dress, copyrights, trade secrets, right of publicity and other proprietary rights (other than proprietary rights owned by OSH) used by Seller in connection with Merchandise or the development or manufacture of Merchandise are owned by Seller or that Seller has been properly authorized by the owner of such proprietary rights to use such rights in connection with such Merchandise and to sell such Merchandise as incorporates such proprietary rights to OSH for use or further resale; (b) all Merchandise has been or shall be produced, packaged, tagged, labeled, packed, shipped and invoiced in compliance with the applicable requirements of federal, state and local laws, regulations, ordinances and administrative orders and rules of the United States, its territories and all other countries in which Merchandise is produced or delivered; (c) Seller and all subcontractors and agents involved in the production or delivery of Merchandise strictly adhere, and shall continue throughout the term of each Vendor Agreement to strictly adhere, to all applicable federal, state and local laws, regulations and prohibitions of the United States, its territories and all countries in which Merchandise is produced or delivered with respect to the operation of their production facilities and their other business and labor practices, including laws, regulations and prohibitions governing the working conditions, wages, hours and minimum age of the work force; and (d) Merchandise has not been and shall not be produced or manufactured, in whole or in part, by child labor or by convict or forced labor. Seller shall provide OSH with any guaranty of compliance with the foregoing in such form as OSH may designate with respect to Merchandise. Seller represents and warrants that all sales of Merchandise to OSH are or shall be made at no less than fair value under the United States Antidumping Law. As long as Merchandise is not subject to a United States antidumping investigation on the date of this Agreement (as first set forth above), Seller represents and warrants that it shall indemnify OSH for all antidumping duties imposed on such Merchandise which is (i) sold prior to the date of publication of the International Trade Administration's preliminary determination of sales at less than fair value; and (ii) exported before the date of publication of the International Trade Administration's final determination of sales at less than fair value. Seller also represents and warrants that it shall indemnify OSH for any expenses (including reasonable attorneys' fees) and administrative costs incurred by OSH in its participation in any United States antidumping proceeding involving such Merchandise.

**8.3 Century Compliance.** Seller represents and warrants that all information, data transmissions and transactions, regardless of form, originating from Seller or any of its contractors or subcontractors or otherwise controlled by Seller or any of its contractors or subcontractors relating to the Merchandise or otherwise required or permitted under any Vendor Agreement shall utilize and include four digit year elements. The year must encompass a two digit century that precedes and is contiguous with, a two digit year of a century (e.g. 1999, 2000, etc.).

9.   ELECTRONIC PROCESSING. Until January 1, 1998, OSH shall order Merchandise from Seller by delivery to Seller of signed purchase orders in forms provided by OSH. From and after January 1, 1998, unless otherwise agreed to by OSH, the parties shall process Purchase Orders and other related documents (including invoices and ship notices) and installment payments and advances in respect of all monetary obligations between OSH and Seller electronically, through electronic data interchange ("EDI"), either directly or through a third party provider satisfactory to both parties. Each party shall be responsible for its own costs, including the costs of any provider with which it contracts. All EDI transactions shall be in accordance with standards approved by the Accredited Standards Committee X 12 (ASCX12), and in accordance with any instructions and procedures which OSH may supply from time to time. Each EDI invoice (or ship notice, in the absence of an invoice) or non-EDI invoice or ship notice if OSH waives the EDI processing requirement shall contain an appropriate, agreed upon code, symbol or statement affirming Seller's compliance with all applicable requirements of the Fair Labor Standards Act (as amended), the regulations and orders of the United States Department of Labor issued pursuant thereto and of any similar state laws and regulations: All electronic fund transfers and wire transactions shall be in accordance with National Automated Clearing House Association (NACHA) rules, and in accordance with the instructions and procedures established by OSH from time to time.  Neither party shall be liable to the other for any special, incidental, exemplary or consequential damages arising from or as a result of any delay, omission or error in the electronic transmission or receipt of any

documents, even if the other party has been advised of the possibility of such damages.

