1
2
3
4                        UNITED STATES DISTRICT COURT
5                       NORTHERN DISTRICT OF CALIFORNIA
6
7    ORCHARD SUPPLY HARDWARE LLC,           Case No.  12-cv-06361-JST
               Plaintiff,
8
9          v.                              **ORDER GRANTING IN PART AND
                                           DENYING IN PART MOTION TO
10   HOME DEPOT USA, INC., et al.,         DISMISS THE SECOND AMENDED
                                           COMPLAINT**
               Defendants.
11                                         Re: ECF No. 54

12   **I.      INTRODUCTION**

13          Plaintiff Orchard Supply Hardware ("Plaintiff" or "Orchard") brings a Second Amended

14   Complaint ("SAC") against Defendants Home Depot USA, Inc., ("Home Depot"), Milwaukee

15   Electric Tool Corporation ("METCo") and Makita USA, Inc. ("Makita") (collectively,

16   "Defendants") for violations of Section 1 of the federal Sherman Act ("Sherman Act"), 15 U.S.C.

17   § 1, violation of California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 & 16726,

18   violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et*

19   *seq.*, tortious interference with existing contracts, tortious interference with prospective economic

20   relations, and false advertising in violation of both the federal Lanham Act, 15 U.S.C. § 1125, and

21   California Business & Profession Code § 17500.  ECF No. 53.  Defendants have filed a joint

22   motion to dismiss the SAC.  ECF No 54.  After considering the papers, and the arguments of the

23   parties at oral argument in response to the Court's tentative order, the Court GRANTS IN PART

24   and DENIES IN PART the motion to dismiss.

25   **II.     BACKGROUND**

26          **A.      Factual Background**

27          For the purposes of a motion to dismiss, the Court adopts the following factual allegations

28   from the SAC.

United States District Court
Northern District of California

Plaintiff owns and operates a chain of 92 all-purpose general hardware stores throughout California and Oregon, and is a retail competitor of Defendant Home Depot.[1]  SAC, ¶¶ 1 & 13. Defendant Home Depot is currently the largest, and dominant, seller of hardware products in the United States.  Id., ¶ 105.  Defendants METCo and Makita are each suppliers of power tools that distribute their products to consumers through retail hardware stores such as Plaintiff Orchard and Defendant Home Depot.  Id., ¶¶ 14 & 17.  Collectively, Defendants METCo and Makita control between 31 and 50 percent of the market share of various power tools, and are specially regarded among tradesmen and other professional customers.  Id., ¶¶ 15 & 26.  Plaintiff Orchard and Defendant Home Depot both do business with these two suppliers.  Id., ¶¶ 14 & 17.  METCo and Makita account for two of the three product lines that account for a "predominate [sic] share of the sales of professional power tools in the United States." Id. ¶ 31.  A retail hardware seller cannot remain a viable business in the power tool or related markets if it lacks tools made by both METCo and Makita.  Id. ¶ 15.[2]

On June 7, 2012, Home Depot executive Craig Menear publicly announced that Defendant Home Depot "would take appropriate measures to answer competitive threats . . . [and] lock down the supply of professional power tools."  Id. ¶ 139.  Within a week, Defendant Makita gave notice that it would stop selling power tools to Orchard.  Id., ¶¶ 18, 140.  Two weeks later, Defendant METCo also informed Orchard that it "would cease to make further sales of any of its products to Orchard."  Id., ¶¶ 18, 142.  Another power tool supplier, Black & Decker Dewalt ("Black & Decker"), disclosed to Plaintiff that Defendant Home Depot had also requested that Black & Decker refuse to deal with Orchard, but that Black & Decker had refused.  Id. ¶ 144.  In response,

---

[1] Orchard operates 90 stores in seven geographic markets in California, ("Central" Region, "Central-South Coast/Los Angeles County" Region, "East Bay" Region, "Monterey Bay" Region, "Orange County" Region, "San Francisco Peninsula" Region, "Silicon Valley" Region) as well as two stores in Oregon ("Portland" region).  Id., ¶ 147.

[2] The power tool market Orchard refers to is one that contains seven professional-grade power tools.  METCo, Makita and Black & Decker are the three leading suppliers of the full line of professional power tools.  Id. ¶¶ 15, 31 & 70.

1    Black & Decker claims that Defendant Home Depot has lessened its purchases of Black & Decker

2    products and begun placing them in disadvantageous locations in its retail outlets.  Id.  Around the

3    same time, Defendants Makita and METCo each also informed Amazon that it would no longer

4    make further sales to that company, and instructed its distributors not to fill any orders placed by

5    Amazon.  Id., ¶ 145.  Defendants Makita and METCo also instructed national wholesale

6    cooperatives to have their members "cease to fill 'third-party orders'" of their products.  Id.  In the

7    1990s, METCo and Makita ended their relationships with other companies, such as Lowes and

8    Menards, in relatively simultaneous fashion.  Id., ¶¶ 44 & 128.

9            In the "spring or early summer of 2012" Home Deport "stated or implied" to each of the

10   three major suppliers that it was conferring with the other suppliers about ceasing sales to Orchard

11   and other companies.  Id., ¶ 129.  Defendants METCo and Makita acceded to Home Depot's

12   demand to supply products exclusively to Home Depot, despite having previously indicated they

13   wished to continue and expand their sales to Orchard and other suppliers.  Id., ¶¶ 18, 20.  Both

14   companies "cannot afford to cross" Home Depot, their principal trading partner.[3]  Id., ¶ 22.

15   However, most professional customers will consider a hardware provider "deficient" if it does not

16   carry the products of either of these two companies.  Id., ¶ 32.  Therefore, Home Depot's threats to

17   remove suppliers' products were hollow unless at least one supplier agreed to the requested

18   arrangement.  Id., ¶ 48.  Similarly, no supplier would voluntarily give up their relationship with

19   Orchard if there was no true risk to its relationship with Home Depot.  Therefore, Orchard alleges

20   upon information and belief that Home Depot "made clear by express and/or implied statements to

21   Makita and [METCo]" that it was conferring with the other company, and Defendants METCo

22   and Makita understood from Home Depot that the other company would also abandon sales to

23   Orchard and Amazon around the same time.  Id., ¶ 43, 199.  Two of Orchard's officers were

24   formerly executives at Home Depot, and they claim the company would never make explicit

25   illegal threats, but rather "adroitly suggest or insinuate" to the suppliers that it was conferring with

26   the company's other suppliers.  Id., ¶ 47.