10. OSH IDENTIFICATION. If OSH directs Seller to mark or label any Merchandise with a trade name, trademark, logo or service mark owned by or licensed to OSH ("OSH Identification"), such marking or labeling shall be limited to the indicated quantities of such Merchandise and shall be done in accordance with OSH specific instructions. Seller shall not sell or otherwise dispose of, nor permit the sale or disposal of, any Merchandise bearing any OSH Identification (including any rejected Merchandise) to anyone other than OSH without first obtaining OSH express written consent and then removing all OSH Identification prior to such sale or disposal. OSH may elect, but shall have no obligation, to purchase from Seller any surplus labels, packaging or other materials bearing OSH Identification. All such materials not purchased from Seller by OSH shall be destroyed at the cancellation or termination of the Vendor Agreement. Seller shall have no interest or rights in any OSH Identification except as expressly granted in a Vendor Agreement. The provisions of this Section 10 shall survive the cancellation or termination of each Vendor Agreement.

11. DEFENSE OF CLAIMS. Seller shall, at its own cost and expense, defend OSH, its subsidiaries, and the officers, directors, employees, licensees, agents, distributors and independent contractors of OSH and its subsidiaries (each an "Indemnified Party") from and against all allegations (even though such allegations may be false, fraudulent or groundless) asserted in any claim, action, lawsuit or proceeding between any Indemnified Party and any third party arising out of any of the following (collectively, the "Claims"), whether actual or alleged and whether or not Seller's Indemnity and Contribution Obligations (as defined below) shall apply: (a) infringement or misappropriation of any patent, trademark, trade name, trade dress, copyright, trade secret, right of publicity or other proprietary right in connection with Merchandise, or any unfair competition involving Merchandise; (b) death of or injury to any person, damage to any property, or any other damage or loss, by whomsoever suffered, resulting or claimed to result in whole or in part from any actual or alleged defect in Merchandise, whether latent or patent, including actual or alleged improper construction, installation, repair or design of Merchandise; or actual or alleged failure of Merchandise to comply with any specifications or samples or with any express or implied warranties of Seller, or any claim of strict liability in tort relating to any Merchandise; (c) violation by Merchandise in its manufacture, possession, use or sale, of any federal, state or local laws, regulations, ordinances or administrative orders or rules of the United States, its Territories or any other country in which Merchandise is produced or delivered; (d) defect involving the packaging, tagging, labeling, packing, shipping and/or invoicing of Merchandise; (e) failure to warn or inadequate warnings and/or instructions; or (f) display, assembly or installation of Merchandise. Seller shall use counsel reasonably satisfactory to OSH in the defense of such Claims. OSH may, at its election, take control of the defense and investigation of the Claims, and may employ and engage attorneys of its own choice to manage and defend such Claims, at Seller's cost, risk and expense, provided that OSH and its counsel shall proceed with diligence and good faith with respect thereto. The obligations of Seller under this Section 11 (collectively, "Defense Obligations") shall survive the cancellation or termination of each Vendor Agreement.

12. INDEMNIFICATION AND CONTRIBUTION. Seller shall hold harmless and indemnify the Indemnified Parties from and against any and all claims, demands, actions, lawsuits, proceedings, liabilities, losses, costs and expenses (including reasonable attorneys' fees and disbursements and costs of investigation) incurred by any of the Indemnified Parties in any claim, demand, action, lawsuit, or proceeding between Seller and any Indemnified Party or between any Indemnified Party and any third party or otherwise arising out of any Claims, including but not limited to claims of negligent acts or omissions by any Indemnified Party. In any case to which the Seller's indemnity obligation set forth in the preceding sentence is not enforceable under applicable law and in which either (a) any Indemnified Party or (b) Seller is found to be liable to a third party with respect to Merchandise, then OSH and Seller shall each contribute to the payment of any judgment awarded in favor of such third party in proportion to the comparative degree of culpability of the Indemnified Parties and Seller. The obligations of Seller and OSH under this Section 12 (collectively, "Indemnity and Contribution Obligations") shall survive the cancellation or termination of each Vendor Agreement.