27   ──────────────────

28   [3] Black & Decker, the third major supplier of "professional" power tools, is not similarly
     dependent on Home Depot for sales.  Id.  ¶ 49.

United States District Court
Northern District of California

1     Finally, Plaintiff alleges that Defendant Home Depot engaged in false advertising.  Id.,

2  ¶¶ 244 & 257.  "Several of Home Depot's stores at various locations in Southern California"

3  displayed promotions and advertisements suggesting that Orchard charges more than Home

4  Deport for the same products.  Id. ¶ 244.  In fact, the products depicted were not actually the same,

5  and differed in quality and manufacturer.  Id. ¶¶ 246-249.

6         **B.    Procedural History**

7     Plaintiff filed a complaint in December 2012, asserting causes of action for violation of the

8  Sherman Act, the Cartwright Act and the UCL, and for tortious interference with existing

9  contracts and tortious interference with prospective economic relations.  "Original Complaint,"

10 ECF No. 1.  The Court granted Defendants' motion to dismiss the initial complaint in April 2013,

11 and granted Plaintiff leave to file an amended complaint to allege additional facts to support the

12 claims in the Original Complaint.  Order Granting Motion to Dismiss without Prejudice ("Order"),

13 ECF No. 42.

14     In May, Plaintiff filed a first amended complaint re-asserting its initial claims, and the

15 Court granted the parties' stipulated request to allow Plaintiff leave to file a second amended

16 complaint adding claims for false advertising.  ECF Nos. 45 & 51.  Defendants then filed a motion

17 to dismiss the SAC, which the Court now considers.  Motion.

18        **C.    Jurisdiction**

19     Plaintiff's first two causes of action arise under federal law, Section 1 of the Sherman

20 Antitrust Act.  15 U.S.C. § 1.  The Court has exclusive jurisdiction over those claims pursuant to

21 Section 4 of the Clayton Act.  15 U.S.C. § 15.  Since the third through seventh causes of action

22 arise from the same "nucleus of operative fact" as the Sherman Act claims, this Court can, and

23 hereby does, exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(a).

24     Plaintiff's eighth cause of action arises under federal law, the Lanham Act, and therefore

25 subject-matter jurisdiction is proper pursuant to 28 U.S.C. § 1331.  Since the ninth cause of action

26 arises from the same "nucleus of operative fact" as that claim, supplemental jurisdiction is also

27 appropriate.

28

United States District Court
Northern District of California

4

United States District Court
Northern District of California

#### D.      Legal Standard

"Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).  Dismissal is also proper where the complaint alleges facts that demonstrate that the complaint is barred as a matter of law.  See Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990); Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980).

For purposes of a motion to dismiss, "all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." Cahill v. Liberty Mut. Ins. Co., 80 F.3d 336, 337-38 (9th Cir. 1996).  However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a Plaintiffs' obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  To survive a motion to dismiss, a pleading must allege "enough fact to raise a reasonable expectation that discovery will reveal evidence" to support the allegations.  Id. at 556.

### III.    DISCUSSION

#### A.      Sherman Act

Section 1 of the Sherman Act prohibits "unreasonable restraints" of trade.  State Oil Co. v. Khan, 522 U.S. 3, 10 (1997).  "[T]he accepted standard for testing whether a practice restrains trade in violation of § 1" is the "rule of reason." Leegin Creative Leather Products, Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007).  As an alternative, a plaintiff can also allege that a restraint is one that has already been "deemed unlawful *per se*." Khan, 522 U.S. at 10.  Plaintiff pursues both theories in the SAC.

##### 1.      *Per Se* Violation: Unlawful Group Boycott

An unlawful group boycott is one type of *per se* violation of Section 1.  NYNEX Corp. v. Discon, Inc. ("Discon"), 525 U.S. 128, 134-36 (1998).  In order to establish an unlawful group boycott, Plaintiff must establish, *inter alia*, the existence of a horizontal arrangement between

5

METCo and Makita to jointly participate in the boycott. Id., 525 U.S. at 135. "The crucial question" is whether METCo and Makita's conduct "stemmed from independent decision or from an agreement, tacit or express." Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540 (1954); see also Discon, 525 U.S. at 136. It would not be a *per se* violation for Home Depot to seek and obtain an exclusive distributorship agreement with a provider. See id. at 136-37; see also Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761 (1984) ("[a] manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently").

Plaintiff does not argue in the SAC or in its opposition to the motion to dismiss that Makita and METCo communicated directly with each other. Instead, in the parlance of antitrust law, Plaintiff argues that Defendant Home Depot formed a "hub" connecting two "spokes" -- Milwaukee and METCo -- into a horizontal arrangement. Opposition of Orchard Supply Hardware LLC to Defendants' Joint Motion to Dismiss its Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Opp."), ECF No. 55, at 3:1-10. A hub-and-spoke relationship can establish a horizontal arrangement, but there still must be a "rim": an at-least-tacit understanding between the horizontal competitors that each would participate in the boycott.