13. INSURANCE. Seller shall obtain and maintain, at its expense, a policy or policies of Commercial General Liability Insurance covering liabilities relating to Merchandise, including products and completed operations, with a broad form Vendor's Endorsement naming OSH, in such amounts and with such companies and containing such other provisions satisfactory to OSH. All such policies shall provide that the coverage thereunder shall not be terminated without at least thirty (30) days prior written notice to OSH. Certificates of insurance evidencing such coverage shall be submitted in advance of or concurrent with the execution of the UTC by Seller and upon each policy renewal. Approval of any of Seller's insurance policies by OSH shall not relieve Seller of any obligations contained herein, including Seller's Defense and Indemnity and Contribution Obligations set forth above, even for claims in excess of Seller's policy limits. If at any time Seller does not provide OSH with the certificates of insurance required hereunder or if, in OSH opinion, such policies do not provide adequate protection for OSH, and Seller does not furnish evidence of acceptable coverage within fifteen (15) days after OSH so notifies Seller, OSH shall have the right to: (a) immediately terminate or cancel each Vendor Agreement or any part of OSH obligations under such agreements, or cancel all or any outstanding orders for Merchandise, upon written notice to Seller; and (b) withhold making any payment or advance in respect of any OSH monetary obligations which may be outstanding under the applicable Vendor Agreements until evidence of acceptable coverage is provided.

14. OSH REMEDIES. In addition to all other remedies available to OSH under the UCC or otherwise, any Merchandise may be rejected by OSH and abandoned, returned or held at Seller's expense and risk, when such Merchandise: (a) is not produced, sold, shipped and/or delivered in compliance with the terms of the applicable Vendor Agreements, or otherwise does not conform to the applicable Vendor Agreements; (b) is delivered in excess of the quantities ordered, in broken packs or partial shipments, or in packages or assortments other than as specified; (c) allegedly violates any federal, state or local laws, regulations issued pursuant to such laws, or any governmental administrative orders, rules or regulations, of the United States, its territories or any other country in which Merchandise is produced or delivered; or (d) allegedly infringes any patent, trademark, trade name, trade dress, copyright, trade secret, right of publicity or other proprietary right, or allegedly involves any unfair competition. OSH right to reject and return or hold Merchandise at Seller's expense shall, without limiting such right, extend to Merchandise sold to OSH hereunder which was returned by a OSH customer for any reason entitling OSH to reject or revoke acceptance of such Merchandise. OSH may, at its option, require Seller to replace any nonconforming Merchandise or grant OSH a full refund or full credit (collectively, "Refund Credit"). At its election, OSH may accept nonconforming Merchandise, and Seller shall be liable for any reduced value of such Merchandise and to repair the same. Acceptance of Merchandise by OSH shall not relieve Seller of any of its warranty or other obligations hereunder. OSH may also charge to Seller all direct and indirect costs incurred by OSH as a result of any nonconforming Merchandise or delivery, or an administrative fee in an amount reasonably related to such costs whether or not the Merchandise is rejected by OSH (collectively, "Return Costs"). All Refund Credits, Return Costs, Defense Obligations, Indemnity and Contribution Obligations and other monetary obligations owing by Seller to OSH under the UTC (collectively, "Seller's Monetary Obligations"), may, at OSH's option, be deducted and recouped from any monetary obligations which may be owing by OSH at any time pursuant to the Vendor Agreements. Acceptance by OSH of replacement Merchandise, of a full or partial credit or refund, or of Return Costs, shall not relieve Seller of liability for other damages sustained by OSH as a result of Seller's failure to deliver in a timely manner conforming Merchandise or arising as a result of any other breach by Seller.

15. CANCELLATION AND TERMINATION. OSH shall have the right to cancel or terminate immediately the related Vendor Agreements for any particular line or lines of Merchandise or any part of OSH obligations under such agreements, or cancel or terminate all or any outstanding orders for Merchandise under such Vendor Agreements if: (a) OSH reasonably believes that Seller does not have Merchandise which conforms to the terms hereof, and is ready for shipment in the specified quantities and at the delivery dates specified; (b) it is alleged that Merchandise infringes any patent, trademark, trade name, trade dress, copyright, trade secret, right of publicity or other proprietary rights; (c) it is alleged that Merchandise was manufactured or to be sold to OSH in violation of any applicable federal, state or local laws, regulations, ordinances or administrative orders or rules of the United States, its territories or any country in which the Merchandise is produced or delivered or in violation with the UTC; (d) Seller shall refuse to furnish appropriate guaranties to protect OSH as may be requested by OSH pursuant to Section 8.2; (e) Seller shall