This Court dismissed Plaintiff's original complaint because it lacked factual allegations that Defendants Makita or METCo had an arrangement with each other, tacit or otherwise. Order, at 5:1-2. The initial complaint failed to plead facts sufficient to give rise to a plausible inference that Makita and METCo engaged in illegal coordination as opposed to "merely parallel conduct that could just as well be independent action." Id., at 5:12-15 (quoting Twombly, 550 U.S. at 557). A complaint alleging an unlawful group boycott need not allege specific communications amongst conspirators, and circumstantial evidence can establish an antitrust conspiracy. See id., at 6:23-26. The Court noted, however, that "considerably more than the allegations in the Complaint" was required before an illegal agreement could be inferred, and cited multiple cases in which plaintiffs had successfully pled antitrust conspiracies by alleging certain "parallel plus" behavior that gave rise to such an inference. Id., at 7:1-8. These so called "plus factors" are sufficient to sustain a claim of a "hub and spoke" conspiracy if they place the parallel behavior in

6

a context that raises the "suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  In re Text Messaging Antitrust Litigation, 630 F.3d 622, 627 (7th Cir. 2010).  A complaint of antirust conspiracy should allege "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties".  Twombly, at 556, n.4 (quoting 6 Areeda & Hovenkamp, Antitrust Law ¶ 1425, at 167–185 (2d ed. 2003)).  A conspiracy is not inferable from an "obviously reasonable [response] to a common external stimulus or business problem."  6 Areeda & Hovenkamp, Antitrust Law, ¶ 1425 at 182 (3rd. ed. 2010).

In the SAC, Plaintiff alleges facts that it argues give rise to the inference of coordinated behavior between METCo and Makita.  SAC, at ¶¶ 44-49.  In its opposition, Orchard lists seven specific "plus factors": 1) confirmation from Black & Decker that Home Depot approached other suppliers; 2) Makita and METCo's past history of shutting off supplies to Home Depot's rivals in lockstep; 3) Home Depot's public announcement of its plan to lock up suppliers; 4) the fact that Makita and METCo's conduct was contrary to their own interests; 5) Orchard officers' inside knowledge of Home Depot's strategy; 6) the fact that METCo and Makita operate in a product market dominated by three suppliers; and 7) Makita and METCo's simultaneous implementation of identical complex arrangements. Opp., at 9:14-13:28.

Most of these factors were alleged in the initial complaint and discussed in the last motion to dismiss.  In particular, the Original Complaint emphasized the argument that Makita and METCo's action was against their economic self-interest.  The SAC contains no new facts demonstrating why this is so.  While those two companies may have wanted to continue their relationships with Orchard, the complaint makes it clear that Makita and METCo are "extraordinary[ily] dependen[t] on continued good relations with Home Depot".  SAC, at ¶ 49.  Orchard even acknowledges that the degree of dependency is so great that the suppliers "could not afford to reject [Home Depot's] demands." Id., ¶ 51.  Either company stood to benefit significantly from becoming Home Depot's sole supplier of professional power tools, if Home Depot went through on its threat to exclude non-conforming suppliers.

7

United States District Court
Northern District of California

1    Orchard points out that Home Depot publicly announced its intention to lock up suppliers

2 and then approached all three of its professional power tool suppliers to secure commitments to do

3 so.[4]  Given this, and the fact that METCo and Makita were totally dependent on Home Depot,

4 Orchard gives no sufficient explanation for why METCo and Makita's decision to implement

5 identical arrangements with their own distributors and partners is not simply a reflection of the

6 suppliers' response to the "common stimuli" of Home Depot's demand.  Nor does Orchard

7 suggest why the past instances of METCo and Makita simultaneously ending relationships with

8 other Home Depot competitors were not responses to common demands from Home Depot at that

9 time.

10    The remaining "plus factors" likewise fail to create a plausible inference of coordinated

11 behavior.  First, Orchard's "inside" knowledge of Home Depot's strategy and course of business

12 provides little support.  Orchard does no more that allege that two employees, who last worked at

13 Home Depot over a decade ago, "surmised" that Home Depot would have subtly communicated to

14 METCo and Makita what the other suppliers were doing.  Opp., at 6:1.  Second, as the Court

15 explained in its order dismissing the original complaint, the fact that the market for professional

16 tools is dominated by three suppliers "does not indicate the two announcements probably would

17 not have been independent responses to the common stimulus of Home Depot's [demand]."

18 Order, at 6:20-22.  Altogether, the SAC's allegations do not "nudge" the claim of coordinated

19 behavior "across the line from conceivable to plausible."  Twombly, 550 U.S. at 570.

20    At the hearing on the motion, and in its opposition brief, Orchard's counsel primarily relies

21 on a set of new allegations that Makita and METCo cut off their supplies to online seller Amazon,

22 directed their distributors not to make sales to Orchard, and directed their distributors and

23 members of wholesale cooperatives not to make sales or fill third party orders for Amazon.  See,

24 e.g., SAC, ¶¶ 19, 24; Opp., at 4:6-6:8.  Orchard argues that it has sufficiently pled a *per* se antitrust

25

26 ────────────────

27 [4] Notably, Orchard alleges that Black & Decker has come forward to confirm that it was
approached, threatened, and punished by Home Depot, but does not allege that Home Depot ever
implied to Black & Decker that it should end its relationship with Orchard because METCo and

28 Makita were going to do so as well.

8

violation because these alleged facts demonstrate "a wide combination consisting of manufacturers, distributors and a retailer." Discon, 525 U.S. at 136 (quoting Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 213 (1959). But as Orchard itself acknowledges in its brief, Discon specifically held that "precedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors." Discon, 525 U.S. at 135; see also Opp., at 5:3. Makita and METCo's arrangements with its distributors and with wholesale cooperators are vertical agreements. Alleging these types of agreements does not state a horizontal group boycott claim.

The SAC does not allege facts sufficient to state a claim of a *per se* violation of section 1.

### 2.    "Rule of Reason" Violation

As an alternative to its claim of a *per se* violation, Plaintiff argues that the facts support a viable Section 1 claim under the rule of reason. Under the rule of reason, a court must determine whether a restraint on trade constitutes an "unreasonable restraint on competition . . . taking into account "specific information about the relevant business" and "the restraint's history, nature, and effect." Leegin, 551 U.S. at 885 (2007) (internal citations omitted). To establish a rule of reason violation a plaintiff must plead "(1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1197 (9th Cir. 2012) cert. denied, (U.S. 2012) 133 S.Ct. 573. Generally, a plaintiff must also allege sufficient facts to support its claim that the restraint in question harmed competition within a relevant geographic and product market. Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1044 (9th Cir. 2008). Defendants argue that Orchard has failed to meets its burden to plead facts sufficient to establish any of these elements.