fail to maintain the insurance required hereunder or fail to produce evidence thereof; (f) Seller becomes the subject of a case under the Federal Bankruptcy Code or similar state or federal insolvency laws; any creditor of Seller commences action to enforce or foreclose upon a lien or security interest in property of Seller; or any property of Seller passes into the hands of a creditor of Seller, receiver, or assignee for the benefit of creditors, becomes the subject of a levy for taxes or to satisfy a judgment, or otherwise is attached for the benefit of a creditor of Seller (excluding the consensual granting of a lien or security interest by Seller to secure a debt); (g) Seller ceases operating the manufacturing or assembly line(s) applicable to the Merchandise or necessary components incorporated into the Merchandise, or announces its intention to do so prior to fulfilling all outstanding Purchase Orders, or otherwise becomes unable for any reason timely to fulfill outstanding Purchase Orders; (h) Seller commits a material breach of any Vendor Agreements relating to such Merchandise; (i) a Change of Control occurs with respect to Seller; (j) Seller shall fail to comply with the four digit year element requirement in Section 8.3; (k) Seller changes the location(s) of manufacturing Merchandise or (l) cancellation or termination is otherwise permitted by the UCC or other applicable law. For any imported Merchandise which is subject to a customs embargo or quota restriction, OSH may cancel or terminate any Purchase Order or delay any installment payment or advance in respect of OSH monetary obligations to Seller, if any, under each applicable Vendor Agreement until the embargo is lifted or necessary quota becomes available.

16. RECOUPMENT AND SET-OFF. OSH and Seller acknowledge and agree that OSH monetary obligations to Seller under the Vendor Agreements shall at all times be net of Seller's Monetary Obligations, and any installment payment or advance made by OSH to Seller in respect of any Purchase Order while any Seller's Monetary Obligations are outstanding shall be deemed to be an overpayment to Seller to the extent of such outstanding Seller's Monetary Obligation and be subject to recoupment by OSH. Without limiting the foregoing, OSH shall have the right, at all times, to deduct any Seller's Monetary Obligations from any amounts owed to Seller by OSH, and to pay only the net sum due, if any. Any Seller's Monetary Obligations which remain outstanding after any exercise by OSH of its recoupment and/or set-off rights shall be paid by Seller promptly upon demand by OSH. For the purpose of OSH exercise of the right of recoupment and/or setoff only, any raw materials, components and parts sold by Seller to OSH for use in Merchandise, if applicable, shall be deemed to be sold to OSH pursuant to a Purchase Order.

17. CONFIDENTIALITY. All Proprietary Information (as hereinafter defined) is the sole and exclusive property of OSH. Seller shall not in any manner use, reproduce or disclose, directly or indirectly, to any third party at any time any Proprietary Information, except in connection with Seller's performance under the Vendor Agreements. Upon demand by OSH, Seller shall deliver to OSH immediately all materials containing Proprietary Information in Seller's possession (whether prepared by OSH or Seller). Proprietary Information shall consist of: (a) all information relating to OSH sales, pricing, cost, inventory, operations, plans and programs; (b) all trade secrets of OSH, including any and all customer lists, customer survey responses and any other information concerning any of OSH customers; (c) Specifications, to the extent furnished by OSH; (d) patent applications, copyrights and other OSH intellectual property; and (e) any other information that is not publicly available and designated by OSH as Proprietary Information. The provisions of this Section 17 shall survive the cancellation or termination of each Vendor Agreement.