### a.    The Restraint of Trade

To the extent the complaint rests upon the allegation of a horizontal agreement between Defendants Makita and METCo, it is insufficient for the same reasons discussed above. But Plaintiff has also pled facts suggesting the existence of two vertical agreements (between Home

United States District Court
Northern District of California

1    Depot and METCO and between Home Depot and Milwaukee) that could be unreasonable

2    restraints of trade under the rule of reason.  SAC, ¶¶ 17 & 18.

3         Defendants object that Plaintiff has not alleged this type of antitrust violation in the SAC,

4    and that both of Plaintiff's antitrust claims are predicated on the existence of a coordinated

5    horizontal group boycott.  Motion, at 10:20-11:1.  Defendants base this assertion on the heading of

6    the SAC's second cause of action, which reads "Unlawful Group Boycott; Rule-of-Reason

7    Violation and Quick Look Violation."  SAC, above ¶ 202.  The SAC could certainly be clearer on

8    this point, but in this and past motion practice Plaintiffs do not appear to have abandoned the

9    argument that the vertical agreements themselves could constitute illegal restraints of trade.  See

10   Opp., at 18:8-12, 19:1-27; see also Transcript of Proceedings, ECF No. 44, at 23:8-22, 30:25-

11   31:24.  Were it otherwise, the two causes of action would be simply redundant.  There would be

12   no need to prove the various elements of a rule-of-reason violation if Plaintiffs had alleged

13   sufficient facts to state a claim for a horizontal group boycott, since that arrangement is a *per se*

14   Section 1 violation.

15                    **b.    Injury to Competition within a Product Market**

16        To state a rule-of-reason claim, a plaintiff must show "an injury to competition, rather

17   than just an injury to plaintiff's business."  Sicor, Ltd. v. Cetus Corp., 51 F.3d 848, 854 (9th Cir.

18   1995).  "In order successfully to allege injury to competition . . . a claimant must, at a minimum,

19   sketch the outline of the antitrust violation with allegations of supporting factual detail."  Les

20   Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n, 884 F.2d 504, 507-08 (9th Cir. 1989).  "Ordinarily,

21   the factual support needed to show injury to competition must include proof of the relevant

22   geographic and product markets and demonstration of the restraint's anticompetitive effects within

23   those markets."  Id. at 508.

24        In its original complaint, Orchard alleged in a general way that Home Depot would be able

25   to charge higher prices and deprive consumers of choice as a result of its agreements, arguing that

26   this was "the very kind of harm to competition that lies at the heart of a rule-of-reason offense."

27   Original Complaint, at ¶¶ 20 & 166.  The Court held that these generic allegations were

28   insufficient to plead a viable injury to competition, noting, *inter alia*, that there were no

United States District Court
Northern District of California

10

1   allegations that the agreement facilitated horizontal collusion or foreclosed competitors from

2   entering into or competing in a market.  Order, at 9:5-7 (citing Brantley, 675 F.3d 1192, 1202 (9th

3   Cir. 2012) cert. denied, 133 S. Ct. 573 (U.S. 2012).

4        In the SAC, however, Orchard has alleged that the agreements are foreclosing competitors

5   from competing in a specific product submarket: the market for certain specific professional

6   power tools, as purchased by professional customers.  SAC, ¶¶ 30-31, 66, 151-63.  The SAC

7   alleges that there is little or no cross-elasticity of demand among the products identified in the

8   complaint, and that the majority of professional customers will view a store as "deficient" if it

9   does not carry a full line of both METCo or Makita tools, resulting in those customers ceasing to

10  purchase any products at that store.  SAC, ¶¶ 32, 87-88.  Orchard alleges that professional

11  customers only consider a shopping at a relatively small number of hardware outlets, that only a

12  few of those sellers compete with Home Depot on price, and that the challenged agreements

13  therefore completely foreclose those outlets from competing for professional customers.  Id., ¶¶

14  14-16, 35(2), 69-88, 109, 156, 171-73, 175-76, 184, 191.

15       "The outer boundaries of a product market are determined by the reasonable

16  interchangeability of use or the cross-elasticity of demand between the product itself and

17  substitutes for it."  Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962).  "However, within

18  this broad market, well-defined submarkets may exist which, in themselves, constitute product

19  markets for antitrust purposes."  Id.  Among the "'practical indicia' of an economically distinct

20  submarket" are the following: "'industry or public recognition of the submarket as a separate

21  economic entity, the product's peculiar characteristics and uses, unique production facilities,

22  *distinct customers, distinct prices*, sensitivity to price changes, and specialized vendors.'"

23  Newcal, 513 F.3d at 1045 (quoting Brown Shoe, 370 U.S. at 325) (emphases added).  The market

24  Orchard alleges in the SAC is defined by a distinct set of products, and within that market Orchard

25  alleges that there is a distinct submarket as indicated by a distinct set of purchasers, sensitive to a

26  distinct price point.  Within this submarket, Orchard alleges that the challenged agreements have

27  the effect of totally foreclosing competition.  These allegations suffice to outline a defined

28  submarket in which Orchard has pled harm to competition.

United States District Court
Northern District of California

11

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

     Part of the difficulty with this area of analysis is that "injury to competition" and "injury to the plaintiff's business" are distinct but also significantly overlapping categories.  That a business suffers harm does not mean competition has also been harmed.  But if a company suffers a harm that excludes it from competing in a market, it will often argue that the harm it suffers will affect the marketplace and cause harm to competition.  The Ninth Circuit's recent decision in Gorlick Distribution Centers, LLC v. Car Sound Exhaust System, Inc., ___ F.3d ___, Case No. 10-36083, 2013 WL 3766902 (9th Cir. July 19, 2013) sheds some light on this distinction.