18. ASSIGNMENT BY SELLER. Seller shall not assign (by contract, operation of law or otherwise) its rights or obligations under any Vendor Agreement or grant a security interest in or pledge as collateral any interest herein or therein, except with OSH prior written consent, and the failure of Seller to obtain OSH prior written consent shall render any such attempt to assign, or grant a security interest or lien in its rights or obligations void and of no force and effect; provided, however, that Seller may assign its right to receive installment payments or advances from OSH in respect of any monetary obligations of OSH to Seller under any Vendor Agreement, subject to the terms and conditions contained herein. Any factor or permitted assignee, secured creditor or pledgee of Seller shall acquire such interest subject to all of OSH recoupments, set-offs, claims and defenses and all of the terms and conditions contained herein, and Seller shall notify any such factor, assignee, secured creditor or pledgee of such fact. OSH shall have no obligation to make payments to anyone other than Seller unless and until Seller: (a) notifies OSH in writing of the assignment of such installment payments or advances along with the name and address of the person to whom such installment payments or advances should be sent; (b) obtains a separate OSH accounts payable number for such installment payments or advances; and (c) uses such accounts payable number on every invoice which OSH is to pay directly to the third party. Seller retains responsibility for all allegedly misdirected installment payments or advances which result from Seller's failure to comply with the terms and conditions hereof.

19. SEVERABILITY. If any provision of any Vendor Agreement or this UTC is held to be invalid, illegal or unenforceable by a court of competent jurisdiction, then such provision shall be deemed modified to the extent necessary to make such provision enforceable by such court, and the invalidity in whole or in part of any portion of such Vendor Agreement or this UTC shall not impair or affect the validity or enforceability of the remaining provisions of such Vendor Agreement or this UTC.

20. CUMULATIVE RIGHTS. All rights and remedies under the Vendor Agreements are cumulative, and the exercise of any right or remedy herein provided shall be without prejudice to the right to exercise any other right or remedy provided for herein or at law or in equity.

21. APPLICABLE LAW AND JURISDICTION. The Vendor Agreements and the UTC shall be construed and enforced in accordance with the internal laws of the State of Illinois, without regard to its conflict of law principles. The rights and obligations of the parties hereto shall not be governed by the provisions of the United Nations Convention on Contracts for the International Sale of Goods. The UTC shall not be effective until the UTC has been received and executed by OSH. The federal and/or state courts of Illinois shall have personal and subject matter jurisdiction over, and the parties each hereby submit to the venue of such courts with respect to, any dispute arising pursuant to any Vendor Agreement, and all objections to such jurisdiction and venue are hereby waived. Seller consents to service of process permitted under Illinois law or by certified mail, return receipt requested.

IN WITNESS WHEREOF, Seller and OSH have each caused the UTC to be executed by its duly authorized representative as of the date written below and such execution evidences each party's acceptance of and agreement with the terms and conditions set forth herein.

Dated: 4/20/00

ORCHARD SUPPLY HARDWARE CORPORATION

By: _____
(Signature)

Title: Buyer

SELLER

MILWAUKEE ELECTRIC TOOL CORP.
(Company Name)

By: _____
(Signature)

Title: _____

[PLACE SELLER'S NAME LABEL HERE]

# EXHIBIT 5

Facebook        RSS

LinkedIn   Welcome Log In / Create an Account

Hardware Store Connect    Media Kit    Events    Multimedia    Subscribe    About

E-MAIL    PRINT    SHARE ON FACEBOOK  SHARE ON LINKEDIN  SHARE ON TWITTER  MORE SHARING SERVICESSHARE

# Home Depot will defend its lead in power tools

JUNE 7, 2012 | BY KEN CLARK

Speaking at The Home Depot's 2012 Investor and Analyst Conference in Atlanta, Home Depot executive VP merchandising Craig Menear revved up the power tool rhetoric.

Menear said the company intends to defend its position as power tool market share leader.

He also described power tools as a category with a relatively high vulnerability to online competitors. One of the best defenses is a large fleet.

"Our 2,200 stores are convenient for our pro customers when they have a tool go down on the job," Menear said. "We are now executing a strategy to compete across all channels of the business."

The company is also playing offense in the category, developing and maintaining strategic relationships with suppliers that bring new products to Home Depot as exclusives, he said. Also, the company is building its capabilities in the area of product repair.

And online, Home Depot is fighting fire with fire, he said. "Rapid expansion of online assortments and brands has produced excellent results in this channel as well," he said. "We have grown market share the last two quarters faster than the online market leader."

The online-market share leader would be Amazon, which many believe is benefiting from smartphone-fueled consumer behavior that lets shoppers browse in a store, search online for cheaper prices and buy somewhere else.