     In Gorlick, plaintiff Gorlick alleged that car parts supplier Car Sound Exhaust System offered preferential terms to Allied, Gorlick's rival in the aftermarket automotive parts market. Id., 2013 WL 3766902, at *1.  Gorlick alleged that this act harmed competition because Gorlick and Allied together account for 70% of the aftermarket automotive exhaust products market in Oregon and Washington, and so any practice that harms Gorlick automatically gives Allied increased market power and hurts competition.  Id. at *5.  In rejecting this argument, the court noted that it might have held otherwise if it were only concerned with the market for *Car Sound's* specific products, rather than the wider market for aftermarket automotive exhaust products.  Id. Although Allied's favorable terms might have foreclosed Gorlick from selling Car Sound products, there were many other manufacturers who made similar products.  "Absent an allegation that Car Sound was the only, or even the dominant, brand of automotive exhaust parts, the supposed arrangement between Car Sound and Allied doesn't affect competition in the relevant market."  Id.

     The allegations that the Ninth Circuit noted were missing in Gorlick are the allegations Orchard has made in its complaint.  Orchard has alleged that METCo and Makita (combined) are the dominant brands of professional power tools.  It also has alleged that the submarket for the specified power tools, as purchased by professional customers seeking the lowest prices, is the sort of limited market that the automotive exhaust products market is not.  On the facts of the complaint, Home Depot's agreements shut competitors out of this specific submarket in the way that the Ninth Circuit noted that Allied was not shut out of the broader aftermarket automotive exhaust products market.

United States District Court
Northern District of California

1    Defendants argue that Orchard has failed to allege harm to competition because it has

2    alleged neither a reduction in the output or quality of goods, and has not demonstrated an increase

3    in price caused by Orchard's foreclosure from the market.  Motion, 16:5-8.  But these are not

4    always necessary to prove harm to competition.

5    An antitrust plaintiff need not demonstrate that prices have actually been raised to plead a

6    rule-of-reason claim.  In <u>F.T.C. v. Indiana Federation of Dentists</u>, 476 U.S. 447, 452 (1986), for

7    example, the Federal Trade Commission found that a dental association rule which forbid

8    members from submitting x-rays to insurance carriers in connection with insurance claims was an

9    unreasonable restraint on trade.   Dental insurance companies sought the x-rays in order to limit

10   their payment to the least expensive adequate method of treatment, a tactic designed to keep dental

11   treatment costs down as policyholders demanded.  <u>Id.</u> at 449.  The Supreme Court upheld the

12   F.T.C.'s finding that this constituted harm to competition, despite the lack of direct impact on the

13   price patients paid for dental insurance.

14        A refusal to compete with respect to the package of services offered
          to customers, no less than a refusal to compete with respect to the
15        price term of an agreement, impairs the ability of the market to
          advance social welfare by ensuring the provision of desired goods
16        and services to consumers at a price approximating the marginal
          cost of providing them.  Absent some countervailing procompetitive
17        virtue . . . such an agreement limiting consumer choice by impeding
          the ordinary give and take of the market place cannot be sustained
18        under the Rule of Reason.

19   <u>Id.</u> at 459 (internal citations omitted).  While <u>Indiana Federation</u> is factually distinguishable from

20   this case, the point is that a plaintiff does not need to prove that prices have actually been raised to

21   plead harm to competition.

22        Defendants also object that the SAC contains insufficient allegations that defendants

23   actually had market power in the relevant submarket, and that therefore it has not validly pled

24   harm to competition.  Citing <u>Newcal</u>, Defendants argue that a "plaintiff must allege both that a

25   'relevant market' exists and that the defendant has power within that market."  513 F.3d at 1044.

26   <u>Newcal</u> went on to state that "[t]here is no requirement that these elements of the antitrust claim be

27   pled with specificity," and that "unless it is apparent from the face of the complaint that the

28   alleged market suffers a fatal legal defect," "alleged markets may survive scrutiny under Rule

13

12(b)(6) subject to factual testing by summary judgment or trial." Id.  The Court can plausibly infer from the allegations of the complaint that Defendant Home Depot has significant market power in the defined submarkets at issue.

Finally, Defendants note that the SAC fails to specifically define *Orchard*'s market power within the submarket.  Therefore, they argue that Orchard has not demonstrated that its foreclosure from the market will harm competition, and also that Orchard has not pled its own antitrust injury.  Given the allegations that the agreements completely foreclosed previously existing competition within a specific product submarket, the Court can plausibly infer harm to competition without requiring Orchard to plead the specific percentage of market power that it, and other Home Depot competitors, previously held.  The Court can also infer that Orchard has lost profits and suffered damages as a result of the challenged agreements, sufficient to allege antitrust injury.  See SAC, ¶¶178-87.

In a motion for summary judgment or at trial itself, it will fall to Orchard to prove the allegations in the complaint.  See McDaniel v. Appraisal Institute 117 F.3d 421, 423 (9th Cir. 1997).  However, since at this stage the Court must take Orchard's allegations as true, Plaintiff has sufficiently pled harm to competition.

### c.       Aggregation of Harm to Competition

Defendants also argue that Plaintiff has not alleged any facts showing the individual anticompetitive effect of each separate vertical agreement.  Defendants argue that the Court cannot consider the aggregate effect of both agreements in evaluating the rule of reason claims.

At oral argument, Defendants' counsel acknowledged that there is no in-circuit precedent that clearly prohibits a plaintiff from aggregating the anticompetitive effects of multiple agreements to make an allegation of an unreasonable restraint of trade.  Defendants instead rely heavily on Dickson v. Microsoft Corp., 309 F.3d 193 (4th Cir. 2002).  In that case the plaintiff "alleged discrete conspiracies between Microsoft and two original equipment manufacturers (OEMs): Dell and Compaq." Id. at 210.  The Fourth Circuit held that the complaint "did not allege a conspiracy among Microsoft and all OEMs; it alleged discrete conspiracies between Microsoft and Compaq and Microsoft and Dell." Id.  Therefore, the court "could not consider the

1   cumulative harm of Microsoft's agreements with all OEMs but instead was required to consider –

2   individually – Microsoft's agreements with Compaq and Dell." Id.