Login or register to post comments        Print    E-mail

Post a Comment

Related Terms:    Headlines    Home Depot News    Home Centers    Atlanta    Home Depot    Company Technology    The Home Depot    Craig Menear    Dow Jones Industrial Average    executive    Home Depot    The Home Depot    VP

**RELATED CONTENT**

Home Depot names new Canadian chief

Home Depot will hire 60,000 for spring push

Romancing the pros

Home Depot reports $68 billion in 2010 sales

Home Depot's Menear honored by City of Hope

Home Depot shows sales and earnings growth

Home Depot in China: Fewer cities, tighter focus

AdChoices

Events    Media

Subscribe    About Us    Privacy Policy

**News**
Headlines
Opinion
Products
Photo features
Industry events

**Hardware Stores**
Hardware Stores Headlines
Co-op news
Independent profiles

**Home Centers**
Home Centers Headlines
Home Depot News
Lowe's News
Warehouse home center profiles
HCN TOP 300 INDUSTRY SCOREBOARD

**Pro Dealers & LBM**
Pro Dealer news
ProDealer Industry Summit
THE 2012 TOP 200 PRO DEALER SCOREBOARD

**Green Central**

**Research**
Industry Scoreboards
RISI Research
Industry Dashboard
Special reports


Lebhar-Friedman websites

**Retail Group**
Chain Store Age
Connecting NW Arkansas
Drug Store News
Home Channel News
Retailing Today
RetailCareersNow
Specialty Pharmacy
DSN Collaborative Care

**Events - Retail**
Retail Clinician Congress
ProDealer Industry Summit
SPECS
Main & Wall
Green for Retail
Executive SPECS
Golden Hammer Awards

**Industry Guides, Research & Reports**
RetailNet

**International**
Diamond-Friedman Co. Ltd.
Diamond Chain Store Age
Diamond Home Center
Diamond Retail Technology
Diario IP Mark Distribucion Actualidad
Diamond Drug Store News Japan

View mobile site

© 2012 Home Channel News. All Rights Reserved.

# EXHIBIT 6

| **From:** | Rich Chapman |
| **To:** | Jeff Garcia |
| **Cc:** | Hiroshi Tsujimura: Daniel Rhodes: Brandon Stover |
| **Subject:** | Orchard Supply |
| **Date:** | Thursday, August 02, 2012 4:26:54 PM |

Jeff,

Brandon has asked that I confirm in writing our conversation of a few weeks ago.

As we discussed on the phone, Makita USA has determined that Orchard Supply is not a good fit for our distribution strategy going forward.
As such, we will not be accepting any further purchase orders effective immediately.

We appreciate your interest in our products,


Rich Chapman
Sr., V.P., Sales
Makita USA

# EXHIBIT 7


**MILWAUKEE ELECTRIC TOOL CORPORATION**

13135 West Lisbon Road • Brookfield, Wisconsin 53005 • 262.781.3600 • Fax 262.781.3117

darrell.hendrix@milwaukeetool.com • www.milwaukeetool.com

*SENT VIA CERTIFIED MAIL –*
*RETURN RECEIPT REQUESTED*

June 29, 2012

Orchard Supply Hardware, LLC
Attn: Steve Mahurin
6450 Via Del Oro
San Jose, CA 95119

> Re:   Termination of Vendor Agreement and all related agreements between
> Milwaukee Electric Tool Corporation and Orchard Supply Hardware

Dear Steve:

This letter provides Orchard Supply Hardware ("OSH") with 30 days' notice that Milwaukee
Electric Tool Corporation is terminating its business relationship and any agreements between it
and Orchard Supply Hardware including without limitation the Volume Rebate Program
agreements dated October 1, 2010 and the Marketing Alliance Program agreement dated
September 19, 2008.

During the period prior to termination, OSH may continue to order Milwaukee products in
quantities and on terms acceptable to us in light of the impending termination. The quantities
should not exceed OSH's immediate needs and should not seek to stockpile inventory to
continue acting as a Milwaukee distributor after the termination date. Due to the termination,
we reserve the right to require payment C.O.D., a letter of credit or similar security to assure
timely payment. All orders are subject to our approval.

If questions arise about new orders during the next 30 days, please direct them to me.

Regards,

Milwaukee Electric Tool Corporation

Darrell Hendrix
Senior Vice President of Sales