3          The Ninth Circuit addressed the question of aggregation, and the reach of Dickson, in

4   William O. Gilley Enterprises, Inc. v. Atl. Richfield Co., 561 F.3d 1004, 1010-12 (9th Cir. 2009)

5   ("Gilley I"), opinion withdrawn and superseded, 588 F.3d 659 (9th Cir. 2009) In that case, the

6   district court dismissed a Section 1 complaint because "Plaintiffs failed to allege that the

7   [challenged] agreements, when considered individually, would be capable of producing significant

8   anticompetitive effects." William O. Gilley Enterprises, Inc. v. Atl. Richfield Co., 588 F.3d 659,

9   662 (9th Cir. 2009) ("Gilley II").

10         On appeal, the Ninth Circuit initially held that "the district court erred in not allowing

11  [Plaintiffs] to allege the cumulative effects of a single Defendant's . . . agreements." Gilley I, 561

12  F.3d at 1010.  The Ninth Circuit found that "Ninth Circuit and United States Supreme Court

13  precedent . . . has allowed the aggregation of multiple contracts when evaluating the legality of an

14  individual contract." Id. (citing Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d

15  1291 (9th Cir. 1982); Fortner Enters. v. United States Steel Corp., 394 U.S. 495, (1969); Standard

16  Oil Co. of Cal. & Standard Stations, Inc., v. United States, 337 U.S. 293 (1949); also quoting 2

17  Areeda & Hovenkamp ¶ 310c1, p. 201 ("An aggregation of claims may produce sufficient proof of

18  violation or injury where violation requires that a certain legal threshold be met and no claim

19  standing alone is sufficient to meet the threshold.")).  The Ninth Circuit read Dickson as holding

20  only that "because the plaintiff did not allege the cumulative effect of . . . [the agreements] in the

21  complaint, the Fourth Circuit declined considering their aggregate effects." Id.  The Ninth Circuit

22  then held that "Dickson is distinguishable from the present case, as the plaintiffs here do expressly

23  allege that each Defendant's agreements considered in the aggregate have anticompetitive effects."

24  Id.  (So, too, does the plaintiff in this case.  See, e.g., SAC, ¶ 64.)

25         The Ninth Circuit later withdrew Gilley I, after concluding that the plaintiff's claims were

26  actually barred by res judicata, and that the dismissal should therefore be affirmed on that ground.

27  Gilley II, 588 F.3d at 668-69.  This Court does not cite the withdrawn Gilley opinion as precedent,

28  see Ninth Circuit Rule 36-3(a), but its reasoning is persuasive.  Dickson did not clearly hold that

United States District Court
Northern District of California

15

United States District Court
Northern District of California

1    aggregation is generally prohibited in rule of reason Section 1 claims.  The <u>Gilley I</u> court read

2    <u>Dickson</u> as holding only that antitrust plaintiffs must be held to the type of allegations pled in their

3    complaint.  This interpretation is consistent with the language the Fourth Circuit used.  <u>Dickson</u>

4    noted that the complaint "alleged discrete conspiracies," and stated that "[c]onsequently, the

5    district court correctly determined that it could not consider the cumulative harm" of the

6    agreements.  309 F.3d at 210 (emphasis added).

7           Even were this Court to read <u>Dickson</u> as Defendants do, it would still need to consider the

8    weight of in-circuit precedent, which leans away from disallowing aggregation in pleading Section

9    1 claims.  <u>See</u>, <u>e.g.</u>, <u>Twin City</u>, 676 F.2d 1291, 1302-03 (9th Cir. 1982); <u>Fortner</u>, 394 U.S. 495,

10   502 (1969); <u>see also</u> 2 Areeda & Hovenkamp ¶ 310c1, p. 201-02 (3d ed. 2010).[5]  In particular,

11   Defendants do not effectively distinguish <u>Twin City</u>, which specifically held that, "in assessing the

12   antitrust liability of a defendant, [a court] may look to the overall effects of a defendant's conduct

13   in the relevant market," rather than being "limited to looking at the market implications of the one

14   contract between the antitrust plaintiff and defendant."  676 F.2d at 1302.  In <u>Twin City</u>, The

15   Ninth Circuit affirmed the district court's decision to aggregate all of plaintiff's many contracts in

16   a market to arrive at a total market share of about 24 percent, instead of considering only the one

17   percent share of the market represented in one specific contract with defendant.  <u>Id.</u> at 1297-98.

18          As Defendants acknowledge, <u>Twin City</u> stands for the proposition that the "aggregation of

19   a single defendant's contracts may be appropriate when determining the anticompetitive impact of

20   that single defendant's conduct."  Defendants' Reply in Support of Motion to Dismiss Complaint

21   ("Reply"), ECF No. 56, at 10:10-14.  In assessing the anticompetitive impact of Defendant Home

22   Depot's overall conduct in entering into the two agreements, aggregation is appropriate.

23

24   [5] "[S]uppose that the defendant has entered into distinct tying or exclusive dealing contracts with
     four different purchasers. Each contract individually forecloses approximately 15 percent of the
25   market in question and thus would ordinarily be insufficient to establish a violation. However, in
     the aggregate the contracts foreclose approximately 60 percent of the market, which is more than
26   sufficient. In such a case it would clearly be improper for the court to examine each agreement
     with the same defendant separately, conclude that the agreement standing alone is insufficient to
27   establish illegality, and dismiss the complaint without considering the impact of the aggregation."
     2 Areeda & Hovenkamp ¶ 310c1, p. 201-02 (3d ed. 2010).
28

Defendants also place inappropriate weight on a negative inference from <u>Rebel Oil Co., Inc. v. Atl. Richfield Co.</u>'s holding that "[t]he aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to monopolize."  51 F.3d 1421, 1437 (9th Cir. 1995).  Defendants infer from this that a monopoly conspiracy is the *only* situation in which aggregation is permitted.  <u>Rebel Oil</u> did not hold as much.

As <u>Gilley I</u> noted, a "defendant who restrains trade by an obvious pattern and practice of entering into individual contracts should not be allowed to do piecemeal what he would be prohibited from doing all at once."  561 F.3d at 1010.  Under Defendants' interpretation, a company could reach separate agreements with eleven different suppliers, each of whom has a nine percent market share, locking up 99 percent of the market, and yet still be outside the reach of Section 1's prohibition of unreasonable restraints of trade.  Defendants' counsel clarified at oral argument that in their view, such an arrangement could not violate Section 1, and offered instead that such conduct could only be an attempted monopolization in violation of Section 2.  But the two sections are not mutually exclusive categories.  Although legally distinct, the "two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1." <u>Flintkote Co. v. United States</u>, 7 F.3d 870, 874 (9th Cir. 1993) (<u>quoting</u> <u>United States v. Socony–Vacuum Oil Co.</u>, 310 U.S. 150, 226, n. 59 (1940).

Aggregating the effect of the METCo-Home Depot agreement and the Makita-Home Depot agreement is appropriate for the purpose of showing the Defendant Home Depot's conduct was anticompetitive.  The Court agrees with Defendants, however, that it is inappropriate to aggregate the two vertical agreements in evaluating whether METCo and Makita's conduct was anti-competitive.  METCo and Makita each separately made an agreement with Home Depot.  Orchard does not contend that, taken individually, these contracts have an anticompetitive effect.  "A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."  <u>Monsanto</u>, 465 U.S. at 761.  If an individual supplier could be held liable for the cumulative impact of all suppliers' conduct, a company would have to investigate what other businesses were doing before it acted in order to make sure its own conduct wasn't anticompetitive, a burden the antitrust law does not impose.

17

1    Because Orchard has not pled any facts about either agreement individually, it cannot meet

2    its burden to prove those agreements are anti-competitive.  Therefore, the Rule of Reason claims

3    against METCo and Makita must be dismissed.

4                              d.       Scope of the Geographic Market

5        In order to plead a viable claim of a rule of reason violation, Plaintiff must allege sufficient

6    facts to support its claim that these agreements harmed competition with a relevant geographic and

7    product market.  Newcal, 513 F.3d at 1044.  As previously stated,  "the validity of the 'relevant

8    market' is typically a factual element rather than a legal element, alleged markets may survive

9    scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial."  Id. at 1045.

10   Plaintiff has adequately pled a relevant product market: the market for seven professional grade

11   power tools.  SAC ¶¶ 151-163.

12       The Court determined that the definition of the relevant geographic market in the original

13   complaint was unacceptably vague and conclusory, and dismissed the rule of reason claim on that

14   basis.  Order, at 8:14-16.  In the SAC, Orchard has provided substantially more allegations about

15   the geographic markets.  SAC, at ¶¶ 147-150.  Orchard's stores are organized into seven different

16   markets in California, and one in Oregon, with the total number of stores in each market also

17   provided.  Id. ¶ 147.  Defendants argue that Orchard has still not met its burden because it must

18   allege both the relevant market and that the defendants have market power within each market.

19   Plaintiff has alleged that Defendants have market power generally in the United States, and has

20   alleged sufficient facts from which the Court can plausibly infer that Home Depot has market

21   power within each of these smaller markets.  This is sufficient under the liberal reading of the

22   complaint required under Rule 12(b)(6).  See Cahill, 80 F.3d at 337.

23       For the reasons stated above, Orchard has adequately pled a claim against Home Depot for

24   a rule of reason violation of section 1 of the Sherman Act, but has not pled that claim against

25   Makita and METCo.

26           B.       Cartwright Act

27       The Cartwright Act, California's antitrust law, was "modeled after the Sherman Act," and

28   therefore the Court's analysis "mirrors the analysis under federal law."  County of Tuolumne v.

United States District Court
Northern District of California

18

1    Sonora Community Hosp., 236 F.3d 1148, 1160 (9th Cir. 2001).  The parties agree that the

2    Plaintiff's ability to bring a claim under the Cartwright act is dependent on its ability to bring a

3    viable Sherman Act Claim.  Opp., at 24:9-11; Reply, at 13:12-14.  The Court has determined that

4    Plaintiff has a viable rule of reason claim under section 1 of the Sherman Act with respect to

5    Home Depot, but not with respect to METCo or Makita.  Accordingly, Plaintiff has stated

6    sufficient facts to establish a viable Cartwright Act claim against Home Depot, but not the other

7    two Defendants.

8         **C.    Unfair Competition Law**

9         California's Unfair Competition Law ("UCL") prohibits both "unlawful" and "unfair"

10   business practices.  Cal. Bus. & Prof. Code §§ 17200 et seq.  Plaintiff can only assert an

11   "unlawful" practice insofar as it can assert violations of other laws.  See AT&T Mobility LLC v.

12   AU Optronics Corp., 707 F.3d 1106, 1107, n.1 (9th Cir. 2013).  Moreover, acts permissible under

13   antitrust laws "cannot be deemed 'unfair' under the unfair competition law," at least not where a

14   plaintiff alleges that the acts are unfair for the same reason it argues that they violate antitrust law.

15   Chavez v. Whirlpool Corp., 93 Cal. App. 4th 363, 375 (2001).  In its opposition, Plaintiff does not

16   argue that the pled facts support a viable UCL claim except insofar as they support viable Sherman

17   and Cartwright Act violations.  Opp., at 24:9-12.

18        Therefore, for the same reasons as explained above, the Complaint states sufficient facts to

19   establish a viable UCL claim against Home Depot, but not METCo or Makita.

20        **D.    Tortious Interference with Existing Contracts**

21        To state a viable claim for tortious interference with existing contracts, a plaintiff must

22   plead:  (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this

23   contract; (3) defendant's intentional acts to induce a breach of the contractual relationship;

24   (4) actual breach of the contractual relationship; and (5) resulting damage.  Pacific Gas & Electric

25   Co. v. Bear Stearns & Co. 50 Cal.3d 1118, 1126 (1990).  The Court dismissed the claim for

26   tortious interference with existing contracts that was pled in the original complaint because

27   Plaintiff failed to plead the existence of any enforceable contracts.  Order, at 10:21-26.  In the

28   SAC, Plaintiff has alleged that Home Depot interfered with Orchard's Universal Terms and

United States District Court
Northern District of California

19

1    Conditions contract with both METCo and Makita, which allegedly required each supplier to

2    continue selling parts and accessories to Orchard for a ten-year period after it stopped selling any

3    given power tool to the company.[6]

4        Defendant argues that Plaintiff has failed both to adequately plead this claim because the

5    SAC fails to specifically allege that Orchard performed under the terms of the contract, and fails to

6    specifically allege that the contract was breached.  The Court disagrees, and believes that both of

7    these elements can be plausibly inferred from the facts in the SAC.  However, Defendant also

8    argues that Plaintiff has failed to allege that Home Depot *knew* of the relevant contracts, which is a

9    required element in the claim.  Plaintiff neither disputed this in its opposition brief, nor provided

10    any additional argument on the point at oral argument.  The Court therefore finds that Plaintiff has

11    not pled sufficient factual allegations to state a claim for tortious interference with existing

12    contracts.

       **E.**      **Tortious Interference with Prospective Economic Relations**

13

14        In contrast to the tort of interference with existing contracts, a plaintiff need not show a

15    specific enforceable contract in order to assert a claim for tortious interference with prospective

16    economic relations.  See Bed, Bath & Beyond, 52 Cal. App. 4th at 879.  However, Plaintiff must

17    show that the defendant's conduct is "wrongful apart from the interference itself."  Korea Supply

18    Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1153-54 (2003).  Since the SAC hinges its

19    allegations of wrongful conduct on the claimed antitrust violations, this allegation is sufficient to

20    state a claim against Home Depot, but insufficient to state a claim against METCo and Makita, for

21    the same reasons discussed *supra*.

22        **F.**      **Lanham Act**

23        In the SAC, Plaintiff brings a new claim for false advertising in violation of the Lanham

24    Act, 15 U.S.C. § 1125(a)(1)(B).  A plaintiff must prove five elements to demonstrate a Lanham

25    Act claim: (1) a false statement of fact in a commercial advertisement about a product; (2) the

26

27    [6] The SAC also alleged a claim based on tortious interference with Orchard's existing contractual
relationships with its customers, but Orchard has dropped this aspect of its claim.  Opp., at 24:13-

28    16.

*United States District Court*
*Northern District of California*

statement actually deceived substantial segment of its audience; (3) the deception is material;(4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement.  <u>Skydive Arizona, Inc. v. Quattrocchi,</u> 673 F.3d 1105, 1110 (9th Cir. 2012).

Defendants argue that Plaintiff has not alleged that Defendant caused the false statement to enter into interstate commerce because it alleges the advertisements were only in stores in Southern California.  But as defined in the Lanham Act, "commerce" refers to "all commerce which may lawfully be regulated by Congress."  15 U.S.C. § 1127.  "It is well settled that so defined 'commerce' includes intrastate commerce which 'affects' interstate commerce."  <u>Thompson Tank & Mfg. Co., Inc. v. Thompson</u>, 693 F.2d 991, 993 (9th Cir. 1982).  Plaintiff has alleged that Home Depot and Orchard compete with each other in multiple states, as well as against ubiquitous online realtors such as Amazon.  Defendants cite no case in which a court dismissed a complaint on similar facts.  While the alleged false advertisements were limited to one state, the Court can infer, reading the complaint liberally as it must, that the advertisements could affect interstate commerce.

Defendants also argue that Plaintiff has failed to plead the false advertising claim with particularity, as Rule 9(b) requires for claims grounded in fraud.  Defendant specifically faults the SAC's lack of information regarding the specific stores where these advertisements were displayed and the dates they were displayed.  The purpose of Rule 9(b) is to give defendants adequate notice of the charges being brought so they can defend against them, and to deter the filing of frivolous charges related to fraud.  <u>In re Stac Electronics Securities Litigation</u>, 89 F.3d 1399, 1405 (9th Cir. 1996).  The SAC includes a great deal of detail about the content of the advertisements in questions, including the serial numbers and prices of some of the relevant products.  <u>See</u>, <u>e.g.</u>, SAC, ¶ 246.  Orchard has also alleged these advertisements were located in Southern California stores.  Orchard's allegations are not generic or vague claims, and it has pled enough facts to put Home Depot on notice regarding the specific advertisements in question, and to describe the who, what, when, where and how of the alleged fraud.  Orchard has met its burden under Rule 9(b).

### G.    California False Advertising Law Claims

Plaintiffs also bring a new claim of false advertising under California's false advertising law, Cal. Bus. & Prof. Code. §§ 17500.  To state such a claim "it is necessary only to show that members of the public are likely to be deceived" by an advertisement.  Kasky v. Nike, Inc., 27 Cal.4th 939, 951 (2002).  Plaintiff has met this burden, and for the reasons discussed *supra*, it has satisfied the particularity requirement of Rule 9(b).

### H.    Leave to Amend

The Court does not grant Plaintiff leave to amend the SAC to re-assert the dismissed claims.  In deciding whether to grant leave to amend, a court considers whether "the amendment of the complaint would cause the opposing party undue prejudice, is sought in bad faith, constitutes an exercise in futility, or creates undue delay," as well as "whether plaintiff has previously amended his complaint." Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989).  The fourth and fifth factors can be dispositive on their own.  See Sisseton-Wahpeton Sioux Tribe of Lake Traverse Indian Reservation, N. Dakota & S. Dakota v. United States, 90 F.3d 351, 355-56 (9th Cir. 1996).  "The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." Ascon, 866 F.2d at 1160.

Plaintiff had a full opportunity to allege facts sufficient to state a claim after receiving the Court's guidance following the first motion to dismiss, and after a second motion it does not seem likely that Plaintiff will be able to state additional facts sufficient to plead the dismissed claims. The Court concludes that it would be futile to permit further amendment.

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motion to dismiss.  All claims against Defendants METCo and Makita are DISMISSED.  The first and sixth causes of action are DISMISSED WITH PREJUDICE.  The second, third, fourth, fifth, seventh, eighth and ninth causes of action against Home Depot remain.

//

//

United States District Court
Northern District of California

Defendant Home Depot shall file an answer to the Second Amended Complaint not later than thirty days from the date of this order.

**IT IS SO ORDERED.**

Dated:  September 19, 2013

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California